**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NATSOFT CORPORATION, UPDRAFT LLC,<br><br>Plaintiffs,<br><br>v.<br><br>HEXAWARE TECHNOLOGIES LIMITED, HEXAWARE TECHNOLOGIES, INC.<br><br>Defendants. | Case No. 1:25-cv-11517<br><br>Document Filed Electronically Under Seal Jury Demanded |

# COMPLAINT

Plaintiffs Natsoft Corporation ("Natsoft") and Updraft, LLC ("Updraft"; collectively with Natsoft, "Plaintiffs") file this Complaint for patent infringement, breach of contract, unjust enrichment (as an alternative to breach of contract), and intentional interference with prospective economic advantage against Hexaware Technologies Limited ("Hexaware Ltd.") and Hexaware Technologies, Inc. ("Hexaware Inc."; collectively with Hexaware Ltd., "Hexaware" or "Defendants") and allege as follows:

## I. NATURE OF THE ACTION

1. This is, *inter alia*, an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 100, *et seq*., arising out of Defendants' making, using, offering for sale, selling, and/or importing their modernization platforms/services/products, i.e., Defendants' platforms, services, or products relating to modernization of, e.g., computer applications or code, including but not limited to Defendants' "RapidX™", "Amaze®", and "Tensai®"/ATOP "platforms" (collectively, the "Accused Products") prior to expiration of U.S. Patent Nos. 8,640,106 (the "'106 patent"), 8,972,928 (the "'928 patent"), 8,972,948 (the "'948 patent"),

9,063,673 (the "'673 patent"), 9,778,916 (the "'916 patent"), 9,858,046 (the "'046 patent"), 10,664,243 (the "'243 patent"), 11,029,934 (the "'934 patent"), and 12,032,941 (the "'941 patent") (collectively, the "patents-in-suit").

2. This is also an action for Defendants' breach of its contract with Plaintiff Updraft at least through Defendants' improper use of Updraft's information to develop the Accused Products.

3. This is also an action for Defendants' unjust enrichment (as an alternative to breach of contract) and intentional interference with prospective economic advantage at least through Defendants' use of Plaintiffs' information to develop the Accused Products and compete with Plaintiffs in the market.

## II. THE PARTIES

### A. Plaintiffs

4. Plaintiff Natsoft is a privately owned corporation organized and existing under the laws of New Hampshire having its principal place of business at 27 Worlds Fair Dr., Somerset, NJ 08873.

5. Plaintiff Updraft is a limited-liability company organized and existing under the laws of Delaware having its principal place of business at 27 Worlds Fair Dr., Somerset, NJ 08873. Natsoft is the majority owner of Updraft.

6. Natsoft and Updraft are affiliates.

7. Natsoft and Updraft work together to offer for sale and sell services, including in the United States and within this judicial district, relating to automated extraction of business rules from computer code, automated testing of computer code, and automated modernization of computer code.

**B. Hexaware Defendants**

8. On information and belief, Defendant Hexaware Ltd. is a company organized and existing under the laws of the Republic of India having a principal place of business at the address: A Block, Bldg. No. 152, Millennium Business Park, T.T.C. Industrial Area, Sector - 3, Mahape, Navi Mumbai, Maharashtra 400710, India.

9. On information and belief, Defendant Hexaware Ltd. also has an office in the State of Illinois and within this district at the following address: 145 S Wells St. 15th Floor, Chicago, Illinois 60606, United States.

10. On information and belief, Hexaware Ltd. purports to be a global technology and business process services company that specializes in artificial-intelligence ("AI")-first solutions.

11. On information and belief, Defendant Hexaware Inc. is a company organized and existing under the laws of New Jersey having a principal place of business at Suite 600, 101 Wood Avenue South, Iselin, New Jersey 08830 and an office at 24th Floor, 185 Hudson Street, Jersey City, New Jersey 07302.

12. On information and belief, Defendant Hexaware Inc. has an office in the State of Illinois and within this district at the following address: 145 S Wells St. 15th Floor, Chicago, Illinois 60606, United States.

13. On information and belief, Hexaware Inc. is a wholly owned subsidiary of Hexaware Ltd.

14. On information and belief, Hexaware Ltd. has the following independent directors: Joseph McLaren Quinlan, Milind Sarwate, Sukanya Kripalu Anand, and Vivek Sharma.

15. On information and belief, Hexaware Ltd. has the following non-independent, non-executive directors: Sandra Horbach, Neeraj Bharadwaj, Julius Genachowski, Kapil Modi, Lucia De Soares, and Patrick McCarter.

16. On information and belief, Hexaware Inc. has the following independent directors: Michael W. Bender, Joseph McLaren Quinlan, Milind Sarwate, Sandra Horbach, Patrick McCarter, Julius Genachowski, Lucia Soares, Neeraj Bharadwaj, and Kapil Modi.

17. On information and belief, Hexaware Ltd. and Hexaware Inc. have an overlapping Board of Directors.

18. On information and belief, the Chief Executive Officer of Hexaware Ltd. is Mr. Srikrishna Ramakarthikeyan.

19. On information and belief, the Chief Executive Officer of Hexaware Ltd., Mr. Srikrishna Ramakarthikeyan, is also known as and referred to in public appearances as "R. Srikrishna" (e.g., "Hexaware CEO R Srikrishna Speaks On The Steady Q4 But Slack In Guidance" at https://www.youtube.com/watch?v=AxEowHHMCFA; "R Srikrishna, CEO, Hexaware Technologies" at https://www.youtube.com/watch?v=X0RcSX3F5dE).

20. On information and belief, Mr. Srikrishna Ramakarthikeyan is an Executive Director of the Board of Directors at Hexaware Ltd.

21. On information and belief, Mr. Srikrishna Ramakarthikeyan is an Executive Director of the Board of Directors at Hexaware Inc.

22. On information and belief, "R. Srikrishna" is designated as an agent for Hexaware Inc. for the purposes of service of process at the following address: Metro 101, Suite 600, 101 Wood Avenue South, Iselin, NJ, 08830.

23. On information and belief, "R. Srikrishna" designated as an agent for Hexaware Inc. for the purposes of service of process is the Chief Executive Officer of Hexaware Ltd., Mr. Srikrishna Ramakarthikeyan.

24. On information and belief, Hexaware Ltd. and Hexaware Inc. work in concert to

offer for sale and sell technology and business-process services in the United States, including in Illinois and this district.

25. On information and belief, such technology and business-process services include services relating to the Accused Products.

26. Hexaware Ltd. markets RapidX on its website at https://hexaware.com/platforms/rapidx/, accessible in the United States, including in Illinois and this district.

27. Hexaware Ltd. markets Amaze on its website at https://hexaware.com/platforms/amaze/, accessible in the United States, including in Illinois and this district.

Hexaware Ltd. markets Tensai/ATOP on its website at https://hexaware.com/platforms/tensai/, accessible in the United States, including in Illinois and this district.

28. On information and belief, Hexaware Inc. markets RapidX on the website https://hexaware.com/platforms/rapidx/, accessible in the United States, including in Illinois and this district.

29. On information and belief, Hexaware Inc. markets Amaze on the website https://hexaware.com/platforms/amaze/, accessible in the United States, including in Illinois and this district.

30. On information and belief, Hexaware Inc. markets Tensai/ATOP on the website https://hexaware.com/platforms/tensai/, accessible in the United States, including in Illinois and this district.

## III. JURISDICTION AND VENUE

31. The patent-infringement claims in this action arise under the patent laws of the United States, Title 35 of the United States Code. This Court has exclusive subject-matter jurisdiction of these claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

32. Hexaware Ltd. and Hexaware Inc. have, in concert, under Hexaware Ltd.'s

direction and control, committed patent infringement in this judicial district by making, using, offering for sale, selling, and/or importing the Accused Products and/or related technology in this judicial district prior to expiration of the patents-in-suit.

33. Hexaware Ltd. is subject to personal jurisdiction in Illinois and this judicial district because, among other things, Hexaware Ltd. itself, and through its agents, affiliates, and/or subsidiaries, including Hexaware Inc., purposefully availed itself of the benefits and protections of the laws of Illinois such that it should reasonably anticipate being subject to a cause of action in this Court.

34. Hexaware Ltd. is also subject to personal jurisdiction in Illinois and this judicial district because, on information and belief, it controls and dominates Hexaware Inc. and therefore the activities of Hexaware Inc. in this jurisdiction are attributable to Hexaware Ltd.

35. The breach-of-contract, unjust enrichment (as an alternative to breach of contract), and intentional interference with prospective economic advantage claims in this action arise under state law. However, under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over these state-law claims because the claims are so related to the patent claims in the action that they form part of the same case or controversy under Article III of the United States Constitution. This Court also has related-claims jurisdiction over these state-law claims pursuant to 28 U.S.C. § 1338(b) because these claims arise out of activity that is unfair competition.

36. This Court has personal jurisdiction over Defendant Hexaware Inc. for at least the following reasons: (1) Hexaware Inc. has consented to jurisdiction in this district via contract (*infra* ¶ 71); (2) Hexaware Inc has committed breach of contract, been unjustly enriched (as an alternative to breach of contract), and has committed intentional interference with prospective economic advantage in Illinois, including this district, by engaging in the activity described below with

respect to the development and marketing of the Accused Products; (3) Hexaware Inc. has an office in Chicago, Illinois, which is within this district; (4) Hexaware Inc. has committed acts of patent infringement in Illinois and this district by making, using, offering for sale, selling the Accused Products and/or related products and services in Illinois and this district, and/or importing the Accused Products into Illinois and this district; (5) Hexaware Inc. engages in other persistent courses of conduct and derives substantial revenue from products and/or services provided to its customers in Illinois and this district; and (6) Hexaware Inc. has purposefully established systematic and continuous contacts with Illinois and this district and should reasonably expect to be brought into Court here.

37. This Court has personal jurisdiction over Defendant Hexaware Ltd. for at least the following reasons: (1) Hexaware Ltd. has consented to jurisdiction in this district via contract (*infra* ¶ 71); (2) Hexaware Ltd. has at an office in Illinois and this district (identified above); (3) Hexaware Ltd. has committed acts of patent infringement in Illinois and this district making, using, offering for sale, selling the Accused Products and/or related products and services in Illinois and this district, and/or importing the Accused Products into Illinois and this district; (4) Hexaware Ltd. has committed breach of contract, been unjustly enriched (as an alternative to breach of contract), and has committed intentional interference with prospective economic advantage in Illinois and this district by engaging in the activity described below with respect to the development and marketing of the Accused Products; (5) Hexaware Ltd. engages in other persistent courses of conduct and derives substantial revenue from products and/or services provided to its customers in Illinois and this district; (6) Hexaware Ltd., itself and through its subsidiary Hexaware Inc., has purposefully established systematic and continuous contacts with Illinois and this district and should reasonably expect to be brought into Court here; and

(7) Hexaware Ltd. controls Hexaware Inc. and therefore Hexaware Inc.'s activities in Illinois and this district are attributed to Hexaware Ltd.

38. Alternatively, this Court has personal jurisdiction over Hexaware Ltd. under Federal Rule of Civil Procedure 4(k)(2)(A) because (a) Plaintiffs' patent claims arise under federal law; (b) Hexaware Ltd. is a foreign defendant not subject to personal jurisdiction in the courts of any state; and (c) Hexaware Ltd. has sufficient contacts with the United States as a whole, including, but not limited to, offering for sale and selling technology and business process services (including relating to the Accused Products) in the United States that this Court's exercise of jurisdiction over Hexaware Ltd. satisfies due process and is consistent with the Constitution and laws of the United States.

39. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c) and, with respect to the patent-infringement claims, 28 U.S.C. § 1400(b) because Defendants have a regular and established place of business in Illinois and this district, Defendants have committed acts of patent infringement, breached their contract with Plaintiff Updraft, were unjustly enriched (as an alternative to breach of contract), and intentionally interfered with Plaintiffs' prospective economic advantage in Illinois and this district, and a portion of the prospective witnesses may reside in Illinois and this district.

## IV. THE PATENTS-IN-SUIT

40. On January 28, 2014, the '106 patent, titled "System and Method for Testing Application Code," was duly and legally issued. The '106 patent is currently assigned to Updraft. A true and correct copy of the '106 patent is attached as Exhibit 1.

41. On March 3, 2015, the '928 patent, titled "System and Method for Generating Application Code," was duly and legally issued. The '928 patent is currently assigned to Updraft. A true and correct copy of the '928 patent is attached as Exhibit 2.

42. On March 3, 2015, the ’948 patent, titled “System and Method for Generating Application Requirements,” was duly and legally issued. The ’948 patent is currently assigned to Updraft. A true and correct copy of the ’948 patent is attached as Exhibit 3.

43. On June 23, 2015, the ’673 patent, titled “System and Method for Implementing Application Code from Application Requirements,” was duly and legally issued. The ’673 patent is currently assigned to Updraft. A true and correct copy of the ’673 patent is attached as Exhibit 4.

44. On October 3, 2017, the ’916 patent, titled “System and Method for Iterative Generating and Testing of Application Code,” was duly and legally issued. The ’916 patent is currently assigned to Updraft. A true and correct copy of the ’916 patent is attached as Exhibit 5.

45. On January 2, 2018, the ’046 patent, titled “System and Method of Implementing Application Code from Application Requirements,” was duly and legally issued. The ’046 patent is currently assigned to Updraft. A true and correct copy of the ’046 patent is attached as Exhibit 6.

46. On May 26, 2020, the ’243 patent, titled “System and Method for Iterative Generating and Testing of Application Code,” was duly and legally issued. The ’243 patent is currently assigned to Updraft. A true and correct copy of the ’243 patent is attached as Exhibit 7.

47. On June 8, 2021, the ’934 patent, titled “Method and System for Updating Legacy Software,” was duly and legally issued. The ’934 patent is currently assigned to Updraft. A true and correct copy of the ’934 patent is attached as Exhibit 8.

48. On July 9, 2024, the ’941 patent, titled “Method and System for Updating Legacy Software,” was duly and legally issued. The ’941 patent is currently assigned to Updraft. A true and correct copy of the ’941 patent is attached as Exhibit 9.

# V. BACKGROUND

## A. Technology and Market

49. Application modernization is the practice of updating older software for newer computing approaches, including newer languages, frameworks, and infrastructure platforms. This practice is also sometimes called legacy modernization, legacy application modernization, software modernization, or platform modernization and includes the conversion, rewriting, or porting of a legacy system to modern computer programming languages, architectures, software libraries, protocols, or hardware platforms.

50. Companies across industries are faced with maintaining or replacing software written in legacy programming languages, such as COBOL. The software may contain years or even decades worth of complex business logic, which may have at most limited documentation. As developers retire and maintenance becomes costlier, more challenging, and/or riskier, demand has risen for tools and services that can extract and document the software's logic (business rules) and convert the software into modern, more maintainable code in a more modern language. Automating this process as much as possible saves valuable time.

51. Rules engines have been developed which can execute programs written as business rules.

52. Testing is a crucial component of the application development cycle. It helps ensure that a platform works as anticipated. Building test suites or test cases is a large component of the testing activity. Developing test suites, especially for legacy platforms, can be costly and tedious. Testing efforts can be more than half the total costs associated with system modernization. COBOL is an approximately 60-year-old computer-programming language. COBOL is still used today in the banking, insurance, and telecommunication industries. The computer systems in these industries are mission critical and downtime must be minimized.

53. According to Precedence Research, the North American application modernization services market was $8.33 billion in 2024 and is projected to be worth around $39.84 billion by 2034, growing at a compound annual growth rate of 16.94% from 2025 to 2034. https://www.precedenceresearch.com/application-modernization-services-market (last accessed Aug. 12, 2025) (archived at https://web.archive.org/web/20250723075632/https://www.precedenceresearch.com/application-modernization-services-market). Precedence Research provides the following chart:




*Id.* Thus, from 2025-2034, Precedence Research estimates the North American application modernization services market to be worth over $216 billion.

**B. Plaintiffs' Solutions**

54. Updraft developed tools for automated extraction of business rules from computer code, automated testing of computer code, and automated modernization of computer code now comarketed by Plaintiffs. Updraft took about 5-6 years to develop initial versions of these tools, and it consistently continued developing these tools since its initial patent filings in 2011, with

further development and improvement ongoing. In total, to date, Updraft has spent over $100 million in development costs, employing hundreds of employees across multiple countries. Updraft employees collectively spent thousands of hours developing the tools.

55. Plaintiffs' business-rule-extraction process separates computer code that implements the business purpose of an application from low-level or supporting code. The business-relevant code is represented in rule form, such as tables of business conditions and actions that are performed if the business conditions in a rule hold. Plaintiffs' AI-driven analysis assures that the extracted business rules are correct (produce the same behavior as the legacy code), complete (cover all business-relevant code), and consistent (reflect the context of rules so that they do not conflict). The tabular representation of code as business-relevant rules can be easier to understand than the legacy code, where business logic may be intermingled with low-level and technical code. To aid business analysts in reviewing business rules, terminology extracted from legacy code can be automatically replaced by more easily understandable business terminology. In addition to rules tables, business rules can be provided textually and as a graph of the rule execution.

56. Plaintiffs' automated test generation tool scans clients' code and creates possible behavior paths (test cases/suites) therefrom. The result is a seamless testing process that collaborates behavioral paths with data stimuli compiled to interface with the test generator. The continuous process of communication between the test generator, stimuli (data), and the platform helps complete the activity of test generation. Clients can further help inject the data to a custom-built test-execution engine or an off-the-market product to create an end-to-end automation of the testing process.

57. Plaintiffs' fully automated modernization process transforms clients' legacy

systems into behaviorally equivalent modern systems that meet the clients' performance and maintainability objectives.

58. Plaintiffs' marketed tools embody the patents-in-suit.

### C. The Parties' Relationship, the Contracts, and Defendants' Breach and Tortious Activity

59. Plaintiffs and Defendants entered a confidential relationship whereby Defendants were to provide modernization services to Defendants' clients using Plaintiffs' tools.

60. Defendants represented to Plaintiffs that Defendants had specific, identified (to Defendants) clients that could benefit from Plaintiffs' tools. Plaintiffs performed multiple proof-of-concepts for Defendants whereby Plaintiffs demonstrated their tools to Defendants for the purpose of Defendants using Plaintiffs' tools with Defendants' clients for the mutual benefit of Plaintiffs and Defendants.

61. Plaintiffs expected an economic benefit from the parties' relationship through Defendants' provision of such services to Defendants' clients. On information and belief, Defendants knew of Plaintiffs' expectancy.

62. As part of this relationship, Plaintiff Updraft and Defendant Hexaware Ltd. entered into a contract entitled "Mutual Confidentiality & Non-Disclosure Agreement" ("NDA"). A true and correct copy of the NDA is attached as Exhibit 10.

63. Hexaware Ltd. entered the NDA on behalf of its "affiliates, subsidiaries, parent Companies, successors & assignees." Thus, Hexaware Inc. was also a party to the NDA as an affiliate and/or subsidiary of Hexaware Ltd.

64. The NDA is dated July 4, 2022. It has a term of one year from that date, with the confidentiality obligations (other than for trade secrets) lasting an additional five years, i.e., until July 4, 2028.

65. The NDA provides, among other things, for disclosure of "Confidential Information" from a disclosing party to a receiving party. The agreement defines confidential information as including, but not limited to, among other things, intellectual property, software, computer or program code, techniques, schematics, designs, inventions, methodologies, technologies, products, and services.

66. The NDA provides, among other confidentiality provisions, that a party receiving such Confidential Information shall use it solely in furtherance of the actual or potential business relationship between the parties to the NDA and not in any way that is directly or indirectly detrimental to the disclosing party or its subsidiaries or affiliates.

67. The NDA provides, among other confidentiality provisions, that a party receiving such Confidential Information shall ensure that access to Confidential Information is granted only to those of receiving party's and its majority-owned or controlled affiliates' officers, directors, employees, representatives or agents who have a demonstrated need to know such information in order to carry out the business purpose of the NDA and who are subject to written or professional confidentiality obligations at least as protective of the Confidential Information as the NDA.

68. The NDA provides, among other confidentiality provisions, that a party receiving such Confidential Information shall not reverse engineer, decompile, or disassemble any software, hardware, product, or technology disclosed to the receiving party pursuant to the NDA and any such conduct shall constitute a breach of the NDA.

69. The NDA provides, among other things, that no license under any trade secret, patent, copyright, trademark, or other intellectual property or proprietary right is either granted or implied by the disclosure of Confidential Information.

70. The NDA provides, among other things, that the breach of the NDA by a receiving

party will cause the disclosing party irreparable damage for which recovery of money damages would be inadequate and the disclosing party is therefore entitled to obtain timely injunctive relief and/or specific performance to protect its rights under the NDA in addition to any and all remedies available at law or in equity, without the requirement of posting a bond or other security.

71. The NDA provides, among other things, that it shall be governed by and construed in accordance with the laws of Illinois without regard to conflicts of law provisions. The NDA also provides that the parties to the NDA consent to personal jurisdiction and venue in the state and federal courts within Cook County, Illinois for any actions, suits, or proceedings arising out of or related to the NDA. Cook County, Illinois is within this judicial district.

72. On August 25, 2022, Plaintiffs and Defendants entered into a "POC [A]greement." A true and correct copy of the POC Agreement is attached as Exhibit 11. "POC" refers to "proof of concept," i.e., Plaintiffs demonstrating their tools to Defendants.

73. The POC Agreement contemplates that the Parties would enter into a "teaming agreement … no later than 15 September 2022 and until such time both agree to adhere to the terms agreed herein." Exhibit 11. On information and belief, while the Parties engaged in negotiations of such a teaming agreement, the Parties never executed such a teaming agreement.

74. As memorialized in the POC Agreement, Hexaware was "interested in demonstrating the effectiveness of Updraft's Automated Legacy Modernization tools to its clients." *Id.*

75. Plaintiffs provided Defendants with confidential information of Plaintiffs relating to Plaintiffs' tools for automated extraction of business rules from computer code, automated testing of computer code, and automated modernization of computer code. Plaintiffs spent thousands of manhours to transfer such knowledge to Defendants. Over 50 employees of

Defendants were involved in this transfer of knowledge. The transfer of knowledge included demonstrations of Plaintiffs' proprietary and confidential tools. The transfer of knowledge further included installation of such tools on servers under Defendants' custody and control. The transfer of knowledge further included Plaintiffs answering questions about such tools posed by Defendants.

76. The confidential information provided by Plaintiffs to Defendants was and is not generally available to the public.

77. As part of the Parties' confidential relationship, for purposes of demonstration of Plaintiffs' tools to Defendants' customers, Plaintiffs' tools were installed on an Amazon Web Services environment under the control of Defendants. *E.g.*, Exhibit 11.

In the POC agreement, "Hexaware agree[d] not to make any changes or copies of [Plaintiffs'] tools [installed in Hexaware's Amazon Web Services environment] unless agreed to or instructed to by Updraft." *Id.* Moreover, "Hexaware further agree[d] to use these tools only for the agreed upon demonstration project. Upon completion of the demonstration, Hexaware agrees to delete the tools from the AWS environment on the [Hexaware] client system and confirm this to Updraft. Hexaware agrees not to retain any copies of Updraft tools after the demonstration project is complete." *Id.*

78. A March 2024 public report on Hexaware's application modernization services recognized "Updraft" as a "partner[]" providing tools relating to Hexaware's application modernization services.

> **Focused partnerships:** Hexaware uses Amaze® and RapidX™ with GenAI capabilitie such as reverse engineering, code conversic and code creation. This complements its functionality with tools from partners, such as CAST, Updraft, Heirloom, Astadia, CloudFrame, TmaxSoft, LzLabs and OpenText (Micro Focus).

Application Modernization Services, U.S. (March 2024), available at https://hexaware.com/wp-content/uploads/2024/04/Application-Modernization-Services-U.S.pdf (last accessed Aug. 8, 2025).

79. On information and belief, Hexaware created the document available at https://hexaware.com/wp-content/uploads/2024/04/Application-Modernization-Services-U.S.pdf (as of Aug. 8, 2025). But regardless of whether Hexaware created the document, Hexaware hosted the document on its website at the aforementioned URL. On information and belief, in hosting the document, Hexaware believed the contents of the document to be accurate.

80. A March 2025 public report on Hexaware's "application modernization services" references "full or semi-automated code refactoring" in connection with "partner" "Natsoft."

> **Streamlined project execution:** Hexaware's framework includes accelerated discovery with RapidX, CAST and AWS Blu Age, full or semi-automated code refactoring with RapidX, AWS BlueAge and Natsoft,

> CI/CD integration, integrated development environment (IDE), version control with GIT, code quality review, automated testing and deployment, and application rehosting with TmaxSoft, Rocket Software and LzLabs. Hexaware's other partner tools include Astadia, Cloudframe and Heirloom.

Application Modernization Services, U.S. (March 2025), available at https://hexaware.com/wp-

content/uploads/2025/03/Application-Modernization-Services-U.S.pdf (last accessed Aug. 8, 2025); *see also* https://hexaware.com/news/hexaware-named-a-leader-in-the-isg-provider-lens-mainframes-services-and-solutions-2025-us-quadrant-report/ (last accessed Aug. 8, 2025) (archived at https://web.archive.org/web/20250729163839/https://hexaware.com/news/hexaware-named-a-leader-in-the-isg-provider-lens-mainframes-services-and-solutions-2025-us-quadrant-report/).

81. On information and belief, Hexaware created the document available at https://hexaware.com/wp-content/uploads/2025/03/Application-Modernization-Services-U.S.pdf (as of Aug. 8, 2025). But regardless of whether Hexaware created the document, Hexaware hosted the document on its website at the aforementioned URL. On information and belief, in hosting the document, Hexaware believed the contents of the document to be accurate.

82. On information and belief, Defendants marketed their application modernization services as being able to take advantage of tools from Updraft and/or Natsoft. Defendants did not seek permission from Plaintiffs to market Plaintiffs' technology in this fashion, nor did Defendants compensate Plaintiffs for doing so. On information and belief, by naming Plaintiffs in their marketing literature, Defendants intentionally took advantage of Plaintiffs' reputation as a leader in the legacy-modernization field to engage clients that otherwise would have sought out Plaintiffs' tools from Plaintiffs. On information and belief, Defendants used Plaintiffs' confidential information and/or Plaintiffs' tools installed in Defendants' Amazon Web Services environment in doing so.

83. On information and belief, rather than involving Plaintiffs in the relationship with Defendants' customers interested in Plaintiffs' tools, Defendants instead used Plaintiffs' confidential information and/or Plaintiffs' tools installed in Defendants' Amazon Web Services

environment to develop Defendants' own competing tools so as to cut Plaintiffs out.

84. Defendants have been unjustly enriched by using and taking advantage of Plaintiffs' information (including confidential information) and Plaintiffs' thousands of manhours spent on the Parties' relationship to bring to market the Accused Products, which compete with Plaintiffs' offerings, on a quicker timeline than would otherwise have been possible, all the while cutting Plaintiffs out of any economic benefit from the sale of the Accused Products. Defendants have profited through this unfair competition.

85. Defendants have gained a competitive advantage vis-à-vis Plaintiffs as a result of their improper use of Plaintiffs' information (including confidential information) and their benefitting, without compensating Plaintiffs accordingly, from Plaintiffs' thousands of manhours spent on the Parties' relationship.

86. By using Plaintiffs' information (including confidential information) and labor to compete with Plaintiffs, Defendants wrongfully and intentionally deprived Plaintiffs of the economic benefit Plaintiffs would have received had Defendants marketed Plaintiffs' tools to Defendants' customers as contemplated by the Parties' relationship and agreements, thereby causing damage to Plaintiffs.

**D. <u>Defendants' Accused Products</u>**

87. Hexaware considers itself to be one of the "Top 10 Legacy Modernization Companies Powering Enterprise Transformation" and "[o]ne of the leading application modernization companies." https://hexaware.com/blogs/top-10-legacy-modernization-companies-powering-enterprise-transformation/ (last accessed August 7, 2025) (archived at https://web.archive.org/web/20250821150008/https://hexaware.com/blogs/top-10-legacy-modernization-companies-powering-enterprise-transformation/).

88. On information and belief, Hexaware uses one or more of the Accused Products,

including in conjunction with each other, as part of its modernization services. A March 2024 document describing Hexaware's application modernization services states, "Hexaware uses Amaze® and RapidX™ with GenAI capabilities, such as reverse engineering, code conversion and code creation." Application Modernization Services, U.S. (March 2024).

89. On information and belief, Hexaware promotes the Accused Products together, with a March 2025 document on Hexaware's application modernization services stating, "Amaze®, RapidX™ and Tensai®, all using GenAI to enrich automation and reduce time to market." Application Modernization Services, U.S. (March 2025).

90. According to Hexaware, in what Hexaware calls the "Hexaware Approach," "Hexaware offers modernization services along six approaches—rehost, replatform, re-architect, rebuild, replace, and run (continuous optimization)—and augments each approach with" what Hexaware calls "proprietary automation," with the Accused Products each being part of this approach:

> One of the leading application modernization companies, Hexaware offers modernization services along six approaches—rehost, replatform, re-architect, rebuild, replace, and run (continuous optimization)—and augments each approach with proprietary automation:
>
> - RapidX™ uses generative AI to analyze legacy applications by decoding source code and mapping complex system dependencies. Through AI-driven assessment and optimization recommendations, it accelerates the initial modernization phase significantly.
> - Amaze® automates code conversion and data migration tasks, accelerating cloud deployment while enforcing quality and security controls.
> - Tensai® provides a low-code DevSecOps framework with integrated policy checks, facilitating secure continuous integration and delivery from the first migrated release.

*Id.*

91. On information and belief, the so-called "proprietary automation" includes "GenAI," which is referred to elsewhere in the document. *Id.* "GenAI" is "generative artificial intelligence."

92. On information and belief, the "GenAI" used by the Accused Products includes GenAI provided by OpenAI.

93. On information and belief, the one or more of the Accused Products use GenAI to generate code.

94. Hexaware promotes RapidX, Amaze, and Tensai/ATOP together as "Hexaware's Flagship Platforms for Legacy Modernization," including as follows:




https://hexaware.com/services/digital-software-solutions/legacy-modernization-services/ (last accessed Aug. 11, 2025) (archived at https://web.archive.org/web/20250717101527/https://hexaware.com/services/digital-software-solutions/legacy-modernization-services/).

95. Hexaware's legacy modernization services include the modernization of various technologies, including the following:




*Id.*

96. Hexaware promotes its legacy modernization services as follows: "The digital landscape is evolving rapidly, creating challenges for enterprises that rely on legacy applications. Our legacy modernization services offer a strategic pathway, leveraging our deep expertise to transform outdated legacy systems into agile, scalable, and digital-native platforms. From legacy

application modernization and data modernization to legacy modernization to cloud, we reduce risk and enable future-ready digital capabilities." *Id.*

97. According to Hexaware, "Vibe coding is the practice of 'talking' your code into existence with natural-language prompts, then letting an AI pair-programmer handle the boilerplate." https://hexaware.com/blogs/vibe-coding-for-ai-agents-platforms/ (last accessed August 8, 2025) (archived at https://web.archive.org/web/20250821150240/https://hexaware.com/blogs/vibe-coding-for-ai-agents-platforms/).

98. According to Hexaware, "Hexaware brings together AI-native delivery, automation-first engineering, and deep expertise in Vibe Coding for AI Agents to help you go from idea to production fast." *Id.*

99. On information and belief, AI agents used as part of or in association with one or more of the Accused Products perform or include "vibe coding."

100. On information and belief, as used by Hexaware in the documents cited herein, "AI" refers to artificial intelligence.

101. On information and belief, aspects of the Accused Products, including RapidX, were developed based on confidential information disclosed by Plaintiffs to Defendants.

102. On information and belief, by using confidential information disclosed by Plaintiffs to Defendants to develop aspects of the Accused Products, including RapidX, Defendants saved money and manhours and developed such aspects, including RapidX, on a shorter timeline.

103. On information and belief, Defendants saved at least tens of millions of dollars (including, but not limited to, by saving manhours) by using Plaintiffs' confidential information to develop aspects of the Accused Products, including RapidX.

104. Defendants, with the Accused Products, compete with Plaintiffs in the market for

services relating to automated extraction of business rules from computer code, automated testing of computer code, and automated modernization of computer code.

105. On information and belief, Hexaware has used one or more of the Accused Products for legacy modernization, including iteratively generating and testing code, for multiple clients, including one or more of: (1) a UK-based global shipping services provider to modernize its infrastructure to enable real-time tracking of 50,000+ vessels across 75 countries, delivering 25% cost savings, (2) a US mortgage enterprise to convert its loan system from PL/SQL to microservices, achieving 30% faster processing and reducing data errors by 40%. https://hexaware.com/blogs/top-10-legacy-modernization-companies-powering-enterprise-transformation/ (last accessed Aug. 11, 2025) (archived at https://web.archive.org/web/20250821150008/https://hexaware.com/blogs/top-10-legacy-modernization-companies-powering-enterprise-transformation/).

**1. RapidX**

106. According to Hexaware, Hexaware "[a]ccelerates legacy modernization with RapidX™, a GenAI platform that creates AI-based SMEs for seamless knowledge transfer. Its toolset enables fast discovery, automated code refactoring, and smooth integration with CI/CD and partner platforms. By prioritizing high-impact projects, Hexaware delivers quick results and reinvestable gains for continuous transformation." https://hexaware.com/blogs/top-10-legacy-modernization-companies-powering-enterprise-transformation/ (last accessed Aug. 8, 2025) (archived at https://web.archive.org/web/20250821150008/https://hexaware.com/blogs/top-10-legacy-modernization-companies-powering-enterprise-transformation/).

107. According to a document hosted on Hexaware's website, Hexaware's "[a]pplication [m]odernization [s]ervices" include "full or semi-automated code refactoring with RapidX." Application Modernization Services, U.S. (March 2025). On information and belief,

"full or semi-automated code refactoring with RapidX" means that RapidX automatically generates code.

108. According to Hexaware, RapidX integrates business context and automated intelligence into software development, driving velocity and exponential productivity while accelerating time to market. According to Hexaware, RapidX enables maintainable code, reducing resource costs for enhancements and bug fixes. https://hexaware.com/platforms/rapidx/ (last accessed Aug. 8, 2025) (archived at https://web.archive.org/web/20250821150914/https://hexaware.com/platforms/rapidx/).

109. According to Hexaware, "RapidX embeds AI-powered gurus into development workflows." *Id.* According to Hexaware, RapidX "AI assists in solution design, architecture decisions, and implementation planning." *Id.* According to Hexaware, RapidX "AI strengthens engineering workflows with test generation, regression automation, and system-wide reliability checks." *Id.*

110. According to Hexaware, "RapidX™ AI Agents conduct deep code analysis, using reverse engineering to decode undocumented legacy systems **(such as mainframe, older client-server technologies, older middleware technologies)** and uncover hidden dependencies, dead code, data lineage, and critical business logic. It goes beyond surface insights by mapping process flows, interlinking business rules, and analyzing data forensics. This intelligence enables IT and business teams with critical insights needed to shape their modernization strategy and move to microservices, cloud-native technologies, etc." *Id.*

111. According to Hexaware, "RapidX™ AI Agents empower engineers, architects, and product teams, actively guiding development and modernization." *Id.* According to Hexaware, RapidX's "AI Agents" include:

> **Product Agents:** Create a prioritized roadmap with estimations, themes, epics, and stories, ensuring it is functionally rich, domain-aware, and technically precise for seamless execution.
>
> **Engineering Agents:** Create solution designs, define features, and implementation paths, ensuring technical feasibility and alignment with business needs.
>
> **QA Agents**: Generate test cases, automate regression testing, and validate functionality for reliability.

*Id.*

112. According to Hexaware, "RapidX™ Cognitive Continuity integrates AI-driven engineering agents that deeply understand an organization's application codebases, system interdependencies, connectivity, data flows, and embedded business logic. Trained on institutional domain knowledge, these agents take on specialized roles to drive structured, intelligent software evolution." *Id.*

113. According to Hexaware, RapidX "reverse-engineers legacy applications, extracting business rules, dependencies, and workflows to create actionable, business-friendly blueprints." *Id.*

114. According to Hexaware, RapidX's "AI agents generate architecture roadmaps and specifications, preserving critical knowledge and mitigating the risk of expertise loss." *Id.*

115. According to Hexaware, RapidX "bridges the gap between legacy and digital systems, ensuring a unified, future-ready infrastructure that swiftly responds to evolving market demands." *Id.*

116. On information and belief, RapidX provides for modernization of legacy computer code. *Id.*

117. According to Hexaware, "By orchestrating the AI agents through Agentic AI, RapidX™ eliminates bottlenecks, accelerates IT productivity, and creates a seamless, continuous

engineering ecosystem that future-proofs software evolution." *Id.* On information and belief, "Agentic AI" as used by Hexaware refers to AI capable of autonomous action to achieve goals. Agentic AI operates in an iterative fashion. Agentic AI can assist in code generation, testing, and debugging.

118. On information and belief, a goal of RapidX is to accelerate modernization, which includes code conversion and data migration.

119. On information and belief, RapidX generates application requirements from inputted requirements and parameters, and outputs the application requirements in accordance with a system communication protocol.

120. On information and belief, RapidX, alone or in connection with other Accused Products, provides for testing of generated computer code based on the application requirements and the parameters to produce feedback.

121. On information and belief, RapidX, alone or in connection with other Accused Products, provides for iterative generation of computer code based on feedback from testing the code.

122. On information and belief, RapidX is described generally at the webpages previously available at https://zealous-wave-0a10ee400.1.azurestaticapps.net/443/intro (with a navigation sidebar to various webpages, e.g., …/architecture) (last accessed May 14, 2025). These webpages were available as of May 14, 2025, but were since taken offline and are no longer available as live webpages. Archive versions of these webpages are accessible at https://web.archive.org/web/20250514175657/https://zealous-wave-0a10ee400.1.azurestaticapps.net/443/intro (with a navigation sidebar to various webpages, e.g., …/architecture).

123. On information and belief, RapidX is described generally at the webpage previously available at https://docs.rapidx.dev/ (last accessed May 29, 2025). This webpage was available as of May 29, 2025, but was since taken offline and is no longer available as a live webpage. An archive version of this webpage is accessible at https://web.archive.org/web/20250529133200/https://docs.rapidx.dev/.

124. On information and belief, Defendants controlled the webpage previously available at https://docs.rapidx.dev/ and it was taken offline by or at the direction of Defendants.

**2. Amaze**

125. On information and belief, Amaze converts legacy source code to modern source code.

126. According to Hexaware, Hexaware "developed Amaze® as an automated code conversion tool, that leverages advanced LLM (Large Language Model) and Generative AI (GenAI). Our solution employs a pattern-based and template-based structure, allowing for efficient and accurate conversions." https://hexaware.com/blogs/the-role-of-ai-in-automating-sas-to-pyspark-conversion-accelerating-data-migration/ (last accessed Aug. 11, 2025) (archived at https://web.archive.org/web/20250605092428/https://hexaware.com/blogs/the-role-of-ai-in-automating-sas-to-pyspark-conversion-accelerating-data-migration/).

127. According to Hexaware, Amaze provides a "Comprehensive Conversion Ecosystem," which Hexaware describes as follows:

- **Comprehensive Conversion Ecosystem**
  - **End-to-End Solution**: Unlike point solutions, Amaze® provides a complete migration journey from code conversion to validation and optimization.
  - **Integrated Conversion Dashboard**: This feature tracks conversion progress, code quality, and potential issues in real time—a feature missing in most competing tools.

*Id.*

128. On information and belief, the "validation and optimization" and/or "code quality,

and potential issues" referred to in the previous paragraph includes automated testing.

129. According to Hexaware, among other things, "Hexaware's Amaze® platform transforms your move to the cloud—fueled by automation, it positions your business at the forefront of cloud transformation." https://hexaware.com/platforms/amaze/ (last accessed Aug. 8, 2025) (archived at https://web.archive.org/web/20250821150351/https://hexaware.com/platforms/amaze/).

130. According to Hexaware, "Amaze® for Cloud transforms the way you do business as an effortless cloud modernization solution platform powered by AI. Automating the heavy lifting right from assessments to landing zone creation to code transformation and migration, it simplifies hybrid, public, and multi-cloud transitions, giving your enterprise an edge over the rest. As a powerful, comprehensive cloud modernization platform, it's your gateway to application, data, and AI transformation with limitless flexibility." https://hexaware.com/platforms/amaze/amaze-for-enterprise-cloud-services/ (last accessed Aug. 8, 2025) (archived at https://web.archive.org/web/20250720213618/https://hexaware.com/platforms/amaze/amaze-for-enterprise-cloud-services/).

131. According to Hexaware, "Amaze® makes it easy as a simplified platform for cloud-readiness assessments that uncover potential blockers before you begin. It auto-generates an HTML report, giving you clear insights into potential blockers such as containerization, re-platforming to Tomcat, potential microservices, DevOps readiness, and internal/external dependencies." *Id.* "Amaze® helps action the insights from the cloud assessments and SME discussions to drive fluid cloud transformation. It eliminates blockers identified during the assessment using automation to generate microservices and essential artifacts like Terraform scripts and Docker files." *Id.*

132. According to Hexaware, "Amaze® takes the complexity out of governance by embedding compliance and policy controls directly into your process of modernization with the cloud. With AI-powered security protocols, it ensures that every action aligns with industry standards and trust models so you stay secure and compliant. By maintaining visibility and control, you can scale confidently while minimizing risks and avoiding costly compliance failures." *Id.*

133. According to Hexaware, Amaze, when used in the context of "cloud migration" or "cloud replatforming," "convert[s] source code from on-premise design patterns to cloud-friendly design patterns," i.e., to "cloud-friendly" source code. *Start Your Cloud Migration Journey on the Intelligent Wheels – Amaze® and Azure*, Hexaware Ltd. 2021, at 2, available at https://hexaware.com/wp-content/uploads/2021/01/Amaze_v3.0_Whitepaper_in_Azure_Cloud_Platform.pdf (last accessed Aug. 8, 2025).

134. According to Hexaware, Amaze "performs two important activities on the desired platform – application assessment and application code transformation." *Id.* The latter includes refactoring code with no change in business logic. *Id.*

135. According to Hexaware, Amaze performs automated testing on the generated (or transformed or refactored) code. *Id.* On information and belief, there is feedback between the code generation and testing. *Id.* On information and belief, the code generation is an iterative process based on the testing results.

136. According to Hexaware, Amaze "can transform code from its current state to target state by breaking the monolith on-prem application into granular stateless macro services." *Id.* at 6. For example, Amaze will decouple code relating to the user interface ("UI") from code relating to the back end. *Id.* Amaze will separately convert/refactor the UI and backend code. *Id.* Amaze will also separately upgrade libraries and frameworks. *Id.*

137. According to Hexaware, Amaze "features can be categorized into two types – code transformation from old technology to a new technology and code generation for new features." *Id.* at 9.

138. According to Hexaware, with Amaze, "we [Hexaware] thoroughly assess the legacy application code to understand the readiness and migration possibilities and also do a containerization readiness evaluation with regard to the kind of transformation that is required. We understand the complexity of the code and the interdependencies or the legacy design patterns that can be challenging when these applications are migrated to the cloud." https://hexaware.com/blogs/is-hexawares-amaze-for-applications-a-panacea-for-legacy-application-modernization/ (last accessed Aug. 8, 2025) (archived at https://hexaware.com/blogs/is-hexawares-amaze-for-applications-a-panacea-for-legacy-application-modernization/).

139. According to Hexaware, with Amaze, "we [Hexaware] not only migrate these applications into the modern platform but also break this application monolith fat applications into microservices and enable API enablement. This along with automation enable enterprises to successfully migrate not only to the cloud but also eliminate certain dependencies of license and provide a much scalable environment for the new and modern application." *Id.*

140. According to Hexaware, with Amaze, "we not only do an assessment but also transform the application code into a modern platform. We take complete accountability to ensure that enterprises don't face any risk in their modernization journey." *Id.*

141. According to Hexaware, Hexaware has used Amaze for clients as follows:

## Proof Points for Success with Amaze®

- **Successful Migrations**: 200+ complex script conversions across diverse industries
- **Client Satisfaction**: 90% of clients report significant improvements in data processing efficiency
- **Continuous Improvement**: Regular AI model updates based on real-world conversion experiences

## Customer Success: Scaling Data Transformation Solutions Across Industries

Our Amaze® solution has demonstrated remarkable success in helping organizations modernize their data infrastructure, delivering significant cost savings and efficiency improvements across multiple high-profile clients:

**Breakthrough Conversions**

- **American Health Insurance Company**:
  - Converted 150+ complex SAS scripts
  - Achieved 70-80% overall conversion accuracy
  - Reduced data processing time by 40%
- **Australian Health Insurance Company**:
  - Migrated 34 critical data processing scripts
  - Comprehensive testing and optimization
  - Improved data processing performance by 55%
- **Belgian State-Owned Bank**:
  - Successfully transformed core analytics workflows
  - Streamlined data migration process
  - Enhanced data processing scalability
  - Achieved significant operational efficiency gains

https://hexaware.com/blogs/the-role-of-ai-in-automating-sas-to-pyspark-conversion-accelerating-data-migration/ (last accessed Aug. 11, 2025) (archived at https://web.archive.org/web/20250605092428/https://hexaware.com/blogs/the-role-of-ai-in-automating-sas-to-pyspark-conversion-accelerating-data-migration/). On information and belief, the "conversions" referred to above involved automatic generation of code.

142. According to Hexaware, it used Amaze for "a prominent financial institution in Belgium." https://hexaware.com/case-study/powering-sas-to-pyspark-data-platform-

modernization-with-ai-automation-using-amaze-for-data-and-ai/ (last accessed Aug. 11, 2025) (archived at https://web.archive.org/web/20250821152157/https://hexaware.com/case-study/powering-sas-to-pyspark-data-platform-modernization-with-ai-automation-using-amaze-for-data-and-ai/). Hexaware described this engagement as follows:

> ## Automating SAS to PySpark Code Conversion with Amaze® for Data and AI
>
> Hexaware advised on strategic enterprise data platform modernization and executed through a comprehensive code conversion automation, utilizing its platform Amaze® for Gen AI-powered data transformation. This approach accelerated our client's large-scale code conversion from legacy SAS code to PySpark, requiring minimal manual intervention.
>
> The AI-driven code conversion process used natural language processing, deep learning techniques, and advanced machine learning (ML) algorithms to intelligently map complex SAS syntax to equivalent PySpark constructs on Python, ensuring semantic accuracy and preserving the original business logic.
>
> Here's what our solution assured:
>
> - **Automated Code Conversion:** Amaze® accurately and efficiently converted SAS code to PySpark using LLMs, minimizing manual effort and reducing the risk of errors.
> - **Quality Assurance:** Built-in quality checks ensured the accuracy and reliability of the converted code, maintaining data integrity.
> - **Performance Optimization:** Amaze® optimized the converted PySpark code for performance, leveraging the capabilities of Python's Spark engine.

*Id.*

143. Upon information and belief, as part of the so-called "Quality Assurance," Amaze or an accompanying product or service automatically generated and ran test cases and generated feedback, which was used iteratively for the "Automatic Code Conversion."

**3. Tensai/ATOP**

144. On information and belief, what Defendants at times refer or referred to as "ATOP" is at times referred to as "Tensai" or is incorporated into what is referred to as "Tensai." Regardless of whether Defendants admit the allegation of the prior sentence, for purposes of this Complaint, when Plaintiffs refer to "Tensai," they intend to include what Defendants refer to or have referred to as "ATOP."

145. Hexaware promotes "**Tensai® for Autonomous Testing** Power next-gen application delivery to deliver high-quality applications on time with cost efficiencies."

https://hexaware.com/platforms/tensai/ (last accessed Aug. 11, 2025) (archived at https://web.archive.org/web/20250821150319/https://hexaware.com/platforms/tensai/). On information and belief, this description relates to what was or is known as "ATOP."

146. According to Hexaware, "ATOP," i.e., "Autonomous Test Orchestration Platform," is Hexaware's "artificial intelligence-driven unified testing platform." https://hexaware.com/flyer/autonomous-testing-with-generative-ai/ (last accessed Aug. 11, 2025) (archived at https://web.archive.org/web/20250514171359/https://hexaware.com/flyer/autonomous-testing-with-generative-ai/). Hexaware explains, "While many organizations automate their test execution processes, these solutions often address only limited aspects of the testing process. To achieve optimal software test delivery timeframes without compromising test coverage, organizations require an autonomous solution that comprehensively manages Quality Assurance and adapts seamlessly to changes." *Id.*

147. According to Hexaware, "[w]ith its plug-and-play capabilities, ATOP caters to various testing needs such as UI, API, Data Security, Resilience, and Performance. It enables faster Quality Assurance even in highly advanced Agile and DevOps-enabled projects that surpass traditional practices. Implementing [Hexaware's] Autonomous Testing Solutions offers several; benefits[, including] 40-70% QA effort reduction by eliminating or reducing human intervention [and] "4X faster QA cycle time with 100% automation coverage." *Id.*

148. On information and belief, ATOP incorporates machine learning, deep learning algorithms, and natural language processing techniques to make testing independent from human intervention.

149. On information and belief, ATOP generates test cases automatically based on user acceptance criteria.

150. On information and belief, ATOP also provides an estimation of modernization and/or code conversion schedules.

151. On information and belief, ATOP or the features comprising ATOP are used in connection with RapidX. On information and belief, RapidX iteratively generates code based on feedback from ATOP.

152. On information and belief, ATOP or the features comprising ATOP are used in connection with Amaze. On information and belief, Amaze iteratively generates code based on feedback from ATOP.

**E. <u>Defendants' Patent Infringement</u>**

153. Plaintiffs initially notified Defendants of, among other things, their infringement of Updraft patents based on RapidX in a letter dated February 24, 2025, sent via email and USPS Priority Mail. Plaintiffs specifically named each of the patents-in-suit by number. Thus, Defendants knew of each of the patents-in-suit, and Plaintiffs' contention that Defendants' RapidX infringed such patents, no later than February 24, 2025.

154. Plaintiffs requested, among other things, Defendants to cease and desist all activity relating to RapidX. The parties corresponded about Defendants' patent infringement over the ensuing months leading up to the filing of this Complaint. Defendants denied infringement without evidence and refused to cease and desist activity related to RapidX.

155. In a letter dated May 30, 2025, Plaintiffs provided exemplary claim charts regarding Defendants' infringement of the '928 patent and the '934 patent based on public information relating to RapidX obtained off of the world wide web. In a letter dated July 10, 2025, Defendants responded to Plaintiffs' exemplary claim charts by again denying infringement but did not provide any evidence to support such denial.

156. On information and belief, Defendants possess nonpublic information relating to

the Accused Products, including RapidX, including schematics, documentation, and source code. In the course of the parties' correspondence, Defendants did not provide any nonpublic information to support their denials of patent infringement.

157. Defendants' denials of infringement conflict with publicly available information about RapidX.

158. For example, in their July 10, 2025 letter, Defendants appear to deny that RapidX generates code despite Defendants' own public documents stating, e.g., that RapidX's "toolset enables … automated code refactoring." https://hexaware.com/blogs/top-10-legacy-modernization-companies-powering-enterprise-transformation/ (last accessed Aug. 7, 2025) (archived at https://web.archive.org/web/20250821150008/https://hexaware.com/blogs/top-10-legacy-modernization-companies-powering-enterprise-transformation/).

159. Likewise, in their July 10, 2025 letter, Defendants appear to deny that RapidX performs automated testing, despite Defendants' own public documents stating, e.g., that RapidX has "AI Agents," including "QA Agents," which "[g]enerate test cases, automate regression testing, and validate functionality for reliability." https://hexaware.com/platforms/rapidx/ (last accessed Aug. 11, 2025) (archived at https://web.archive.org/web/20250821150914/https://hexaware.com/platforms/rapidx/).

160. On information and belief, by spreading functionality across the multiple Accused Products and platform names, Defendants attempt to permit themselves the ability to deny that a particular Accused Product has specific functionality, whereas, in practice, the functionality exists, whether in the particular Accused Product, another Accused Product, or other related products, services, or platforms used in connection with the particular Accused Product.

161. On information and belief, after Plaintiffs' February 25, 2025 letter and prior to the

filing of this Complaint, Defendants modified or had modified certain webpages relating to RapidX and took down or had taken down other webpages relating to RapidX.

162. Defendants' infringement of Plaintiffs' patents is ongoing, intentional, and willful and a known result of Defendants' use of Plaintiffs' confidential information to create aspects of the Accused Products, including RapidX, through which Defendants compete with Plaintiffs' patented solutions.

## VI. CLAIMS FOR RELIEF

163. As a result of Defendants' patent infringement, breach of contract, unjust enrichment (alternative to breach of contract), and intentional interference with economic advantage, Plaintiffs have been injured and will continue to be injured in an amount of about $500 million or otherwise to be proven at trial.

164. However, no amount of damages can fully repair Plaintiffs' injuries resulting from Defendants' patent infringement, breach or unjust enrichment, and intentional interference with economic advantage, such that Plaintiffs do not have an adequate remedy at law and are entitled to injunctive relief.

### COUNT I
### (Infringement of U.S. Patent No. 8,640,106)

165. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

166. On information and belief, Defendants have infringed and continue to infringe one or more claims of the '106 patent by making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products under 35 U.S.C. § 271(a), by inducing others to infringe under 35 U.S.C. § 271(b), by contributing to infringement under 35 U.S.C. § 271(c), and/or otherwise carrying out acts constituting infringement of the '106 patent

under 35 U.S.C. § 271, either literally or under the doctrine of equivalents.

167. For example, on information and belief, the making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products infringes at least claim 1 of the '106 patent because use of the Accused Products collectively includes, literally or under the doctrine of equivalents, performing a method for a computing entity to test and provide feedback of an automated process for converting input requirements into application code, the method comprising, receiving application requirements, wherein a requirements unit generates the application requirements from the input requirements and verifies the application requirements, wherein an application requirement of the application requirements includes one or more pre-conditions, one or more actions, and one or more post-conditions; as the application requirements are converted into the application code in a plurality of phases, for each of the plurality of phases, receiving a plurality of implementation results corresponding to a current phase of the plurality of phases; and testing the plurality of implementation results, wherein, for a current implementation result of the plurality of implementation results, the testing includes, generating, commensurate with the current phase of the plurality of phases, at least one test case based on one or more of the application requirements, wherein the generating the at least one test case includes, converting at least one of a plurality of test cases into a level of abstraction corresponding to the current phase of the plurality of phases to produce at least one converted test case; and converting the at least one converted test case into an appropriate programming language format to exercise the application code to produce the at least one test case; stimulating the current implementation result based on the at least one test case to produce a current application system response; comparing observed behavior of the current application system response with prescribed behavior of the at least one test case; and generating the feedback based on the comparing of the observed behavior

of the current application system response with the prescribed behavior of the at least one test case.

168. On information and belief, any directly infringing uses of the Accused Products by others occur with Defendants' specific intent and encouragement and are uses that Defendants know occur or are willfully blind to the fact that they occur.

169. On information and belief, at least since February 24, 2025, and as of any earlier date Plaintiffs prove at trial, Defendants' infringement of the '106 patent has been and continues to be willful, intentional, deliberate, and in conscious disregard of Plaintiffs' rights under the patent.

170. On information and belief, Defendants have actively induced, encouraged, aided, and/or abetted infringing uses by others under 35 U.S.C. § 271(b), and continue to do so, with knowledge and specific intent, or willful blindness, that these uses would contravene Plaintiffs' rights under the '106 patent.

171. On information and belief, Defendants have knowingly or with willful blindness contributed to infringement under 35 U.S.C. § 271(c) and continue to do so. On information and belief, the Accused Products are designed for use as part of an infringing system or use, are not a staple article of commerce, and do not have any substantial noninfringing uses.

172. This case is an exceptional case under 35 U.S.C. § 285.

173. Plaintiffs are entitled to monetary relief against Defendants pursuant to 35 U.S.C. §§ 284–85, including lost profit and/or reasonable royalty damages in an amount to be proven at trial, treble damages for Defendants' willful infringement, and attorney fees. 35 U.S.C. § 287 does not apply at least because Plaintiffs do not offer for sale an "article" covered by the '106 patent subject to the marking provision.

174. Plaintiffs have been substantially and irreparably harmed by these infringing

activities and will continue to be so unless those activities are enjoined by this Court.

175. Plaintiffs do not have an adequate remedy at law.

176. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants pursuant to 35 U.S.C. § 283.

**COUNT II**
**(Infringement of U.S. Patent No. 8,972,928)**

177. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

178. On information and belief, Defendants have infringed and continue to infringe one or more claims of the ’928 patent by making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products under 35 U.S.C. § 271(a), by inducing others to infringe under 35 U.S.C. § 271(b), by contributing to infringement under 35 U.S.C. § 271(c), and/or otherwise carrying out acts constituting infringement of the ’928 patent under 35 U.S.C. § 271, either literally or under the doctrine of equivalents.

179. For example, on information and belief, the making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products infringes at least claim 10 of the ’928 patent because use of the Accused Products collectively includes, literally or under the doctrine of equivalents, performing a method for execution by a computing entity, wherein the computing entity includes a processing module, memory, and a network connection, the method comprising, generating, by the computing entity, application requirements from inputted requirements and parameters, wherein the application requirements are in accordance with a system communication protocol; iteratively generating, by the computing entity, application code based on the application requirements, the parameters, and feedback until final application code is generated, wherein the application code is in accordance with the system

communication protocol; and iteratively testing, by the computing entity, the application code based on the application requirements and the parameters to produce the feedback, wherein the feedback is in accordance with the system communication protocol.

180. On information and belief, any directly infringing uses of the Accused Products by others occur with Defendants' specific intent and encouragement and are uses that Defendants know occur or are willfully blind to the fact that they occur.

181. On information and belief, at least since February 24, 2025, and as of any earlier date Plaintiffs prove at trial, Defendants' infringement of the '928 patent has been and continues to be willful, intentional, deliberate, and in conscious disregard of Plaintiffs' rights under the patent.

182. On information and belief, Defendants have actively induced, encouraged, aided, and/or abetted infringing uses by others under 35 U.S.C. § 271(b), and continue to do so, with knowledge and specific intent, or willful blindness, that these uses would contravene Plaintiffs' rights under the '928 patent.

183. On information and belief, Defendants have knowingly or with willful blindness contributed to infringement under 35 U.S.C. § 271(c) and continue to do so. On information and belief, the Accused Products are designed for use as part of an infringing system or use, are not a staple article of commerce, and do not have any substantial noninfringing uses.

184. This case is an exceptional case under 35 U.S.C. § 285.

185. Plaintiffs are entitled to monetary relief against Defendants pursuant to 35 U.S.C. §§ 284–85, including lost profit and/or reasonable royalty damages in an amount to be proven at trial, treble damages for Defendants' willful infringement, and attorney fees. 35 U.S.C. § 287 does not apply at least because Plaintiffs do not offer for sale an "article" covered by the '928 patent

subject to the marking provision.

186. Plaintiffs have been substantially and irreparably harmed by these infringing activities and will continue to be so unless those activities are enjoined by this Court.

187. Plaintiffs do not have an adequate remedy at law.

188. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants pursuant to 35 U.S.C. § 283.

**COUNT III**
**(Infringement of U.S. Patent No. 8,972,948)**

189. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

190. On information and belief, Defendants have infringed and continue to infringe one or more claims of the ’948 patent by making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products under 35 U.S.C. § 271(a), by inducing others to infringe under 35 U.S.C. § 271(b), by contributing to infringement under 35 U.S.C. § 271(c), and/or otherwise carrying out acts constituting infringement of the ’948 patent under 35 U.S.C. § 271, either literally or under the doctrine of equivalents.

191. For example, on information and belief, the making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products infringes at least claim 1 of the ’948 patent because use of the Accused Products collectively includes, literally or under the doctrine of equivalents, performing a method for execution by a computing entity the method comprising, receiving inputted requirements and parameters; generating, by a computing entity that includes a processing module, memory, and a network connection, application requirements based on the inputted requirements, the parameters, and verification feedback, wherein the application requirements including a plurality of application system state transitions,

wherein generating one or more of the plurality of application system state transitions (ASST) includes entering, by the computing entity, a loop that includes generating the one or more of the plurality of ASST based on one or more of the inputted requirements, the parameters and a previously generated one or more of the plurality of ASST; receiving the verification feedback regarding the one or more of the plurality of ASST; determining whether the one or more of the plurality of ASST are at a desired level of completeness based on the verification feedback regarding the one or more of the plurality of ASST; when the one or more of the plurality of ASST are not at the desired level of completeness, repeating the loop based on the verification feedback regarding the one or more of the plurality of ASST; and when the one or more of the plurality of ASST are at the desired level of completeness, exiting the loop; for one or more of the application requirements: determining, by the computing entity, whether the generating of the one or more application requirements is consistent with valid system states and correctness criteria to produce one or more verification results; and comparing, by the computing entity, the one or more verification results with one or more verification thresholds to produce the verification feedback.

192. On information and belief, any directly infringing uses of the Accused Products by others occur with Defendants' specific intent and encouragement and are uses that Defendants know occur or are willfully blind to the fact that they occur.

193. On information and belief, at least since February 24, 2025, and as of any earlier date Plaintiffs prove at trial, Defendants' infringement of the '948 patent has been and continues to be willful, intentional, deliberate, and in conscious disregard of Plaintiffs' rights under the patent.

194. On information and belief, Defendants have actively induced, encouraged, aided, and/or abetted infringing uses by others under 35 U.S.C. § 271(b), and continue to do so, with

knowledge and specific intent, or willful blindness, that these uses would contravene Plaintiffs' rights under the '948 patent.

195. On information and belief, Defendants have knowingly or with willful blindness contributed to infringement under 35 U.S.C. § 271(c) and continue to do so. On information and belief, the Accused Products are designed for use as part of an infringing system or use, are not a staple article of commerce, and do not have any substantial noninfringing uses.

196. This case is an exceptional case under 35 U.S.C. § 285.

197. Plaintiffs are entitled to monetary relief against Defendants pursuant to 35 U.S.C. §§ 284–85, including lost profit and/or reasonable royalty damages in an amount to be proven at trial, treble damages for Defendants' willful infringement, and attorney fees. 35 U.S.C. § 287 does not apply at least because Plaintiffs do not offer for sale an "article" covered by the '948 patent subject to the marking provision.

198. Plaintiffs have been substantially and irreparably harmed by these infringing activities and will continue to be so unless those activities are enjoined by this Court.

199. Plaintiffs do not have an adequate remedy at law.

200. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants pursuant to 35 U.S.C. § 283.

## COUNT IV
**(Infringement of U.S. Patent No. 9,063,673)**

201. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

202. On information and belief, Defendants have infringed and continue to infringe one or more claims of the '673 patent by making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products under 35 U.S.C. § 271(a), by

inducing others to infringe under 35 U.S.C. § 271(b), by contributing to infringement under 35 U.S.C. § 271(c), and/or otherwise carrying out acts constituting infringement of the ’673 patent under 35 U.S.C. § 271, either literally or under the doctrine of equivalents.

203. For example, on information and belief, the making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products infringes at least claim 1 of the ’673 patent because use of the Accused Products collectively includes, literally or under the doctrine of equivalents, performing a method for execution by a processing module, the method comprising, receiving application requirements and parameters from a requirements unit; receiving feedback from a testing unit regarding testing of application code as the application code is being generated; and generating, in a plurality of phases, the application code based on the application requirements, the parameters, and the feedback, wherein, for a current iteration of a plurality of iterations of a phase of the plurality of phases, entering a loop, wherein the loop includes, selecting an implementation tool from a plurality of implementation tools in accordance with implementation constraints and a previous implementation result; generating a current implementation result based on an application of the implementation tool, one or more of the application requirements, one or more of the parameters, and the previous implementation result; receiving current feedback of the feedback regarding the current implementation result; determining whether the current implementation result meets the one or more of the application requirements and passes a current iteration of testing as indicated by the current feedback; when the current implementation result does not meet the one or more of the application requirements or does not pass the current iteration of the testing, adjusting one or more of selecting the implementation tool and the one or more of the application requirements to produce an adjusted implementation set; and repeating the loop using the adjusted implementation set and based on the

current feedback; and when the current implementation result meets the one or more of the application requirements and passes a current iteration of testing, exiting the loop.

204. On information and belief, any directly infringing uses of the Accused Products by others occur with Defendants' specific intent and encouragement and are uses that Defendants know occur or are willfully blind to the fact that they occur.

205. On information and belief, at least since February 24, 2025, and as of any earlier date Plaintiffs prove at trial, Defendants' infringement of the '673 patent has been and continues to be willful, intentional, deliberate, and in conscious disregard of Plaintiffs' rights under the patent.

206. On information and belief, Defendants have actively induced, encouraged, aided, and/or abetted infringing uses by others under 35 U.S.C. § 271(b), and continue to do so, with knowledge and specific intent, or willful blindness, that these uses would contravene Plaintiffs' rights under the '673 patent.

207. On information and belief, Defendants have knowingly or with willful blindness contributed to infringement under 35 U.S.C. § 271(c) and continue to do so. On information and belief, the Accused Products are designed for use as part of an infringing system or use, are not a staple article of commerce, and do not have any substantial noninfringing uses.

208. This case is an exceptional case under 35 U.S.C. § 285.

209. Plaintiffs are entitled to monetary relief against Defendants pursuant to 35 U.S.C. §§ 284–85, including lost profit and/or reasonable royalty damages in an amount to be proven at trial, treble damages for Defendants' willful infringement, and attorney fees. 35 U.S.C. § 287 does not apply at least because Plaintiffs do not offer for sale an "article" covered by the '673 patent subject to the marking provision.

210. Plaintiffs have been substantially and irreparably harmed by these infringing activities and will continue to be so unless those activities are enjoined by this Court.

211. Plaintiffs do not have an adequate remedy at law.

212. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants pursuant to 35 U.S.C. § 283.

**COUNT V**
**(Infringement of U.S. Patent No. 9,778,916)**

213. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

214. On information and belief, Defendants have infringed and continue to infringe one or more claims of the ’916 patent by making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products under 35 U.S.C. § 271(a), by inducing others to infringe under 35 U.S.C. § 271(b), by contributing to infringement under 35 U.S.C. § 271(c), and/or otherwise carrying out acts constituting infringement of the ’916 patent under 35 U.S.C. § 271, either literally or under the doctrine of equivalents.

215. For example, on information and belief, the making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products infringes at least claim 1 of the ’916 patent because use of the Accused Products collectively includes, literally or under the doctrine of equivalents, performing a method for execution by one or more computing entities to generate application code for an application system from inputted requirements, the method comprising generating, automatically by the one or more computing entities, a plurality of application system state transitions from inputted requirements and parameters for a plurality of components of the application system, wherein an application system state transition of the plurality of application system state transitions includes one or more pre-conditions, one or more

actions, or one or more post-conditions, wherein the parameters include one or more of application system behavioral constraints, application system correctness conditions, an application platform, behavior conditions, or data definitions; generating, automatically by the one or more computing entities, in a plurality of implementation phases of an automated process of generating the application code for the plurality of components, the application code of the application system from the plurality of application system state transitions, wherein, for each component of the plurality of components during each implementation phase of the plurality of implementation phases, a plurality of iterations are performed to produce a plurality of intermediate results that corresponds to developing application code, wherein feedback is received based on at least one test case that indicates whether the application code is functioning or is not functioning in accordance with the inputted requirements and parameters, and wherein when the feedback indicates the application code is not functioning in accordance with the inputted requirements and parameters, reverting to generating the plurality of application system state transitions including modifying at least one application system state transition of the plurality of application system state transitions; for a current iteration of the plurality of iterations for a component of the plurality of components during a current implementation phase of the plurality of implementation phases generating a current intermediate result of the plurality of intermediate results, performing a series of steps comprising, generating the current intermediate result based on a previous intermediate result of the plurality of intermediate results and in accordance with current implementation phase development factors that includes at least one of: one or more of the plurality of application system state transitions, one or more of the parameters, or application of one or more implementation tools; generating the at least one test case based on the one or more of the plurality of application system state transitions; testing the current intermediate result in accordance with the at least one

test case; when test results of the testing do not meet a threshold, modifying one or more of: the one or more of the plurality of application system state transitions, the one or more of the parameters, or the application of one or more implementation tools to produce modified current implementation phase development factors; and repeating the series of steps using the modified current implementation phase development factors to produce a new current intermediate result, wherein the new current intermediate result replaces the current intermediate result; when the test results of the testing do not meet a threshold over a number of repetitions of the series of steps based on modification of at least one of: the application system state transitions, the parameters, or the implementation tools to produce modified current implementation phase development factors, providing the feedback that indicates the application code is not functioning in accordance with the inputted requirements and parameters; and when the test results of the testing meets, or exceeds a threshold, exiting the series of steps and providing the feedback that indicates the application code is functioning in accordance with the inputted requirements and parameters; and generating, automatically by the one or more computing entities, a final application code corresponding to the application code after execution of a last iteration of the plurality of iterations.

216. On information and belief, any directly infringing uses of the Accused Products by others occur with Defendants' specific intent and encouragement and are uses that Defendants know occur or are willfully blind to the fact that they occur.

217. On information and belief, at least since February 24, 2025, and as of any earlier date Plaintiffs prove at trial, Defendants' infringement of the '916 patent has been and continues to be willful, intentional, deliberate, and in conscious disregard of Plaintiffs' rights under the patent.

218. On information and belief, Defendants have actively induced, encouraged, aided,

and/or abetted infringing uses by others under 35 U.S.C. § 271(b), and continue to do so, with knowledge and specific intent, or willful blindness, that these uses would contravene Plaintiffs' rights under the '916 patent.

219. On information and belief, Defendants have knowingly or with willful blindness contributed to infringement under 35 U.S.C. § 271(c) and continue to do so. On information and belief, the Accused Products are designed for use as part of an infringing system or use, are not a staple article of commerce, and do not have any substantial noninfringing uses.

220. This case is an exceptional case under 35 U.S.C. § 285.

221. Plaintiffs are entitled to monetary relief against Defendants pursuant to 35 U.S.C. §§ 284–85, including lost profit and/or reasonable royalty damages in an amount to be proven at trial, treble damages for Defendants' willful infringement, and attorney fees. 35 U.S.C. § 287 does not apply at least because Plaintiffs do not offer for sale an "article" covered by the '916 patent subject to the marking provision.

222. Plaintiffs have been substantially and irreparably harmed by these infringing activities and will continue to be so unless those activities are enjoined by this Court.

223. Plaintiffs do not have an adequate remedy at law.

224. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants pursuant to 35 U.S.C. § 283.

## COUNT VI
## (Infringement of U.S. Patent No. 9,858,046)

225. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

226. On information and belief, Defendants have infringed and continue to infringe one or more claims of the '046 patent by making, using, selling, offering for sale within the United

States, or importing into the United States the Accused Products under 35 U.S.C. § 271(a), by inducing others to infringe under 35 U.S.C. § 271(b), by contributing to infringement under 35 U.S.C. § 271(c), and/or otherwise carrying out acts constituting infringement of the ’046 patent under 35 U.S.C. § 271, either literally or under the doctrine of equivalents.

227. For example, on information and belief, the making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products infringes at least claim 1 of the ’046 patent because the Accused Products collectively include an implementation unit comprising, literally or under the doctrine of equivalents, an input/output module operably coupled to receive application requirements and parameters wherein the input/output module is configured to provide connectivity to another computing entity; and a processing module operable to implement production of application code in an iterative manner using one or more implementation tools and using an architecture code level design phase to produce code component architecture artifacts of at least a portion of the application code based on one or more of: the application requirements, the parameters, or architecture phase feedback, wherein the architectural code level design phase includes an architectural level design phase loop; a high-level design (HLD) phase to produce code HLD artifacts based on one or more of the code component architecture artifacts, the application requirements, the parameters, or HLD phase feedback, wherein the HLD phase includes an HLD phase loop; a low-level design (LLD) phase to produce code LLD artifacts based on one or more of the code component architecture artifacts, the code HLD artifacts, the application requirements, the parameters, or LLD phase feedback, wherein the LLD phase includes an LLD phase loop; and an application code level development phase to produce code artifacts based on one or more of the HLD artifacts, the LLD artifacts, the application requirements, the parameters, or code development phase feedback, wherein the

application code level development phase includes an application code level development phase loop, and wherein a plurality of the one or more implementation tools is used in one or more of the architectural code level design phase loop, the HLD phase loop, the LLD phase loop and the application code level development phase loop, and wherein a first implementation tool of the one or more implementation tools is used in one iteration of one of the architectural code level design phase, the HLD phase, the LLD phase and the application code level development phase, and a second implementation tool of the one or more implementation tools is used in another iteration of the one of the architectural code level design phase, the HLD phase, the LLD phase and the application code level development phase.

228. On information and belief, any directly infringing uses of the Accused Products by others occur with Defendants' specific intent and encouragement and are uses that Defendants know occur or are willfully blind to the fact that they occur.

229. On information and belief, at least since February 24, 2025, and as of any earlier date Plaintiffs prove at trial, Defendants' infringement of the '046 patent has been and continues to be willful, intentional, deliberate, and in conscious disregard of Plaintiffs' rights under the patent.

230. On information and belief, Defendants have actively induced, encouraged, aided, and/or abetted infringing uses by others under 35 U.S.C. § 271(b), and continue to do so, with knowledge and specific intent, or willful blindness, that these uses would contravene Plaintiffs' rights under the '046 patent.

231. On information and belief, Defendants have knowingly or with willful blindness contributed to infringement under 35 U.S.C. § 271(c) and continue to do so. On information and belief, the Accused Products are designed for use as part of an infringing system or use, are not a

staple article of commerce, and do not have any substantial noninfringing uses.

232. This case is an exceptional case under 35 U.S.C. § 285.

233. Plaintiffs are entitled to monetary relief against Defendants pursuant to 35 U.S.C. §§ 284–85, including lost profit and/or reasonable royalty damages in an amount to be proven at trial, treble damages for Defendants' willful infringement, and attorney fees. 35 U.S.C. § 287 does not apply at least because Plaintiffs do not offer for sale an "article" covered by the '046 patent subject to the marking provision.

234. Plaintiffs have been substantially and irreparably harmed by these infringing activities and will continue to be so unless those activities are enjoined by this Court.

235. Plaintiffs do not have an adequate remedy at law.

236. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants pursuant to 35 U.S.C. § 283.

## COUNT VII
## (Infringement of U.S. Patent No. 10,664,243)

237. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

238. On information and belief, Defendants have infringed and continue to infringe one or more claims of the '243 patent by making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products under 35 U.S.C. § 271(a), by inducing others to infringe under 35 U.S.C. § 271(b), by contributing to infringement under 35 U.S.C. § 271(c), and/or otherwise carrying out acts constituting infringement of the '243 patent under 35 U.S.C. § 271, either literally or under the doctrine of equivalents.

239. For example, on information and belief, the making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products infringes at

least claim 1 of the ’243 patent because use of the Accused Products collectively includes, literally or under the doctrine of equivalents, performing a method for execution by one or more computing entities, the method comprising: iteratively generating application code utilizing one or more implementation tools and by generating, automatically by the one or more computing entities, a plurality of requirements artifacts based on a component use case input requirement artifact, a scenario input requirement artifact, and a correctness criteria input requirement artifact; generating, automatically by the one or more computing entities for an architecture level design phase, a plurality of architecture level artifacts based on at least some of the plurality of requirements artifacts and the component use case input requirement artifact; generating, automatically by the one or more computing entities for a high-level design (HLD) phase, a plurality of HLD artifacts based on at least some of the plurality of architecture level artifacts, at least a second some of the plurality of requirement artifacts, non-functional input requirements, and protocol document input requirements; generating, automatically by the one or more computing entities for a low-level design (LLD) phase, a plurality of LLD artifacts based on at least a second some of the plurality of architecture level artifacts, at least some of the plurality of HLD artifacts, behavior definition input requirement artifacts, and platform document input requirement artifacts; and generating, automatically by the one or more computing entities for an application code level development phase, a plurality of code artifacts based on at least some of the plurality of LLD artifacts, at least a second some of the plurality of HLD artifacts, and at least a third some of: the plurality of requirement artifacts, the behavior definition input requirement artifacts, and the platform document input requirement artifacts, wherein at least one of the plurality of code artifacts includes the application code.

240. On information and belief, any directly infringing uses of the Accused Products by

others occur with Defendants' specific intent and encouragement and are uses that Defendants know occur or are willfully blind to the fact that they occur.

241. On information and belief, at least since February 24, 2025, and as of any earlier date Plaintiffs prove at trial, Defendants' infringement of the '243 patent has been and continues to be willful, intentional, deliberate, and in conscious disregard of Plaintiffs' rights under the patent.

242. On information and belief, Defendants have actively induced, encouraged, aided, and/or abetted infringing uses by others under 35 U.S.C. § 271(b), and continue to do so, with knowledge and specific intent, or willful blindness, that these uses would contravene Plaintiffs' rights under the '243 patent.

243. On information and belief, Defendants have knowingly or with willful blindness contributed to infringement under 35 U.S.C. § 271(c) and continue to do so. On information and belief, the Accused Products are designed for use as part of an infringing system or use, are not a staple article of commerce, and do not have any substantial noninfringing uses.

244. This case is an exceptional case under 35 U.S.C. § 285.

245. Plaintiffs are entitled to monetary relief against Defendants pursuant to 35 U.S.C. §§ 284–85, including lost profit and/or reasonable royalty damages in an amount to be proven at trial, treble damages for Defendants' willful infringement, and attorney fees. 35 U.S.C. § 287 does not apply at least because Plaintiffs do not offer for sale an "article" covered by the '243 patent subject to the marking provision.

246. Plaintiffs have been substantially and irreparably harmed by these infringing activities and will continue to be so unless those activities are enjoined by this Court.

247. Plaintiffs do not have an adequate remedy at law.

248. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants pursuant to 35 U.S.C. § 283.

**COUNT VIII**
**(Infringement of U.S. Patent No. 11,029,934)**

249. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

250. On information and belief, Defendants have infringed and continue to infringe one or more claims of the ’934 patent by making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products under 35 U.S.C. § 271(a), by inducing others to infringe under 35 U.S.C. § 271(b), by contributing to infringement under 35 U.S.C. § 271(c), and/or otherwise carrying out acts constituting infringement of the ’934 patent under 35 U.S.C. § 271, either literally or under the doctrine of equivalents.

251. For example, on information and belief, the making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products infringes at least claim 1 of the ’934 patent because use of the Accused Products collectively includes, literally or under the doctrine of equivalents, performing a method for execution by a computing device, the method comprising, analyzing, by the computing device, operational code to determine a plurality of identifiers used within the operational code and identify different programming languages within the operational code, wherein the analyzing further includes dividing the operational code into a plurality of code sections based on the different programming languages; for each code section of the plurality of code sections, ascertaining identifiers of the plurality of identifiers based on the corresponding programming language of the different programming languages; determining, for a code section of the plurality of code sections, that the one or more potential features corresponds to an emulator or a programming language converter; testing the

one or more potential features based on a corresponding feature test suite; and when the testing verifies that the one or more potential features corresponds to an emulator or the programming language converter, flagging a corresponding portion of the code section as including the emulator or the programming language converter such that, when the operational code is reprogrammed into a desired programming language, the emulator or the programming language converter is not reprogrammed; and grouping, by the computing device, like identifiers based on a relational aspect of the identifiers to produce a plurality of identifier groups; for one or more identifier groups of the plurality of identifier groups determining, by the computing device, one or more potential features of the one or more identifier groups, wherein a feature corresponds to an aspect of the operational code; testing, by the computing device, the one or more potential features based on a corresponding feature test suite to produce feedback regarding meaningfulness of the one or more potential features, wherein the meaningfulness of a feature indicates the degree to which it is likely the feature is a viable aspect of the operational code; when the meaningfulness is above a threshold, adding, by the computing device, the one or more potential features as one or more meaningful features to a feature set; and when the meaningfulness is at or below the threshold, adjusting, by the computing device, one or more of the relational aspect; and one or more testing parameters used to generate the corresponding feature test suite; and reprogramming the operational code into the desired programming language.

252. On information and belief, any directly infringing uses of the Accused Products by others occur with Defendants' specific intent and encouragement and are uses that Defendants know occur or are willfully blind to the fact that they occur.

253. On information and belief, at least since February 24, 2025, and as of any earlier date Plaintiffs prove at trial, Defendants' infringement of the '934 patent has been and continues

to be willful, intentional, deliberate, and in conscious disregard of Plaintiffs' rights under the patent.

254. On information and belief, Defendants have actively induced, encouraged, aided, and/or abetted infringing uses by others under 35 U.S.C. § 271(b), and continue to do so, with knowledge and specific intent, or willful blindness, that these uses would contravene Plaintiffs' rights under the '934 patent.

255. On information and belief, Defendants have knowingly or with willful blindness contributed to infringement under 35 U.S.C. § 271(c) and continue to do so. On information and belief, the Accused Products are designed for use as part of an infringing system or use, are not a staple article of commerce, and do not have any substantial noninfringing uses.

256. This case is an exceptional case under 35 U.S.C. § 285.

257. Plaintiffs are entitled to monetary relief against Defendants pursuant to 35 U.S.C. §§ 284–85, including lost profit and/or reasonable royalty damages in an amount to be proven at trial, treble damages for Defendants' willful infringement, and attorney fees. 35 U.S.C. § 287 does not apply at least because Plaintiffs do not offer for sale an "article" covered by the '934 patent subject to the marking provision.

258. Plaintiffs have been substantially and irreparably harmed by these infringing activities and will continue to be so unless those activities are enjoined by this Court.

259. Plaintiffs do not have an adequate remedy at law.

260. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants pursuant to 35 U.S.C. § 283.

## COUNT IX
## (Infringement of U.S. Patent No. 12,032,941)

261. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth

herein.

262. On information and belief, Defendants have infringed and continue to infringe one or more claims of the ’941 patent by making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products under 35 U.S.C. § 271(a), by inducing others to infringe under 35 U.S.C. § 271(b), by contributing to infringement under 35 U.S.C. § 271(c), and/or otherwise carrying out acts constituting infringement of the ’941 patent under 35 U.S.C. § 271, either literally or under the doctrine of equivalents.

263. For example, on information and belief, the making, using, selling, offering for sale within the United States, or importing into the United States the Accused Products infringes at least claim 1 of the ’941 patent because use of the Accused Products collectively includes, literally or under the doctrine of equivalents, performing a method comprising obtaining, by a computing device, legacy operational code for analysis, wherein the operational code includes a plurality of versions; determining, by the computing device, that the plurality of versions of the legacy operational code includes more than one legacy programming language; dividing, by the computing device, the legacy operational code into a plurality of sections based on different legacy programming languages; data mining, by the computing device, the plurality of sections of the legacy operational code to determine a plurality of identifiers; determining, by the computing device, a plurality of features of the plurality of sections of the legacy operational code based on grouping lines of code of the plurality of versions based on the plurality of identifiers; generating, by the computing device, a set of requirements from the plurality of features; and creating, by the computing device, new operational code using a new programming language from the set of requirements.

264. On information and belief, any directly infringing uses of the Accused Products by

others occur with Defendants' specific intent and encouragement and are uses that Defendants know occur or are willfully blind to the fact that they occur.

265. On information and belief, at least since February 24, 2025, and as of any earlier date Plaintiffs prove at trial, Defendants' infringement of the '941 patent has been and continues to be willful, intentional, deliberate, and in conscious disregard of Plaintiffs' rights under the patent.

266. On information and belief, Defendants have actively induced, encouraged, aided, and/or abetted infringing uses by others under 35 U.S.C. § 271(b), and continue to do so, with knowledge and specific intent, or willful blindness, that these uses would contravene Plaintiffs' rights under the '941 patent.

267. On information and belief, Defendants have knowingly or with willful blindness contributed to infringement under 35 U.S.C. § 271(c) and continue to do so. On information and belief, the Accused Products are designed for use as part of an infringing system or use, are not a staple article of commerce, and do not have any substantial noninfringing uses.

268. This case is an exceptional case under 35 U.S.C. § 285.

269. Plaintiffs are entitled to monetary relief against Defendants pursuant to 35 U.S.C. §§ 284–85, including lost profit and/or reasonable royalty damages in an amount to be proven at trial, treble damages for Defendants' willful infringement, and attorney fees. 35 U.S.C. § 287 does not apply at least because Plaintiffs do not offer for sale an "article" covered by the '941 patent subject to the marking provision.

270. Plaintiffs have been substantially and irreparably harmed by these infringing activities and will continue to be so unless those activities are enjoined by this Court.

271. Plaintiffs do not have an adequate remedy at law.

272. Plaintiffs are entitled to preliminary and permanent injunctive relief against Defendants pursuant to 35 U.S.C. § 283.

**COUNT X**
**(Breach of Contract – NDA)**

273. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

274. The NDA is a valid and binding contract.

275. Updraft has performed and continues to perform all of its obligations under the NDA.

276. Defendants have breached the NDA and continue to breach the NDA at least by using Updraft's confidential information for purposes other than those permitted in the agreement, including in the development and use of the Accused Products collectively.

277. On information and belief, Defendants have breached the NDA at least by reverse engineering, decompiling, and/or disassembling software, hardware, products, or technology disclosed to them by Plaintiffs pursuant to the NDA.

278. As a direct and proximate result of Defendants' breach, Plaintiffs have suffered and continue to suffer general, expectation, compensatory, incidental, and consequential damages in an amount to be proven at trial.

279. As per § 6b of the NDA, Plaintiffs have and continue to suffer irreparable harm for which monetary damages are inadequate compensation, and Plaintiffs are entitled to injunctive relief, including preliminary and permanent injunctive relief.

**COUNT XI**
**(Breach of Contract – POC Agreement)**

280. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

281. The POC Agreement is a valid and binding contract.

282. Updraft performed all of its obligations under the POC Agreement.

283. Defendants breached the POC Agreement and continue to breach the POC Agreement at least by using Updraft's tools, installed in Defendants' Amazon Web Services environment, for purposes other than those permitted in the agreement, including in the development and use of the Accused Products collectively.

284. As a direct and proximate result of Defendants' breach, Plaintiffs have suffered and continue to suffer general, expectation, compensatory, incidental, and consequential damages in an amount to be proven at trial.

285. Plaintiffs have and continue to suffer irreparable harm for which monetary damages are inadequate compensation, and Plaintiffs are entitled to injunctive relief, including preliminary and permanent injunctive relief.

**COUNT XII**
**(Unjust Enrichment (Alternative to Breach of Contract))**

286. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein, except to the extent those paragraphs allege the existence of any contract between any Plaintiffs and any Defendants.

287. Plaintiffs provided Defendants with information relating to Plaintiffs' tools for automated extraction of business rules from computer code, automated testing of computer code, and automated modernization of computer code. Plaintiffs spent thousands of manhours to transfer such knowledge to Defendants. Over 50 employees of Defendants were involved in this transfer of knowledge. The transfer of knowledge included demonstrations (e.g., proof of concept) of Plaintiffs' tools. The transfer of knowledge further included installation of such tools on servers under Defendants' custody and control. The transfer of knowledge further included Plaintiffs

answering questions about such tools posed by Defendants.

288. By using Plaintiffs' disclosures and efforts to create Defendants' own competing Accused Products, including RapidX, Defendants retained the benefit of Plaintiffs' disclosures and efforts to Plaintiffs' detriment.

289. Defendants have not compensated Plaintiffs for the value of Plaintiffs' disclosures and labor provided to Defendants.

290. This retention of benefit violates fundamental principles of justice, equity, and good conscience.

291. On information and belief, Plaintiffs' damages at least include profits obtained by Defendants that would otherwise have gone to, or been shared by, Plaintiffs.

292. On information and belief, by using Plaintiffs' disclosures and labor to develop the Accused Products, including RapidX, Defendants saved money and manhours and developed the Accused Products, including RapidX, on a shorter timeline.

293. On information and belief, Defendants saved at least tens of millions of dollars (including, but not limited to, through saving manhours) by using Plaintiffs' disclosures and labor to develop the Accused Products, including RapidX.

294. Plaintiffs have and continue to suffer irreparable harm for which monetary damages are inadequate compensation, and Plaintiffs are entitled to injunctive relief, including preliminary and permanent injunctive relief.

## COUNT XIII
## (Intentional Interference with Prospective Economic Advantage)

295. Plaintiffs reallege and incorporate the foregoing paragraphs as if fully set forth herein.

296. Plaintiffs reasonably expected economic benefit or advantage from the parties'

relationship whereby Defendants were to market and/or service Defendants' customers using Plaintiffs' tools for automated extraction of business rules from computer code, automated testing of computer code, and/or automated modernization of computer code.

297. On information and belief, Defendants had knowledge of Plaintiffs' expectation.

298. Defendants intentionally, wrongfully, and maliciously interfered with Plaintiffs' expected economic benefit by using Plaintiffs' information and labor to develop and market, without any benefit to Plaintiffs, Defendants' own competing products.

299. In the absence of Defendants' interference, Plaintiffs would have received their anticipated economic benefit.

300. On information and belief, Plaintiffs' damages at least include profits obtained by Defendants that would otherwise have gone to, or been shared by, Plaintiffs.

301. Plaintiffs have and continue to suffer irreparable harm for which monetary damages are inadequate compensation, and Plaintiffs are entitled to injunctive relief, including preliminary and permanent injunctive relief.

## **REQUEST FOR RELIEF**

Wherefore, Plaintiffs request judgment as follows:

a. A judgment that Defendants, individually or collectively, infringe one or more claims of the patents-in-suit, directly and/or indirectly, literally and/or under the doctrine of equivalents;

b. A judgment that Defendants, individually or collectively, engaged in knowing and willful infringement of one or more claims of the patents-in-suit;

c. That, in accordance with 35 U.S.C. § 283, Defendants and their affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all of those acting on behalf or in active concert or participation with any of them, be preliminary and

permanently enjoined from infringing the patents-in-suit and making, using, selling, offering for sale, and importing the Accused Products;

d. An award of damages under 35 U.S.C. § 284 of $500 million or an amount to be proven sufficient to compensate Plaintiffs for Defendants' infringement, including but not limited to, damages for lost profits and in no event less than a reasonable royalty, together with interests and costs, including an enhancement of damages of up to three times for Defendants' willful infringement;

e. A declaration that this is an exceptional case and that Plaintiffs be awarded their reasonable attorney fees under 35 U.S.C. § 285;

f. A judgment that Defendants have breached the NDA and the POC Agreement;

g. An award of actual damages from Defendants for their breaches of the NDA and the POC Agreement, including general, compensatory, expectation, incidental, and consequential damages, in an amount to be proven;

h. In the alternative to a judgment that Defendants have breached the NDA and POC Agreement, a judgment that Defendants have been unjustly enriched.

i. A judgment that Defendants intentionally interfered with Plaintiffs' prospective economic advantage.

j. An award of damages for Defendants' unjust enrichment (as an alternative to breach of contract) and/or intentional interference with Plaintiffs' prospective economic advantage in an amount to be proven, to include at least (i) the unjust enrichment of Defendants and their affiliates, employees, agents, officers, directors, attorneys, and successors from Defendants' tortious activity; (ii) the revenue or profits that Plaintiffs

would have made but-for Defendants' tortious activity; and/or (iii) a disgorgement of profits earned by Defendants and their affiliates, employees, agents, officers, directors, attorneys, successors due to Defendants' tortious activity;

k. That Defendants and their affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all of those acting on behalf or in active concert or participation with any of them, be preliminary and permanently enjoined from benefiting from Defendants' breach of the NDA and POC Agreement and from further breaching the NDA and POC Agreement, including being enjoined from any activity relating to the Accused Products;

l. That Defendants and their affiliates, employees, agents, officers, directors, attorneys, successors, and assigns and all of those acting on behalf or in active concert or participation with any of them, be preliminary and permanently enjoined from benefiting from Defendants' intentional interference with Plaintiffs' prospective economic advantage, including being enjoined from any activity relating to the Accused Products.

m. Costs and expenses in this action;

n. An award of prejudgment and post-judgment interest; and

o. Such further and other relief as the Court may deem just and proper;

## JURY DEMAND

Plaintiffs demand trial by jury on all claims and issues so triable.

Date: September 22, 2025

Respectfully submitted,

*/s/ Max Stein*________
Max A. Stein
Keith Stolte
**MAXSON MAGO & MACAULAY, LLP**
77 W. Wacker Drive, Suite 4500
Chicago, IL 60601
T: 312-803-0378
mstein@em3law.com
kstolte@em3law.com

Dmitry V. Shelhoff (*pro hac* motion to be filed)
Kenneth S. Canfield (*pro hac* motion to be filed)
Catharina J. Chin Eng (*pro hac* motion to be filed)
**SHELHOFF CANFIELD & CHIN LLC**
30 Chatham Rd. #19
Short Hills, NJ 07078
T: 973-221-4539
dshelhoff@scciplaw.com
kcanfield@scciplaw.com
cchin@scciplaw.com

*Attorneys for Plaintiffs*