**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| Natsoft Corporation, Updraft, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-11517 |
| | ) | |
| Hexaware Technologies Limited,<br>Hexaware Technologies, Inc. | ) | Hon. Manish S. Shah |
| | ) | |
| | ) | |
| Defendants. | ) | |

**Defendant Hexaware Technologies Limited and Defendant Technologies, Inc.'s Brief in Support of their Motion to Dismiss the Complaint in Full and With Prejudice**

# TABLE OF CONTENTS

**Page**


I. PRELIMINARY STATEMENT ..... 1

II. TECHNOLOGICAL BACKGROUND AND DESCRIPTION OF THE PATENTS ..... 3

III. THE INFRINGEMENT ALLEGATIONS IN THE COMPLAINT ..... 6

IV. THE NON-PATENT ALLEGATIONS IN THE COMPLAINT ..... 8

V. LEGAL STANDARD – MOTION TO DISMISS UNDER FRCP 12(b)(6) ..... 9

a. Complaints Alleging Infringement of Invalid Patents Should be Dismissed for Failure to State a Claim ..... 10

b. The Federal Circuit has elaborated on types of computer and software-related claims that are abstract and fail Alice prong 1. ..... 11

c. The Federal Circuit has elaborated on types of computer and software-related claims that fail Alice prong 2 as not containing "something more." ..... 12

VI. ARGUMENT ..... 13

a. The Patents-in-Suit are Directed to the Computer Implementation of the Abstract SDLC to Write Computer Code and are Therefore Invalid Under 35 U.S.C. § 101. ..... 13

i. Claim 1 of the '106 Patent is Representative of the First Family; Claim 1 of the '934 Patent is Representative of the Second Family. ..... 13

ii. The Representative Claims are Invalid as Directed to Patent-Ineligible Subject Matter. ..... 14

iii. The Other Claims Add Nothing Material to the Representative Claims and are Unpatentable as Drawn to Abstract Material. ..... 21

b. The Complaint Fails to Plausibly Allege Patent Infringement ..... 23

c. The Non-Patent Claims Fail as not Stating a Claim on Which Relief may be Granted. ..... 24

i. The Complaint Fails to Properly Allege Breach of Contract. ..... 24

ii. The Complaint Fails to Properly Allege Unjust Enrichment. ..... 26

iii. The Complaint Fails to Properly Allege Interference with Prospective Economic Advantage. .......... 26

VII. CONCLUSION .......... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Labs of Tex. v,. DIRECTTV,*
LLC, 838 F.3d 1253 (Fed. Cir. 2016) ........ 11

*Ali v. Shaw,*
481 F.3d 942 (7th Cir. 2007) ........ 26

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
573 U.S. 208 (2014) ........ 1, 10, 11, 12, 15, 20

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ........ 9

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ........ 9, 23

*Bootler, LLC v. Google, LLC,*
No. 24-cv-3660, 2025 U.S. Dist. LEXIS 172366 (N.D. Ill. Sept. 4, 2025) ........ 1, 10, 14

*Bot M8 LLC v. Sony Corp. of Am.,*
4 F.4th 1342 (Fed. Cir. 2021) ........ 23

*buySAFE, Inc. v. Google, Inc.,*
765 F.3d 1350 (Fed. Cir. 2014) ........ 13

*Cleary v. Philip Morris Inc.,*
656 F.3d 511 (7th Cir. 2011) ........ 26

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
776 F.3d 1343 (Fed. Cir. 2014) ........ 10, 11, 13, 16

*Customedia Techs., LLC v. Dish Network Corp.,*
951 F.3d 1359 (Fed. Cir. 2020) ........ 11, 16

*Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.,*
758 F.3d 1344 (Fed. Cir. 2014) ........ 12

*Electric Power Grp., LLC v. Alstom S.A.,*
830 F.3d 1350 (Fed. Cir. 2016) ........ 11, 12, 13, 19

*Enfish, LLC v. Microsoft Corp.,*
822 F.3d 1327 (Fed. Cir. 2016) ........ 10, 14

*Gottschalk v. Benson,*
409 U.S. 63 (1972) ........ 1, 2, 10

*Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) ........ 11, 12, 14

*Intell. Ventures I LLC v. Erie Indem. Co.*,
850 F.3d 1315 (Fed. Cir. 2017) ........ 20

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ........ 21

*nClosures Inc. v. Block & Co*,
770 F.3d 598 (7th Cir. 2014) ........ 24

*People.ai, Inc. v. Clari Inc.*,
2023 U.S. App. LEXIS 8294 (Fed. Cir. Apr. 7, 2023) ........ 12, 16, 21, 22

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ........ 4, 11, 13, 15, 20, 21

*RecogniCorp, LLC v. Nintendo Co., Ltd.*,
855 F.3d 1322 (Fed. Cir. 2017) ........ 14

*SAP America, Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ........ 1-

*SnowCast Solutions LLC v. Endurance Specialty Holdings, Ltd.*,
2016 U.S. Dist. LEXIS 37559 (N.D. Ill. Mar. 23, 2016) ........ 2, 10, 12, 13, 16, 21

*Trinity Info Media, LLC v. Covalent, Inc.*,
72 F.4th 1355 (Fed. Cir. 2023) ........ 15

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*,
916 F.3d 1363 (Fed. Cir. 2019) ........ 15

**Statutes**

35 U.S.C. § 101 ........ 1, 10, 16

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ........ 1, 9, 10

Defendants Hexaware Technologies, Ltd. and Hexaware Technologies, Inc. ("Hexaware" or "Defendants") move to dismiss the complaint (the "Complaint," ECF No. 1) filed by Plaintiffs Natsoft Corporation and Updraft, LLC ("Plaintiffs" or "Natsoft") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The Complaint alleges infringement of nine patents, breach of two contracts, unjust enrichment and intentional interference with prospective economic benefit. Each of the patents-in-suit are directed to the same, non-patentable subject matter and are therefore invalid under 35 U.S.C. § 101.[1] All claims fail because they do not plausibly allege any valid cause of action.

## I. PRELIMINARY STATEMENT

For "more than 150 years," the Supreme Court has held that patents cannot protect "laws of nature, natural phenomena, and abstract ideas" because these are "the basic tools of scientific and technological work." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 2354 (2014). (unanimous decision of the Court). Thus, "claims involving an algorithm for converting binary-coded decimal numerals into pure binary form" are patent-ineligible. *Id*., citing *Gottschalk v. Benson*, 409 U.S. 63, 65 (1972). In *Benson*, "the mathematical procedures can be carried out in existing computers long in use, no new machinery being necessary. And, as noted, they can also be performed without a computer." *Benson*, 409 U.S. at 67. Using "computers to compute" is not a patent-eligible "invention." *Bootler, LLC v. Google, LLC*, No. 24-cv-3660, 2025 U.S. Dist. LEXIS 172366, at *15 (N.D. Ill. Sept. 4, 2025).

Plaintiffs Complaint asserts that Hexaware has infringed patents directed to the abstract idea of generating computer code to perform a function described in inputted data ("requirements")

[1] 35 U.S.C. § 101 provides: "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."

in an automatic way, *i.e.*, with a computer. Plaintiff's "invention" is the same abstract idea that was found to be unpatentable in *Benson*: the conversion of inputted computer data in one form (decimal-coded binary) to computer data in a different form (pure binary). *Benson,* 409 U.S. at 71-72 (1972*)*. Plaintiff's algorithm, converting data in requirements form to data in code form, "can be carried out in existing computers long in use, no new machinery being necessary" and "can also be performed without a computer." *Id.*, at 67. And, in fact, Plaintiffs' algorithm has long been carried out successfully by existing computers and by hand, as expressly stated in the patents themselves: "While the above described [manual] software development process enables the creation of significant amounts of software annually, it is far from an optimal process." Shared specification of the patents attached to the Complaint as Exhibits 1-7 (*see* note 2 herein) ("FF Spec.") col. 3, ll. 29-32. The Supreme Court has found almost identical claims to be patent-ineligible in *Benson*. The claims here are likewise patent ineligible and invalid. They therefore cannot be infringed, warranting dismissal of the Complaint. *See, e.g., SnowCast Solutions LLC v. Endurance Specialty Holdings, Ltd.*, 2016 U.S. Dist. LEXIS 37559, *at *2* (N.D. Ill. Mar. 23, 2016) (United States District Judge Manish S. Shah).

Hexaware and Plaintiffs are competitors in the crowded marketplace for modernizing "legacy code." Compl. at ¶¶ 101, 104. Plaintiffs advance two theories of why Hexaware's competition is allegedly improper. First, they claim that they own patents to the well-known and routine "Software Development Life Cycle" or "SDLC," as implemented by computer instead of by hand and that Hexaware infringes those patents.[2] Second, undercutting their first theory,

[2] The Complaint asserts the following nine U.S. Patents: 8.640,106 (the "'106 Patent"); 8,972,928 (the "'928 Patent") 8,972,948 (the "'948 Patent"); 9,063,673 (the "'673 Patent"); 9,778,916 (the "'916 Patent"); 9,858,046 (the "'046 Patent"); 10,664,243 (the "'243 Patent"); 11,029,934 (the "'934 Patent"); 12,032,941 (the "'941 Patent). The first seven of these patents (the "First Family") are in a single family, have an earliest filing date of August 31, 2011, and share a common specification (the "FF Spec"). The

Plaintiffs claim that, far from being properly disclosed in these patents, their computer implementation of the SDLC is their confidential property and Hexaware breached contracts with Plaintiffs by marketing competing software. Neither of these theories meets the required pleading standard.

## II. TECHNOLOGICAL BACKGROUND AND DESCRIPTION OF THE PATENTS

"Legacy code" refers to software code that is written in obsolete or disfavored computer languages that have fallen out of popular use as the field of software engineering has evolved over time. Compl. ¶¶ 49–52. These languages may not be supported by modern updates and may "no longer be optimal for current hardware." *Id*. Further, current software engineers are often not familiar with these older languages, making maintenance and updates more difficult. *Id.*, ¶ 50.

In some cases, legacy code is integrally necessary for a business to carry out its core business functions, and, if the legacy code is not updated, the business may suffer. *Id.*, ¶ 52. For this reason, software engineers have for decades developed methods and tools to update and modernize legacy code which comprises converting code written in an old computer language to code written in a more modern language. *See* shared specification of the patents attached to the Complaint as Exhibits 8 and 9 (*see* note 2 herein) ("SF Spec."), col. 1, ll.1-5 and 56-58. The new code is written in a modern language that may be more easily parsed by modern computers.

Modernizing legacy code, therefore, is simply the computer analog of a human translator that translates one language (for example, an older version of English) to another (for example, modern English). The 1863 Gettysburg Address famously begins, "Four score and seven years ago." A translator would modernize this by translating to "eighty-seven years ago." Similarly, the

remaining two patents (the "Second Family") are in a second single family, have an earliest filing date of December 10, 2018, and share a common specification (the "SF Spec.").

same translator would modernize "'Twas the night before Christmas," to "It was Christmas Eve." In both these examples, fewer words are needed for the modernized phrase than for the "legacy" phrase, obsolete words ("score," and "'twas") are removed, and the modernized phrase is more easily parsed today. Translating one language to another is simply using a computer to perform a "mental process[] that can be performed in the human mind or using a pencil and paper," is an abstract idea and not patent-eligible. *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (citing with approval the patent challenger's comparison to a librarian assigning "identifiers" to books).

The process for updating code follows the well-known Software Development Life Cycle ("SDLC"). The SDLC has the following three general steps: (1) gathering of "requirements," or a list of what the computer program is supposed to do; (2) writing code to implement the requirements; and (3) testing the code by the application of "test cases"[3] to see if it properly implements the requirements. FF Spec col. 1, ll. 54-62. This process is done iteratively, so that if the testing phase reveals that the code does not work as intended, the cycle is repeated until the engineers and the business are satisfied with the code. *Id.*, Figs. 33–37. When translating legacy code to a modern language, the requirements are gathered by reviewing the legacy code and determining what the software already does. *See, e.g.*, SF Spec., col. 5, ll. 54-56. This cycle has been carried out by hand since software was first developed, and has also been automated. FF Spec. col. 1 ll. 56-57.[4]

---

[3] "Test cases" "include[] one or more input stimuli and one or more expected output results corresponding to the input stimuli. FF Spec. col. 24, ll. 17-19. "They are used to determine whether the developed code is [sic] functions as expected." *Id.* at 21-22.

[4] The earliest filing date for the First Family is August 31, 2011, predating the earliest filing date for the Second Family (December 10, 2018) by seven years. Therefore, something that was well-known, routine, or conventional before the filing date of the First Family was also well-known, routine, or conventional before the filing date of the Second Family.

The shared specification of the First Family acknowledges that the method of the "invention" mirrors the SDLC for non-specified "inputted" requirements. The shared specification of the Second Family identifies old software code as the source for the inputted requirements. Neither specification points out what, exactly, is allegedly new and not present in the older, well-known, routine methods implemented manually and with conventional computer tools used to translate legacy code.

The First Family specification includes 61 figures and describes each in great detail. Yet, at bottom, each of the figures draws the well-known SDLC algorithm. Figure 1, for example, comprises three functional "black boxes," one for gathering requirements (unit 12), one for writing code (unit 14), and one for testing (unit 16). *See also*, *id*., col. 5 l. 8 – col 8, l. 13.

The shared specification of the First Family includes more complicated *looking* figures, but close inspection reveals that these, too, are comprised of only functional "black boxes" representing the same routine SDLC phases. Figure 2, for example, includes a requirements unit (12), an implementation unit (14), and a testing unit (16). Each of these units are stated to be comprised of "one or more computers." The units are connected via a network. " *Id*.. col. 8 ll. 19-22. Box 18 lists the various types of requirements, unit 26 refers to the "application code," and unit 20 refers to the "application requirements," all of which are described only superficially in the specification. *Id*., col. 8, ll. 23 – 36; col. 8, ll. 49-51; col. 8, ll. 55-58. The lack of detail in the specification indicates these concepts are well-known, routine and conventional. The arrows in the figure show that the process is an iterative cycle (*i.e.*, the SDLC).

The shared specification for the Second Family includes 14 figures, each describing the same translation process: analyze legacy code, gather requirements, generate new code, test it, and repeat until the new code satisfies the requirements. Figure 1 depicts the cycle using a generic

computer network of conventional devices, including databases, servers, workstations, mainframes, and personal and mobile computers, connected by a network. SF Spec., Fig. 1 and col. 2, ll. 51-67. Figure 7 includes unit 110, to "analyze to determine valid identifiers," unit 112 to "group like identifiers based on a relational aspect," unit 114 to "determine a potential feature" and a testing iteration to be repeated until "meaningfulness above a threshold" (unit 118). The terms "feature" and "identifier" are described in the specification, but they refer to old concepts. A "feature" is "a relevant piece of the source code." *Id*., col. 7, ll. 49-51. An identifier is, "in general, a name for elements of the source code such [sic] variables, constants, types, labels, function, subroutine, packages, etc…most programming languages have a naming convention for identifiers…(e.g., variable, constant, type, function, subroutine, packages, etc.)." *Id*., col. 7, l. 61 – col. 8, l. 4.

This Second Family specification, therefore, simply states (using the defined, but old, terms "features" and "identifiers") that part of the translation process is to identify relevant features of the source code by data mining the old source code, grouping elements in the old source code that are similar to each other, and using those groupings to identify the relevant features that should be included in the new source code. The "invention" is to include only relevant features in the new code.

The same is true for every figure included in the patents: black boxes represent desired functions, and the functions are to be performed using well-known, routine methods and conventional computer tools. Neither specification includes any explanation of *how* a computer carries out the desired function represented by the black boxes. Without something more, this is just a mere patent-ineligible abstract idea.

## III. THE INFRINGEMENT ALLEGATIONS IN THE COMPLAINT

The Complaint alleges infringement of nine patents by three Accused Products, RapidX™, Amaze™, and Tensai®/ATOP™. Compl. at ¶ 1. The Complaint's descriptions regarding the Accused Products comprise statements allegedly made publicly by Hexaware that do no more than describe the various stages of the SDLC as implemented for modernizing legacy code. These statements mimic the generic and vague elements of the asserted claims. For example, the Accused Products have "GenAI capabilities, such as reverse engineering, code conversion and code creation." (*id*. ¶ 88); "RapidX integrates business context and automated intelligence into software development." (*id*., ¶ 108); and "AI Agents conduct deep code analysis, using reverse engineering to decode undocumented legacy systems (such as mainframe, older client-server technologies, older middleware technologies) and uncover hidden dependencies, dead code, data lineage, and critical business logic." (*id*., ¶ 110).

The Complaint pleads other statements, mimicking the language of the claims, "on information and belief," without providing any reference for the allegations. For example, the Complaint pleads at paragraph 119: "RapidX *generates application requirements from inputted requirements and parameters, and outputs the application requirements in accordance with a system communication protocol*." This statement mirrors the language of claim 1 of the '106 Patent: "operably coupled to *generate the application requirements from inputted requirements and parameters and output the application requirements in accordance with a system communication protocol*" (emphasis added). The Complaint also pleads the following at paragraph 120: "RapidX, alone or in connection with other Accused Products, <u>provides for testing of generated computer code based on the application requirements and the parameters</u> to produce feedback." This language, too, is a mirror of the language of claim 1 of the '106 Patent: "<u>generates</u>

a set of test cases based on the application requirements and the parameters" (emphasis added). The other allegations in the Complaint follow this same pattern.

These statements simply describe the well-known, routine SDLC as implemented by computer to write software. They, along with the claim language that they copy, include no description of *how* the "invention" should be implemented. Plaintiffs plead, in conclusory manner, infringement of "at least" one claim from each patent that is allegedly infringed. Plaintiffs do not identify any product-specific details that correspond to any identified claim element. As such, the Complaint lacks any specific allegations to support a cause of action.

## IV. THE NON-PATENT ALLEGATIONS IN THE COMPLAINT

Plaintiffs and Hexaware, although competitors, have also worked together on projects. The Complaint alleges, again, in conclusory manner, that Hexaware breached two contracts with Plaintiffs. The first, a non-disclosure agreement (the "NDA," Exhibit 10 to the Complaint), was entered into on or about July 4, 2022. Compl. Ex. 10 at p.1. This NDA provides for the exchange of confidential information (Section 1); in furtherance of "the actual or potential business relationship between the parties;" (Section 2); protection of this information (Section 2); and prohibits Plaintiffs from competing with Hexaware during the Term (one year) and for two years thereafter "to render any services to those clients of [Hexaware] which have been introduced by [Hexaware] to [Plaintiffs] with the exception of those clients with which [Plaintiffs] have an existing relationship or is in discussion with prior to the date" of the NDA (Section 6(j)).

The second "contract" is in the form of an email, described in the Complaint as a "Proof of Concept," or "POC" agreement.[5] Compl. at ¶ 72; Ex. 11. The POC was entered into by the

[5] Insofar as this is a Motion to Dismiss, Hexaware accepts, only for purposes of this Motion, that the POC comprises a contract.

parties on or about August 25, 2022. The POC states that Hexaware will deploy Plaintiffs' tools on its end-client's AWS[6] environment for the purpose of Hexaware "demonstrating the effectiveness of Updraft's Automated Legacy Modernization Tools to its end clients." *Id.*, at p. 2. Updraft would "provide the tools and support to Hexaware with instruction over video calls / screen share." Both parties agreed to "give their best efforts to make this mode of working a success." *Id*.

Plaintiffs allege "upon information and belief," that Hexaware breached these contracts by using "Plaintiffs' confidential information and/or Plaintiffs' tools…to develop Defendants' own competing tools so as to cut Plaintiffs out." Compl. ¶ 83. Plaintiffs claim that Hexaware was unjustly enriched by "using and taking advantage" of Plaintiffs' information. *Id*., ¶ 84. Plaintiffs also claim that Defendants "deprived Plaintiffs of the economic benefit Plaintiffs would have received had Defendants marketed Plaintiffs' tools to Defendants' customers." *Id.*, ¶ 86.

Plaintiffs' Complaint does not identify or particularize any alleged confidential information, a basis for any reasonable expectancy of profit, or anything unjust, and, therefore, these claims fail as well.

## V. LEGAL STANDARD – MOTION TO DISMISS UNDER FRCP 12(b)(6)

The standard for dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) requires the court to determine whether the complaint states a claim to relief that is plausible on its face. A claim is plausible when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. This standard, established in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544

[6] Upon information and belief, "AWS" refers to Amazon Web Services cloud computer and storage services.

(2007) requires more than mere labels, conclusions, or a formulaic recitation of the elements of a cause of action. The court must accept all well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff, but it need not accept legal conclusions as true. *See, e.g*., *Bootler*, U.S. Dist. LEXIS 172366, at *5–6.

a. Complaints Alleging Infringement of Invalid Patents Should be Dismissed for Failure to State a Claim.

"There can be no infringement without patent eligibility." *SnowCast*, 2016 U.S. Dist. LEXIS 37559, *2. Courts routinely find patents that are directed to abstract ideas unpatentable under 35 U.S.C. § 101 at the pleading stage. *See, e.g., id.; Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349–51 (Fed. Cir. 2014). A Rule 12(b)(6) dismissal is proper where patent ineligibility is apparent on the face of the asserted patents. *See, e.g., SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018).

*Alice v. CLS Bank ("Alice")* provides the two-pronged standard for patent validity under § 101. 573 U.S. at 217. First, are the claims directed to an abstract idea? If yes, then a court is to proceed to prong two: do the elements, individually and as an ordered combination, contain an "inventive concept" or something "significantly more than the abstract idea" that transforms the abstract idea into patent eligible subject matter? If not, then the claims are invalid.

While these rules may be difficult to apply and "there is no definitive rule on what constitutes an "abstract idea," the Supreme Court and Federal Circuit "have found it sufficient to compare the [patent] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Bootler*, 2025 U.S. Dist. LEXIS 172366, at *8, citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). If the claims in the earlier case (here, for example, in *Benson*) have already been found to be directed to an abstract idea, then similar claims in the later case are also abstract.

b. The Federal Circuit has elaborated on types of computer and software-related claims that are abstract and fail *Alice* prong 1.

For *Alice* prong one, whether the claims are directed to a patent ineligible concept such as an abstract idea, courts are to focus on the claim language, read in light of the specification, to identify the claimed advance over the prior art. *Content Extraction*, 776 F.3d at 1347. For computer related and software patents such as the patents-in-suit, the key question is whether the claims improve the functioning of the computer or network itself (possibly patent-eligible) or instead use generic computers as tools to implement an abstract process (patent ineligible). *See, e.g.*, *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020). Specific guidelines include:

1. Claims "which involve the mere collection, analysis, and outputting of data are directed to abstract, patent ineligible subject matter." *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022); *see also*, *Affinity Labs of Tex. v,. DIRECTTV*, LLC, 838 F.3d 1253, 1262-63 (Fed. Cir. 2016), quoting *Alice*, 573 U.S. at 220-21.

2. Where the asserted claims recite workflows that engineers, project managers, or quality assurance personnel can perform mentally or with pencil and paper, merely automating those mental steps using generic computers as tools does not state a plausible claim of eligibility. *See, e.g., Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355–56 (Fed. Cir. 2016) (finding abstract claims directed to collecting and analyzing information by steps "people go through in their minds" and implementing them on generic computers and networks).

Relatedly, a claim that "automates 'pen and paper methodologies' is an abstract 'do it on a computer' patent even if the purpose is to conserve human resources and minimize errors." *Int'l Bus. Machines Corp.*, 50 F.4th at 1382. Claims that assist in processing data more quickly than is possible by hand are also abstract and not patent eligible. *PersonalWeb Techs.* F.4th at 1319.

3. Claims drafted entirely in functional, results-oriented language that recite only "black box" functional modules configured to achieve desired outcomes, without any concrete algorithm, data structure, grammar, or architectural constraint are abstract. *See, eg., Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014). Process steps that are written as verbs such as "obtaining, manipulating and displaying data…are abstract concepts." *Elec. Power Grp.*, 830 F.3d at 1353-54 (collecting cases).

Here, insofar as the patents-in-suit claim the functions and use of computers as tools to implement an abstract process, one that has been done successfully by hand for decades, the claims are patent ineligible.

c. The Federal Circuit has elaborated on types of computer and software-related claims that fail *Alice* prong 2 as not containing "something more."

Prong two of *Alice* asks whether the elements, individually and as an ordered combination, contain an "inventive concept" that transforms the abstract idea into patent eligible subject matter. *Alice*, 573 U.S. at 217–18, 221. The "inventive concept" must be "something significantly more" than an abstract idea. *Id*. Specific guidance includes:

1. The abstract idea itself, no matter how useful or important, cannot supply the inventive concept. *Alice,* 573 U.S. at 217–18, 221–24 (2014); *see also*, *People.ai, Inc. v. Clari Inc*., 2023 U.S. App. LEXIS 8294 at *7 (Fed. Cir. Apr. 7, 2023) (improved speed, accuracy, and completeness inherent in automating manual workflows does not provide an inventive concept).

2. The use of "well-known, routine and conventional" computer and network components operating according to their ordinary functions does not qualify as an inventive concept. *Int'l Bus. Machines Corp.*, 50 F.4th at 1379. ("Generic computer components such as an 'interface,' 'network, and 'database' do not satisfy the inventive concept requirement.") *See also, SnowCast,*

2016 U.S. Dist. LEXIS 37559, at *13; *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) (sending information over a network is "not even arguably inventive.")

3. Efficiency gains, improved accuracy, better governance, traceability, or faster iteration are benefits of automating abstract processes and do not constitute patent eligible subject matter. *See, e.g., PersonalWeb*, 8 F.4th at 1319–20; *Elec. Power Grp.*, 830 F.3d at 1353–56.

Here, Plaintiff's claims simply employ the use of "well-known, routine, and conventional" tools to implement an abstract idea and therefore do not contain an "inventive concept" that transforms the abstract idea into patent eligible subject matter.

## VI. ARGUMENT

### a. The Patents-in-Suit are Directed to the Computer Implementation of the Abstract SDLC to Write Computer Code and are Therefore Invalid Under 35 U.S.C. § 101.

#### *i. Claim 1 of the '106 Patent is Representative of the First Family; Claim 1 of the '934 Patent is Representative of the Second Family.*

The Complaint asserts infringement of nine patents, totaling 156 claims, but does not specify which claims are allegedly infringed. To permit analysis of patentability of numerous claims, courts routinely treat one or a few claims as representative of all the claims. The court analyzes the representative claims, reviews any material differences that may exist in the other claims, and then determines patentability. Representative claim analysis is consistent with, for example, *SnowCast*, 2016 U.S. Dist. LEXIS 37559, at *5-6; *see also, Content Extraction*, 776 F.3d at 1348–49 (representative claim treatment is appropriate where all claims were "substantially similar and linked to the same abstract idea").

Representative claim treatment is particularly appropriate here because the Complaint itself treats the claims as interchangeable, alleging infringement by "the Accused Products" collectively without pleading any claim-specific or product-specific technical detail.

Hexaware identifies claim 1 of the ’106 Patent as representative of the claims in the First Family and claim 1 of the ’934 Patent as representative of the claims in the Second Family.[7]

*ii. The Representative Claims are Invalid as Directed to Patent-Ineligible Subject Matter.*

The steps for writing software code have long been performed manually, as admitted in the First Family specification: “The development of software for devices is an ever-increasing challenge since the devices are required to do more and to do it faster. Current software development techniques include a combination of manual steps and automated steps.” FF Spec. col. 1, ll. 54-57. The specification continues to describe the existing method of writing code, *i.e.*, the SDLC. *Id.* col. 1, l. 58 – col. 3, l. 28. The SDLC steps, comprising “a process that start[s] with data, add[s] an algorithm, and end[s] with a new form of data,” has already been found to be abstract by the Federal Circuit in *RecogniCorp,* 855 F.3d 1322, 1327 (Fed. Cir. 2017); *see also*, *Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022) (Claims “which involve the mere collection, analysis, and outputting of data are directed to abstract, patent ineligible subject matter.”) This Court, therefore, may rely on, *inter alia*, *RecogniCorp* and *Zillow* to find that the claims of the patents-in-suit direct to abstract material. *See, e.g., Bootler,* U.S. Dist. LEXIS 172366, at *9-10; *Enfish*, 822 F.3d at 1337-1339.

The First Family specification describes the shortcomings with manual implementation as follows: “The above describe [manual] software development process enables the creation of significant amounts of software annually, it is far from an optimal process and is far from fully automated or near-fully automated.” (FF Spec. col. 3, ll. 29-42.) In simple language: “the field modernizes software successfully by hand, but we can do it better if we automate it.” This is a

[7] Prior to the filing of the motion, Hexaware requested that the Plaintiff identify the specific claims and Plaintiff refused.

quintessential "do it by computer" abstract idea. *See, e.g., Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367–69 (Fed. Cir. 2019) (holding ineligible a "quintessential 'do it on a computer' patent" that merely automated prior pen-and-paper methods). The specification does not describe any allegedly new method.

The Second Family specification identifies the following shortcoming with manual methods: "Prior to the present invention, updating such a software program was limited to virtualization, rehosting, translation, and/or recoding by hand… entails the use of emulators to mimic older computer platforms and/or equipment (e.g., mainframe computers) on newer equipment (e.g., personal computers, workstations, cloud computing, cloud storage, etc.)… [or] involves a conversion of the operational code from one programming language into another." SF Spec., col. 5, l. 54. - col. 6, l. 3. The specification concludes that the best way to avoid this problem is to just "avoid it," *i.e.*, write new code without emulators or translators. *Id.*, col. 6, ll. 14-22. This is abstract: Transforming the nature of a claim "into a patent-eligible application requires more than simply stating the abstract idea while adding the words 'apply it.'" *Trinity Info Media*, 72 F.4th 1355, 1365 (Fed. Cir. 2023) (quoting *Alice*, 573 U.S. at 221). The patents do not provide any way to avoid the use of emulators or converters.

These "inventions" are textbook abstract subject matter and fail *Alice* prong one. Automating a process previously done by hand is abstract even if the automated process increases speed or efficiency or functions to correct mistakes or filter out unnecessary data. *PersonalWeb Techs.*, 8 F.4th at 1319. As admitted in the patents, the claimed process was previously done by hand, and automating it merely (allegedly) increases speed and/or efficiency. FF Spec., col. 3, ll. 35-40; SF Spec., col. 5, ll. 54-56. While the claimed process may have the abstract advantage of excluding non-viable code (without provided a way to exclude this code) (*see, e.g.*, SF Spec, col.

11, ll. 35-37), that does not render the "invention" non-abstract. *See, e.g., People.ai,* 2023 U.S. App. LEXIS 8294 at *7–8. The alleged invention here includes nothing more than automating a routine process and describing the benefits of such automation and is therefore drawn to an abstract idea.[8]

The alleged invention fails *Alice* prong two as well. Employing a computer "for its most basic function, the performance of repetitive calculations" does not provide an inventive concept. *SnowCast*, 2016 U.S. Dist. LEXIS 37559, at *14, quoting *Bancorp Servs., L.L.C. v. Sun Life Assurance Co.*, 687 F.3d 1266, 1278–79 (Fed. Cir. 2012) ("Generic computer implementation is not generally the sort of 'additional feature' that transforms an abstract idea into a patentable invention."). An inventive concept requires "more than performance of well-understood, routine…conventional activities previously known to the industry." *Content Extraction*, 776 F.3d at 1349–51 *quoting Mayo Collaborative Services v. Prometheus Laboratories, Inc*., 566 U.S. 66, 73 (2012). Neither specification here identifies even a single new or non-generic process or tool that was not "well-known, routine, and conventional" before the patents' filing dates.

The First Family specification uses the word "tools" over 140 times. In each case, the tools are stated to be "implementation tools," "validation tools," or the like, and possible tools are provided in a list without description of how the tools work. (*See., e.g.*, FF Spec. at col. 10, ll. 32-35: "where the verification tools include, but are not limited to, theorem proofing tools, model checking tools, state space exploration tools, state abstraction tools, state reduction tools, and/or combinations of such tools.") These tools, provided without explanation, are either well-

[8] Some of the claims are directed to hardware used to carry out methods. These claims recite only generic computing devices and therefore add nothing to the claims that would render them patentable under § 101. *See, e.g., Customedia Techs*., 951 F.3d at 1365.

understood, routine and conventional, or described only by their desired function. The Second Family also describes only well-known, routine, and conventional devices to achieve the results-oriented purpose of the "invention." For example, Figure 5 shows a "legacy software processing system [] implemented on one or more of the computing devices 12-22 of FIG 1." SF Spec., Fig. 5, and col. 6, ll. 7-23. These computing devices are "servers" (unit 12); "workstations" (unit 13); "mainframe computers" (unit 14); "personal computers" (unit 16); "laptop computers" (unit 18); "mobile computing devices" (unit 20); and "wireless mobile computing devices" (unit 22).[9] These are all well-known, routine and conventional.

The claim language does not add anything material to the descriptions of the "invention" provided in the specifications and confirms that the claims are all directed to unpatentable abstract ideas. Claim 1 of the '106 patent reads as follows (emphasis added):

> A method for a computing entity to test and provide feedback of an automated process for converting input requirements into application code, the method comprises:
> ***receiving*** application requirements, wherein a requirements unit generates the application requirements from the input requirements and verifies the application requirements, wherein an application requirement of the application requirements includes one or more pre-conditions, one or more actions, and one or more post-conditions;
> as the application requirements are converted into the application code in a plurality of phases, for each of the plurality of phases:
> ***receiving*** a plurality of implementation results corresponding to a current phase of the plurality of phases; and
> ***testing*** the plurality of implementation results, wherein, for a current implementation result of the plurality of implementation results, the testing includes:
> ***generating***, commensurate with the current phase of the plurality of phases, at least one test case based on one or more of the application requirements, wherein the generating the at least one test case includes:
> ***converting*** at least one of a plurality of test cases into a level of abstraction corresponding to the current phase of the plurality of phases to produce at least one converted test case; and
> ***converting*** the at least one converted test case into an appropriate programming language format to exercise the application code to produce the at least one test case;

[9] Unit 15 is not defined in Fig. 1, but is defined later to mean "operational code" (SF Spec., col. 5, l. 22); units 17, 19, and 21 are not defined in the specification.

> ***stimulating*** the current implementation result based on the at least one test case to produce a current application system response;
> ***comparing*** observed behavior of the current application system response with prescribed behavior of the at least one test case; and
> ***generating*** the feedback based on the comparing of the observed behavior of the current application system response with the prescribed behavior of the at least one test case.

This claim recites a desired function ("to test and provide feedback of an automated process for converting input requirements into application code"), results-oriented "black boxes" ("units"), and the steps of the SDLC. The step "receiving application requirements…from the input requirements," is the requirements gathering step of the SDLC. No method for "receiving" is claimed, nor is a source of the "input requirements." The next phrase reads, "as the application requirements are converted into the application code," without stating how that conversion is accomplished. The steps of "receiving," "testing," "generating," "converting," "converting," "stimulating," "comparing," and "generating," describe the testing phase of the SDLC – write test cases and see if they work, in an iterative manner.

Additionally, the first "converting" step reads, "converting at least one of a plurality of test cases into a level of abstraction corresponding to the current phase of the plurality of phases to produce at least one converted test case," without any indication of what a "level of abstraction" is. The specification provides only the following: "the test execution module accepts the application system test cases and converts them to the appropriate level of abstraction for the artifact to be tested." (col. 38, ll. 56-58); and, "the level of abstraction corresponding to the current implementation includes an abstraction corresponding to an architecture level design process phase." (col. 24, ll. 63-65). This "guidance," without any real explanation or detail, indicates that the concept of "level of abstraction" is either (1) routine and generic, or (2) so abstract as to be undefinable. To the extent that the "level of abstract" has any meaning, it is something to be

determined by a human and therefore not patentable subject matter. *See, e.g., Elec. Power Grp.*, 830 F.3d at 1353–56.

Representative claim 1 of the ’934 Patent reads as follows (emphasis added):

> A method for execution by a computing device, the method comprises:
> *analyzing*, by the computing device, operational code to determine a plurality of identifiers used within the operational code and identify different programming languages within the operational code, wherein the analyzing further includes:
> *dividing* the operational code into a plurality of code sections based on the different programming languages;
> for each code section of the plurality of code sections,
> *ascertaining* identifiers of the plurality of identifiers based on the corresponding programming language of the different programming languages;
> *determining*, for a code section of the plurality of code sections, that the one or more potential features corresponds to an emulator or a programming language converter;
> *testing* the one or more potential features based on a corresponding feature test suite; and
> when the testing verifies that the one or more potential features corresponds to an emulator or the programming language converter,
> *flagging* a corresponding portion of the code section as including the emulator or the programming language converter such that, when the operational code is reprogrammed into a desired programming language, the emulator or the programming language converter is not reprogrammed; and
> *grouping*, by the computing device, like identifiers based on a relational aspect of the identifiers to produce a plurality of identifier groups;
> for one or more identifier groups of the plurality of identifier groups:
> *determining*, by the computing device, one or more potential features of the one or more identifier groups, wherein a feature corresponds to an aspect of the operational code;
> *testing*, by the computing device, the one or more potential features based on a corresponding feature test suite to produce feedback regarding meaningfulness of the one or more potential features, wherein the meaningfulness of a feature indicates the degree to which it is likely the feature is a viable aspect of the operational code;
> when the meaningfulness is above a threshold,
> *adding*, by the computing device, the one or more potential features as one or more meaningful features to a feature set; and
> when the meaningfulness is at or below the threshold,
> *adjusting*, by the computing device, one or more of:
> the relational aspect; and
> one or more testing parameters used to generate the corresponding feature test suite; and
> *reprogramming* the operational code into the desired programming language.

This claim, like claim 1 of the ’106 Patent, uses “-ing” verbs to define functional results, includes functional black boxes (“devices”), and SDLC steps.[10] In this claim, the method is defined as simply “execution by a computing device.” Regardless of the (unstated) purpose of this method, this first statement is fatal to the claims: the entire “invention” is the abstract idea to “apply it” by computer. *Alice*, 573 U.S. at 223-24. The step “determining by the computing device” confirms that the “invention” uses only generic computers.

The step of “dividing” legacy code into portions based on software language can be done by hand and is therefore abstract. The steps of “analyzing,” “dividing,” “grouping,” and “determining, by the computing device,” all relate to using identifiers to determine “features,” (both old concepts, see *supra*) or aspects of the code that are necessary. This use and grouping of a “content-based identifier” for code was already determined to be abstract by the Federal Circuit and is therefore abstract by comparison. *See, Intell. Ventures I LLC v. Erie Indem. Co*., 850 F.3d 1315, 1326-28 (Fed. Cir. 2017) (finding abstract claims to “search a database using an index” in which “every record in the database is associated with one or more descriptive terms organized using category tags for grouping of similar categories.”). In *Erie*, the court compared the claims to the “pen-and-paper” analog of “a hardcopy-based classification system (such as library-indexing system)” in which “classifiers organize and cross-reference information and resources (such as books, magazines, or the like) by certain identifiable tags, e.g., title, author, subject.” *Id*, at 1316. The same analogy applies for the identification and grouping of software languages and identifiers in these claims.

---

[10] A claim to the “stringing together” of multiple abstract steps is also abstract. *PersonalWeb Techs*. F.4th at 1317. Thus, the inclusion of multiple steps in each claim does not render these claims non-abstract.

The steps of "determining, for a code section," "testing the one or more potential features," "flagging," and "adding," are the steps directed to, colloquially, "figure out which features are important and filter out the non-important ones." SF Spec. col. 19, l. 59 – col. 20, l. 24. This iteration is to be repeated until some level of "meaningfulness" is reached. The specification offers only the following regarding "meaningfulness": "The more likely the feature is a viable aspect of the operational code, the more meaningful it is." *Id.*, col. 11, ll. 35-37. In other words, keep testing until you get a feature that is viable. Filtering data and discarding non-important data "based on the characteristics" of the data is "a long-prevalent practice for people" and abstract. *See, e.g.*, *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313-1317 (Fed. Cir. 2016). Steps that can be performed in the human mind, here, repeating a cycle until reaching an undefined threshold of "meaningfulness," are mental processes and abstract. *PersonalWeb*, 8 F.4th at 1316-1317. Further, "data analysis based on various sets of generic rules…cannot supply the inventive step." *People.ai*, 2023 U.S. App. LEXIS 8294, at *12–13. Here, the claims do not provide any rules regarding "meaningfulness," let alone non-generic rules. The last step, "reprogramming" means "write the new code," which is a desired function without description of *how*.

*iii. The Other Claims Add Nothing Material to the Representative Claims and are Unpatentable as Drawn to Abstract Material.*

The other members of the First Family "fine-tune" the claimed system, "but do not change the fundamental purpose of the system itself," which is to automate the manual algorithm (*i.e.*, SDLC) to write software. *SnowCast*, 2016 U.S. Dist. LEXIS 37559, at *8. The other patents-in-suit claim the following:

- The ’928 Patent claims a “system communication protocol” but the First Family specification does not describe a concrete way of creating this “protocol.”[11] This is not patentable. *See, e.g., People.ai*, 2023 U.S. App. LEXIS 8294, at *12–13.
- The ’948 Patent claims the use of “ASST,” or “application system state transitions.” ASSTs are the conditions that are included as part of the requirements. *See* FF Spec., col. 1, ll. 63 - 65: “An objective of the requirements step is to develop a list of requirements that identify the needs and/or conditions for the software development project to meet.” *See also*, FF Spec at col. 1, ll. 21 – 29, defining ASSTs as “one or more pre-conditions, one or more actions, and one or more post-conditions.” ASST, therefore, is simply a defined term for the conditions and parameters that a computer code must meet, *i.e.*, the building blocks of inputted requirements.
- The ’673 Patent instructs users to use conventional tools to carry out the claimed process.
- The ’916 Patent claims that the iteration should continue until a “threshold” is met. “Threshold” is described specification as a measure of completeness, consistency, safety, and verification. FF Spec. at col. 35, ll. 32-42. Similarly, the ’243 Patent claims a “correctness criteria,” described in the specification as providing “indications regarding avoidance of safety violations while generating the application requirements.” *Id.*, col. 8, ll. 33-35. These elements are to be determined by human judgment and comprise “data analysis based on various sets of generic rules” and cannot provide the “inventive step.” *People.ai,* 2023 U.S. App. LEXIS 8294

[11] Figure 1 includes a “systems communication protocol,” (item 22), described in the specification at col. 6. l. 27 – col 7, l. 7. “The system communication protocol includes a data content protocol and/or a communication protocol.” These are defined as: “The data content protocol defines data communication formatting for communications between the units…”; “common communication protocol (*i.e.*, the communication and/or data content between the units is in the same format).” In other words, the function of the “systems communication protocol” is to permit communication between the units; while the specification describes the function, it provides no details regarding how to achieve the desired result. The specification gives only the following explanation of how to arrive at this protocol: “the units 12-16 may negotiate the system communication protocol 22 to use.” FF Spec. at col. 6, ll. 60-61

at *38. Here, the claims do not provide any rules regarding the "threshold" or "correctness criteria," let alone non-generic rules.

- The '046 Patent claims the use of different types of architectures and "artifacts." The word "artifact" is used over 70 times in the First Family specification, but is not defined, illustrating that it is well-known, routine and conventional in the art.

The other member of the Second Family also does not contain any material features that would render the claims patentable:

- The '941 Patent claims the same elements as the '934 Patent for a scenario where the legacy code includes a "plurality of versions" written in "more than one legacy language." Translating this type of legacy code was previously done by hand via the help of emulators or converters. SF Spec, col. 6, ll. 14-22. As discussed, the "invention" of the Second Family is to simply "do it without an emulator." The patent provides no information as to *how* to implement this result.

b. <u>The Complaint Fails to Plausibly Allege Patent Infringement</u>

The Complaint pleads that the three Accused Products infringe the patents-in-suit without identifying and particularizing even a single claim limitation or element as being infringed by an identified Accused Product. The Complaint merely alleges generic statements that mimic the language of the claims and describe the function of modernizing legacy software.

This "bare recitation" of the elements of the cause of action of infringement fails to meet the pleading standard required by *Twombly*. *See Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021). In *Bot*, the Federal Circuit affirmed dismissal of a claim that required "storing 'gaming information including a mutual authentication program' on the same memory." *Id*. at 1354. The court explained, "Bot M8 failed to offer factual allegations that support a plausible inference that the PS4 actually stores the gaming information and mutual authentication program

together. While Bot M8 points to different storage components in the allegedly infringing devices, it never says which one or ones satisfy the mutual authentication limitation. Similarly, here, the Complaint points to three Accused Products, but "never says which one or ones satisfy" any of the claimed limitations. Accordingly, the Court should dismiss the patent infringement claims for, at the very least, a failure to meet the required pleading standard.

c. <u>The Non-Patent Claims Fail as not Stating a Claim on Which Relief may be Granted.</u>

*i. The Complaint Fails to Properly Allege Breach of Contract.*

The Complaint fails to meet the required pleading standard for breach of contract for at least three reasons.

1. Plaintiffs allege patent infringement by Hexaware due to Hexaware's use of Hexaware's own modernization tools. Compl. ¶ ¶ 1; 87-105. Plaintiffs also allege that Hexaware used Plaintiffs' confidential information to develop "aspects" of its competing tools. *Id.*, ¶ 162. The Complaint does not differentiate between the "aspects" of the tools that allegedly rely on Natsoft's confidential information and those that rely, allegedly, on information contained in the public patents. Without identification of any confidential, as opposed to public, "aspect," Hexaware has no notice of the accusations lodged against it and the Court here has nothing to enforce. *See nClosures Inc. v. Block & Co*, 770 F.3d 598, 602 (7th Cir. 2014) (a confidentiality agreement will be enforced "only when the information sought to be protected is actually confidential and reasonable efforts were made to keep it confidential."). Natsoft therefore did not satisfy the pleading standard required to put Hexaware on notice of what it is being accused.

2. The POC includes the following four restrictions on Hexaware: (1) "not to make any changes or copies of the provided tools;" (2) "to use these tools only for the agreed upon demonstration project;" (3) "to delete the tools from the AWS environment on the client system

and confirm this" upon completion of the demonstration; and (4) "not to retain any copies of Updraft tools after the demonstration project is complete." Restrictions (1) and (2) do not survive the termination of the POC (nothing to contrary is stated in the POC). Restrictions (3) and (4), in contrast, are directed to the period after termination of the POC. The POC expired approximately one month after it was executed, on September 15, 2022. *See* POC stating that the parties planned to "agree to a formal teaming agreement…at the earliest, but no later than 15 September 2022 and until such time both agree to adhere to the terms agreed" in the POC. The parties never entered into a formal teaming agreement. Compl. ¶ 73.

Plaintiffs allege Hexaware used Plaintiffs' tools in breach of the contract (presumably a breach of the second covenant in the POC) but does not allege that Hexaware did not delete the tools upon completion of the demonstration or that Hexaware copied, modified or retained the tools (in breach of the other covenants). Absent any allegation that Hexaware ever copied the tools or that it improperly retained the tools, Hexaware cannot possibly have used the tools in breach of the POC for the simple reason that its possession of the tools was limited to the copy it deployed – in accordance with the POC – on the third-party's AWS environment. Plaintiff fails to allege that Hexaware actually had the tools. Therefore, there is no plausible allegation of breach of the POC: the single allegation concerning the use of the tools is impossible without concurrent copying or retention of the tools, neither of which are alleged.

3. The tools stand in contrast to the "support to Hexaware with instruction over video calls / screen share," which is identified as a separate service allegedly provided from Plaintiffs to Hexaware under the terms of the POC. The POC contains no restrictions on Hexaware's use of the knowledge it gained from the support and instruction. And, accordingly, the Complaint does not, and cannot, plausibly allege a breach of anything concerning the "support."

The Complaint alleges that Natsoft put in thousands of man-hours teaching Hexaware how to use the tools. *Id.*, ¶ 75. If true, Hexaware likely gained knowledge from this instruction. However, Hexaware was and is under no obligation not to use this knowledge. Further, since the POC gives Hexaware the obligation to deploy the tools on a third-party's network, the POC itself underscores that any knowledge gained by Hexaware cannot be confidential – it was expected to be shared with a third-party. Using this knowledge for any purpose, therefore, does not breach either contract. Based on the facts alleged in the Complaint, there is no plausible claim for breach of contract. As such, these causes of action must be dismissed.

*ii. The Complaint Fails to Properly Allege Unjust Enrichment.*

A claim for unjust enrichment requires that any profits retained by the defendant is unjust. *See, e.g., Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). Here, Plaintiffs base their claim on Hexaware's decision not to move forward with an engagement that was in the demonstration phase subject to a proof-of-concept agreement. However, a proof-of-concept engagement, by definition, contemplates that the parties may not move forward. A decision to not finalize a speculative joint engagement is not unjust, and any downstream benefits from that decision, therefore, cannot be unjust. Plaintiffs cannot and have not identified or particularized any act that would be unjust. Based on the facts alleged in the Complaint, there is no plausible claim for unjust enrichment. As such, the cause of action must be dismissed.

*iii. The Complaint Fails to Properly Allege Interference with Prospective Economic Advantage.*

Interference with prospective economic advantage, requires a party to "allege[] a business expectancy with a specific third party as well as action by the defendant directed towards that third party." *See, e.g., Ali v. Shaw*, 481 F.3d 942, 946 (7th Cir. 2007). Here, Plaintiffs allege no business expectancy with an identified potential customer of Natsoft of Updraft. Instead, the Complaint

alleges that Plaintiffs had a business expectancy with "Defendants' customers". Compl, ¶ 86. This is not the required element of this cause of action. Further, under the terms of the NDA, Plaintiffs were prohibited from engaging with Hexaware's customers for at least two years following the expiration of the NDA, further underscoring the lack of any realistic business expectancy with "Defendants' customers." Since Plaintiffs failed to allege a specific third-party with which they had a business expectancy, they necessarily fail to allege any wrongful action by Hexaware directed toward such a third party. As such, the cause of action must be dismissed.

## VII. CONCLUSION

The patents-in-suit are directed to abstract ideas: the computer implementation of an algorithm, long done by hand, with a pencil and paper, in a person's mind. The claims are written in purely functional terms. The specifications describe the "invention" in aspirational terms, saying, essentially, "wouldn't it be nice if this was automated?" The patents offer only, "Automate it. Use your computer." as the "invention."

These patents are invalid. There is nothing to infringe. For this reason, the Court should dismiss the patent infringement claims with prejudice.

Further, Plaintiffs' Complaint alleges both that the Accused Products embody the "inventions" in the patents-in-suit, but that unidentified "aspects" of the Accused Products rely on Plaintiff's confidential information. Plaintiffs filed their Complaint under seal – they had the opportunity to identify which "aspects" allegedly embody the public information in the patents-in-suit and which rely on confidential information, but they did not. This omission is fatal: Hexaware has no knowledge of the claims lodged against it. Plaintiffs also fail to explain how Hexaware could have been under any obligation to keep confidential the very information that it was contractually obligated to share with a third-party.

Not only did Plaintiffs fail to put Hexaware on notice of cognizable claims, the allegations in the Complaint are internally inconsistent and cannot be reconciled. The Accused Products cannot, at the same time, embody public information and "private" information, particularly when that "private" information was intended to be shared with a third party and, therefore, was not "private." These allegations all fail as explained above. The Complaint fails to meet the required pleading standard and should be dismissed in its entirety.

**WHEREFORE**, Defendants respectfully request that the Court (a) grant the Motion to Dismiss in its entirety, with prejudice, by holding that (1) the patents-in-suit are invalid under 35 U.S.C. § 101 as directed to unpatentable abstract ideas; (2) Defendants do not infringe the patents-in-suit because these patents are invalid; (3) the Complaint fails to meet the pleading standard for patent infringement; (4) the Complaint fails to put Defendants on notice of the breach of contract claims lodged against them and fails to allege any plausible breach of contract; (5) Hexaware cannot plausibly have been unjustly enriched if the facts in the Complaint are taken as true; and (6) Plaintiff cannot plausibly have been deprived of any realistic business expectancy by Hexaware's actions if the facts in the Complaint are taken as true; and (b) grant such other and further relief as the Court deems just and proper.

Dated: December 12, 2025

Respectfully submitted,

WILSON ELSER MOSKOWITZ EDELMAN
& DICKER LLP

s/ Sarah Fink

Sarah Fink, Esq.
1133 Westchester Ave

White Plains, NY 10604
(914) 323-7000 (phone)
sarah.fink@wilsonelser.com

*s/ Brian Myers*
Brian Myers, Esq.
1500 K Street, NW
Suite 330
Washington, DC 20005
202.626.7695 (phone)
brian.myers@wilsonelser.com

*Attorneys for Defendants*

***Service via ECF***

cc:

MAXSON MAGO & MACAULAY, LLP
Max A. Stein
Keith Stolte
77 W. Wacker Drive, Suite 4500
Chicago, IL 60601
T: 312-803-0378
mstein@em3law.com
kstolte@em3law.com

SHELHOFF CANFIELD & CHIN LLC
Dmitry V. Shelhoff
Kenneth S. Canfield
30 Chatham Rd. #19
Short Hills, NJ 07078
T: 973-221-4539
dshelhoff@scciplaw.com
kcanfield@scciplaw.com
cchin@scciplaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2025, I electronically filed the foregoing pleading with the Clerk of the Court using the ECF system which will send notification of such filing by electronic mail to all ECF participants. I also served on the same date an unredacted copy of the filing to all counsel of record via email.

By: /s/ Brian H. Myers