**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATSOFT CORPORATION, UPDRAFT LLC, <br><br> Plaintiffs, <br><br> v. <br><br> HEXAWARE TECHNOLOGIES LIMITED, HEXAWARE TECHNOLOGIES, INC. <br><br> Defendants. | Case No. 25-cv-11517 <br><br> Document Filed Electronically |

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

## **TABLE OF CONTENTS**

Table of Authorities ........................................................................................................ ii

I.      Introduction ........................................................................................................ 1

II.     The Patents-in-Suit and Hexaware's Mischaracterizations ................................ 3

        A.      The First Family ...................................................................................... 3

        B.      The Second Family .................................................................................. 6

III.    Legal Standard .................................................................................................... 8

        A.      Rule 12(b)(6) Standard ............................................................................ 8

        B.      Patent Eligibility Under 35 U.S.C. § 101 ................................................ 9

                1.      *Alice* Step 1 ............................................................................... 10

                2.      *Alice* Step 2 ............................................................................... 12

IV.     Argument ............................................................................................................ 14

        A.      The Claims of the Patents-in-Suit Are Patent Eligible .......................... 14

                1.      The Two Claims Analyzed by Hexaware Are Patent Eligible ....... 14

                        a.      '106 Patent, Claim 1 ....................................................... 14

                                i.      *Alice* Step 1 ........................................................ 14

                                ii.     *Alice* Step 2 ........................................................ 18

                        b.      '934 Patent, Claim 1 ....................................................... 20

                                i.      *Alice* Step 1 ........................................................ 20

                                ii.     *Alice* Step 2 ........................................................ 21

                2.      The Remaining Claims Are Patent Eligible ................................... 23

                        a.      First Family ..................................................................... 23

                        b.      Second Family ................................................................. 24

        B.      The Complaint Properly Pleads Patent Infringement ............................. 24

        C.      The Complaint Properly Pleads the Non-Patent Claims ........................ 26

                1.      Breach of Contract ....................................................................... 26

                2.      Unjust Enrichment ....................................................................... 29

                3.      Interference with Prospective Economic Advantage ..................... 29

V.      Conclusion .......................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Aatrix Software v. Green Shades Software*,
    882 F.3d 1121 (Fed. Cir. 2018) ................................................................. 20

*Adnexus Inc. v. Meta Platforms, Inc.*,
    160 F.4th 1216, 2025 U.S. App. LEXIS 31911 (Fed. Cir. 2025) ...................................... 8

*Ali v. Shaw*,
    481 F.3d 942 (7th Cir. 2007) ................................................................. 30

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*,
    573 U.S. 208 (2014) ................................................................. 9, 10, 13

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
    841 F.3d 1288 (Fed. Cir. 2016) ................................................... 13, 14, 18, 21

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................. 8, 24

*BASCOM Global Internet Servs. v. AT&T Mobility LLC*,
    827 F.3d 1341 (Fed. Cir. 2016) ................................................................. passim

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................. 8, 24

*Bielanski v. County of Kane*,
    550 F.3d 632 (7th Cir. 2008) ................................................................. 8

*BioMérieux, S.A. v. Hologic, Inc.*,
    No. 18-21, 2018 U.S. Dist. LEXIS 163996 (D. Del. Sept. 25, 2018) ........................... 9, 26

*Bot M8 LLC v. Sony Corp. of Am.*,
    4 F.4th 1342 (Fed. Cir. 2021) ................................................................. 9, 25, 26

*CardioNet, LLC v. InfoBionic, Inc.*,
    955 F.3d 1358 (Fed. Cir. 2020) ................................................................. 15

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
    927 F.3d 1306 (Fed. Cir. 2019) ................................................................. 3, 14, 20

*Cleary v. Philip Morris Inc.*,
    656 F.3d 511 (7th Cir. 2011) ................................................................. 29

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014) ................................................................. 13, 14, 20

*Contour IP Holding v. GoPro, Inc.*,
    113 F.4th 1373 (Fed. Cir. 2024) ................................................................. 10, 12, 15, 16

*Core Wireless Licensing v. LG Elecs., Inc.*,
    880 F.3d 1356 (Fed. Cir. 2018) ................................................................. 12

*DermaFocus LLC v. Ulthera, Inc.*,
    201 F. Supp. 3d 465, 469 n.7 (D. Del. 2016) ........................................... 9, 26

*Digitech Image Techs. v. Electronics for Imaging, Inc.*,
 758 F.3d 1344 (Fed. Cir. 2014)......................................................................... 13

*Disc Disease Sols. Inc. v. VGH Sols.*, Inc.,
 888 F.3d 1256 (Fed. Cir. 2018)........................................................................... 9

*Enfish, LLC v. Microsoft Corp.*,
 822 F.3d 1327 (Fed. Cir. 2016)............................................................... 10, 12, 16

*EZ STAK, LLC v. Dejana Truck & Util. Equip. Co.*,
 No. 17-8742, 2018 U.S. Dist. LEXIS 98537 (N.D. Ill. June 12, 2018).............................. 9

*Finjan, Inc. v. Blue Coat Sys.*,
 879 F.3d 1299 (Fed. Cir. 2018)............................................................... 12, 21

*Gottschalk v. Benson*,
 409, U.S. 63 (1972)............................................................................................. 1

*Int'l Bus. Machs. Corp. v. Zillow Grp.*,
 50 F.4th 1371 (Fed. Cir. 2022) .................................................................. 16, 17

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
 850 F.3d 1315 (Fed. Cir. 2017)........................................................................ 22

*Intellectual Ventures I LLC v. Symantec Corp.*,
 838 F.3d 1307 (Fed. Cir. 2016)........................................................................ 22

*Mayo Collaborative Servs. v. Prometheus Labs.*,
 566 U.S. 66 (2012)................................................................................... 18, 22

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
 837 F.3d 1299 (Fed. Cir. 2016).................................................................. passim

*Packet Intelligence v. NetScout Sys.*,
 965 F.3d 1299 (Fed. Cir. 2020)................................................................. 11, 16

*People.ai v. Clari Inc.*,
 No. 22-1364, 2023 U.S. App. LEXIS 8294 (Fed. Cir. Apr. 7, 2023)...................... 17, 18

*PersonalWeb Techs. v. Google LLC*,
 8 4th 1310 (Fed. Cir. 2021)................................................................... 17, 18, 22

*PowerBlock Holdings, Inc. v. iFit, Inc.*,
 146 F.4th 1366 (Fed. Cir. 2025) ....................................................................... 12

*Rally AG v. Apple Inc.*,
 No. 23-1106, 2024 U.S. Dist. LEXIS 210927 (D. Del. Nov. 20, 2024)..................... 9, 25

*RecogniCorp, LLC v. Nintendo Co.*,
 855 F.3d 1322 (Fed. Cir. 2017)................................................................. 16, 17

*Simonian v. Blistex, Inc.*,
 No. 10-1201, 2010 U.S. Dist. LEXIS 117058 (N.D. Ill. Nov. 3, 2010) ............................ 9

*SnowCast Sols. v. Endurance Speciality Holdings*,
 No. 15-5305, 2016 U.S. Dist. LEXIS 37559 (N.D. Ill. Mar. 23, 2016)........................... 19

*SRI Int'l v. Cisco Sys.,*
    930 F.3d 1295 (Fed. Cir. 2019) ................................................................................ passim

*TecSec, Inc. v. Adobe Inc.,*
    978 F.3d 1278 (Fed. Cir. 2020) ................................................................. 10, 11, 15, 22

*Univ. of Fla. Rsch. Found. v. Gen. Elec. Co.,*
    916 F.3d 1363 (Fed. Cir.2019) ................................................................................ 17

**Rules**

Fed. R. Civ. P. 15(a)(2) ................................................................................ 20

Fed. R. Civ. P. 8(a)(2) ................................................................................ 24

LPR 2.1 ................................................................................ 25

LPR 2.1(b) ................................................................................ 2, 25

LPR 2.2 ................................................................................ 2, 25

## I.     <u>INTRODUCTION</u>

Plaintiffs (Natsoft) oppose Defendants' (Hexaware's) motion to dismiss. Additionally, Hexaware's failure to argue dismissal of Count X (NDA) precludes dismissal of that Count.

**Patent Eligibility.** The claims of the patents-in-suit are eligible under 35 U.S.C. § 101. The claims of an issued patent are presumed valid. At minimum, Hexaware failed to meet its high burden to prove invalidity by clear and convincing evidence at this early stage. In an attempt to shoehorn the claims into its selected caselaw, focusing on two asserted claims ('106 patent claim 1; '934 patent claim 1), Hexaware oversimplifies the claims, mischaracterizes the specifications, and ignores the pertinent caselaw. Each fault justifies denying its motion as to § 101. Moreover, even if Hexaware were to prevail on the two claims it analyzes, those are not representative of the remaining claims, and thus its motion should be denied as to the unanalyzed claims.

Despite Federal Circuit warnings, Hexaware oversimplifies the claims to make them seem abstract. In part, '106 patent claim 1 recites a particular multi-phased method for a computing entity to test and provide feedback of an automated process for converting input requirements into application code, the method having concrete data-representation constraints, a prescribed feedback loop, and phase-aware testing. In part, '934 patent claim 1 is directed to a particular multistep method for reprogramming code into a desired language that solves a computing migration problem unique to legacy code containing emulators/converters, the method involving specified parsing of the code and flagging of code sections. Contrary to Hexaware ([30][1] ("H. Br.") at 2), the claimed inventions are not "the same abstract idea that was found to be unpatentable in [*Gottschalk v. Benson*, 409, U.S. 63, 65 (1972)]," which idea Hexaware over-generalizes to "the

---

[1] Bracketed numbers in citations refer to docket entries.

conversion of inputted computer data in one form … to computer data in a different form,"[2] nor are the claims implementations of what Hexaware calls the "routine 'Software Development Life Cycle' or 'SDLC.'" Instead, the claims are patent eligible as improvements to computing technology and are not so-called "do it on a computer" claims. *Contra* H. Br. 1-2, 11, 15.

As a central mischaracterization—upon which its § 101 challenge hinges—Hexaware claims the '106 patent "expressly state[s]" that "Plaintiffs' algorithm has long been carried out successfully by existing computers and by hand." *Id.* at 2 (citing [1-1] ("'106 [patent]") at 3:29-32). Wrong. Hexaware confuses the specification's discussion of the background to the invention with that of the invention. That the admission does not exist warrants denial of Hexaware's motion.

**Patent-Infringement Pleadings.** Natsoft's complaint meets the required notice pleading standard by identifying the accused products and asserted patents. Natsoft is not required to prove infringement in the pleadings or even plead infringement claim element-by-element. Nor is Natsoft obligated to divine Hexaware's confidential information. Natsoft's pleading infringement of one or more claims from each patent is also permissible. Under this district's Local Patent Rules, Hexaware would produce documents on the operation of the accused products, including source code. LPR 2.1(b). Natsoft would then provide Infringement Contentions identifying asserted claims with element-by-element claim charts. LPR 2.2. Hexaware's motion attempts to circumvent these rules.

**Non-Patent Pleadings.** Natsoft adequately pleaded its non-patent counts. Contrary to Hexaware (H. Br. 2-3), Natsoft's non-patent allegations do not undercut its patent infringement

---

[2] Unlike *Benson*, 409 U.S. at 64, 67, Natsoft's claims are not directed to using a computer for a mathematical formula (unlimited to any end use) that could be done without a computer. Hexaware does not even allege Natsoft's claims are directed to a mathematical formula. And, as explained below, Natsoft's claims cannot be performed without a computer. Not surprisingly, despite citing *Benson* in its "Preliminary Statement" and legal section, Hexaware does not cite it in its argument.

allegations, nor does Natsoft claim that its implementation is not properly disclosed in its patents.

## II.      THE PATENTS-IN-SUIT AND HEXAWARE'S MISCHARACTERIZATIONS

Contrary to Hexaware's assertions (*id.* at 5-6) that the specifications "lack … detail" or depict "black boxes" without "explanation of *how* a computer carries out the desired function," the specifications disclose the inventions in detail, including the "how." Hexaware argues neither specification "points out what, exactly, is allegedly new" (*id.*), seemingly meaning the patents do not label specific disclosure as "new," but "[a]s long as what makes the claims inventive is recited by the claims, the specification need not expressly list all the reasons why this claimed structure is unconventional." *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317 (Fed. Cir. 2019).

### A.      The First Family[3]

In the "Background," the first family identifies a problem: "development of software … is an ever-increasing challenge since devices are required to do more and do it faster," but the prior process of "software development techniques include[d] a combination of manual steps and automated steps." '106 at 1:54-56. Prior to Natsoft's invention, a number of manual steps were required. For example, the "requirements step[]" was "still primarily a manual step … due to the extremely large state space of the system and the lack of automated testing," as well as "the inconsistency of language[] … used to represent the requirements." *Id.* at 2:6-14. For the "architecture step," the automation that existed was "prone to manual errors and incompleteness of testing" and "lack[ed] a standardized language." *Id.* at 2:23-31. In sum, the prior process was "far from an optimal process and … far from fully automated or near-fully automated." *Id.* at 3:29-32. "[E]ach primary step … include[d] multiple manual operations and, for the automated operations, ha[d] little to no standardized implementation and/or formatting requirements," such

---

[3] The earliest filing is August 30, 2011, not August 31. *Compare* '106 at cover *with* H. Br. 4 n.4.

that "each primary step [was] almost a completely autonomous process." *Id.* at 3:32-38. Thus, "automation of the software development process using the current techniques [was] highly improbable." *Id.* at 3:38-42. This was a technological problem in computing technology.

Hexaware twists this disclosure of the problem into an admission that the inventions of the first family simply automate the prior manual method. H. Br. 2, 14-15 (citing '106 at 3:29-42). But the patents' solutions are ***not*** the "far from … optimal" and "far from fully automated" prior process described in the background, but automated systems and processes described in what follows. Hexaware's paraphrase, "the field modernizes software successfully by hand, but we can do it better if we automate it" (*id.* at 14), is a mischaracterization. Per the background, the field did ***not*** modernize software successfully by hand. And automating the prior process was "highly improbable." Natsoft's patents solved this problem. Hexaware's bold assertion that the "specification … acknowledges that the method of the 'invention' mirrors the [existing] SDLC" (*id.* at 5) is false, making it no surprise Hexaware has no citation for this.

The 20-page "Detailed Description" describes the patents' technological solutions that provide automation that was "highly improbable" with the prior process. For example, it describes a software-development automation system with a "requirements unit," "implementation unit," and "testing unit." '106 at 5:6-21, fig. 1. The system includes a "system communications protocol" including "a data content protocol and/or a communication protocol. The data content protocol defines data communication formatting for communication between the units, and may further define the communication within the units." *Id.* at 6:26-32.[4] This addresses the "lack of "standardized implementation … and/or formatting" in the prior process. *Id.* at 2:6-14, 2:23-31.

---

[4] Figure reference numerals omitted from quotations of patent specifications throughout without showing omissions. Specification citations include the figures discussed therein.

4

The specification further describes how the invention generates application code automatically in an ordered fashion. For example, "the requirements unit receives inputted requirements and parameters," each of which are described in detail in the specification and from which the requirements unit generates application requirements. *Id.* at 5:54-6:26. The application requirements are of a specific form, including "one or more application system state transition[s]," or "ASST[s], each including "one or more pre-conditions, one or more actions, and one or more post-conditions." *Id.* at 6:20-26, 7:28-30, 8:47-52, 20:21-29. "The requirements unit outputs the application requirements ... to the implementation unit and/or to the testing unit. ... [T]he implementation unit generates application code based on the application requirements and the parameters, and feedback from the testing unit. The implementation unit outputs the application code ... . The testing unit receives the application requirements and the application code ... [and] may also receive the parameters ... [and] tests the application code and provides feedback ... to the requirements unit and/or the implementation unit." *Id.* at 7:8-23. This process is iterative and may include "several phases," such as "an architectural level design phase, a high level design (HLD) phase, a low level design (LLD) phase, and an application code level phase." *Id.* at 7:24-43; *see also id.* at 16:41-18:26.

"To test the developing application code, the testing unit generates test cases (e.g., input stimuli and expected results corresponding to the current level of development of the application code at a level of abstraction corresponding to the level of development of the application code)." *Id.* at 7:44-48. The testing unit "generates feedback indicating that the developing application is ... [or] is not functioning in accordance with the application requirements." *Id.* at 7:48-57. The implementation unit receives the feedback and reacts in an "iterative process [that] may require thousands, millions, or more steps to reach a favorable outcome." *Id.* at 7:57-8:12. This machine-

5

controlled, closed-loop iterative process is not mere manual SDLC iteration.

Another mischaracterization: Hexaware asserts that the specification fails to explain "level of abstraction." H. Br. 18. However, immediately following lines cited by Hexaware, the specification explains that "level of abstraction" relates to the phases discussed above, i.e., architecture-level design, HLD, LLD, and application-code-level phases. '106 at 24:60-67, 38:56-65 (partially cited by Hexaware); *see also id.* at 7:31-48 (not cited).

The specification describes the above elements further through various embodiments. For example, "the requirements unit includes the requirements conversion module (converting the customer inputted requirements into … the application requirements), the verification module, and an analysis module." *Id.* at 9:34-41. The "requirements conversion module generates a plurality of [ASSTs] as the application requirements from the inputted requirements and the verification feedback. … The iterative process ends when the application requirements are verified to a desired level of completeness." *Id.* at 9:56-10:4. Using described "verification tools," "[t]he verification module receives the [ASSTs] … to verify that they are consistent with the valid application system states and other correctness criteria." *Id.* at 10:25-11:30. There may be "millions, billions, or more possible [valid] states [of the application system's state space]." *Id.* at 10:5-11.

### B. The Second Family

The second family describes a problem faced by the art: computer "programs that are still used today have evolved over years or even decades," such that they contain "obsolete" programming languages and were updated by different programmers leading to "inconsistencies in … optimization," e.g., "the outdated programming language portion … will remain intact, but will include[] a software compiler and/or software interpreter to process that portion." [1-8] ("'934 [patent]") at 1:56-2:3. That is, prior to the present invention, running such software required "converters" to run old code, "emulators to mimic older computer platforms," "translation" that

6

could be inaccurate (among other issues), and/or "recoding by hand." *Id.* at 5:54-6:6. This was a technological problem in computing technology. Again, this is a disclosure of the problem, not an admission the patents' solutions were already done manually. *Contra* H. Br. 15.

The '934 patent presents technological solutions, including a "legacy software processing system" that, e.g., "eliminate[s] disfavored programming languages, … emulators, … [and] convertors" and "generate[s] new operational code" per current languages and conventions. '934 at 6:7-22. The patent discloses and claims (including "how") a machine-controlled, iterative method to update legacy software written in multiple languages to a desired language, eliminating a need for convertors or emulators, comprising, in part, (i) identifying programming languages and dividing code by language (12:41-13:22), (ii) relational grouping of identifiers (8:10-19, 10:65-11:14, 13:23-15:28), (iii) determining features (with potential iterative testing and feedback) of identifier groups (8:20-52, 11:15-12:40, 15:29-16:57), (iv) identifying (with testing) features as corresponding to emulators/convertors (16:58-61), (v) confirming such correspondence and flagging code sections as including an emulator/convertor (16:61-66), and (vi) reprogramming in a desired language without reprogramming any emulator/convertor (16:66-17:2).

Hexaware's assertion that, in view of the disclosed problem of emulators and convertors, "[t]he specification concludes that the best way to avoid this problem is to just 'avoid it'" without providing "any way" (H. Br. 15) is inaccurate. The specification does not simply "avoid" emulators and convertors but describes a detailed method that eliminates the need for them.

Hexaware's assertion that "meaningfulness" is an "undefined" "mental process[]" (*id.* at 21) is also inaccurate. The specification links meaningfulness to objective testing and iterative adjustment of testing parameters, not human judgment. The feature extraction module tests potential features based on a corresponding feature test suite to produce feedback regarding

meaningfulness, applying a threshold to decide whether to add the potential feature to a feature set or adjust relational aspects or testing parameters and repeat. '934 at 11:26-12:40, 19:26-33 (claim 1). That is an algorithmic evaluation tied to execution/test feedback, not a mental process.

## III. <u>LEGAL STANDARD</u>

### A. <u>Rule 12(b)(6) Standard</u>

In deciding a motion to dismiss, a district court is required to accept as true all factual allegations in the complaint and draw all factual inferences in favor of the plaintiff. *Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations … ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires that the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-unlawfully-harmed-me accusation" must be pleaded; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

The Federal Circuit "appl[ies] [its] own law to the specific question of whether a complaint states a claim of patent infringement on which relief may be granted." *Adnexus Inc. v. Meta Platforms, Inc.*, 160 F.4th 1216, 2025 U.S. App. LEXIS 31911, at *7 (Fed. Cir. 2025) (vacating dismissal). "Specific facts are not necessary; the statement need only 'give the defendant fair notice

of what the … claim is and the ground upon which it rests.'" *Disc Disease Sols. Inc. v. VGH Sols.*, Inc., 888 F.3d 1256, 1260 (Fed. Cir. 2018) (reversing dismissal). "A plaintiff is not required to plead infringement on an element-by-element basis." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352 (Fed. Cir. 2021).

In addressing a situation where much of the operation of an accused instrumentality was confidential and not accessible to the patentee plaintiff, a court explained, "Because Plaintiff is not required at the pleadings stage to have full knowledge of how [the accused instrumentality] works, these well-pleaded allegations drawn from Plaintiff's 'information and belief' are sufficient for Plaintiff's infringement claim to survive a motion to dismiss." *Rally AG v. Apple Inc.*, No. 23-1106, 2024 U.S. Dist. LEXIS 210927, at *30 (D. Del. Nov. 20, 2024) (citing *DermaFocus LLC v. Ulthera, Inc.*, 201 F. Supp. 3d 465, 469 n.7 (D. Del. 2016) ("And, indeed, it may not be possible for a plaintiff to describe its case-in-chief with particularity at the outset of litigation, without access to the accused method, the accused apparatus for reverse engineering, or confidential data such as source code."); *BioMérieux, S.A. v. Hologic, Inc.*, No. 18-21, 2018 U.S. Dist. LEXIS 163996, at *10 (D. Del. Sept. 25, 2018) ("Plaintiffs cannot be charged with knowing, at the time they drafted their Complaint, non-public information they could only obtain after filing suit and obtaining discovery. It was appropriate [at the motion to dismiss stage] for Plaintiffs here to rely on publicly-available information ... .") (alteration in *Rally*)); *see also EZ STAK, LLC v. Dejana Truck & Util. Equip. Co.*, No. 17-8742, 2018 U.S. Dist. LEXIS 98537, at *10 n.1 (N.D. Ill. June 12, 2018) (quoting *Simonian v. Blistex, Inc.*, No. 10-1201, 2010 U.S. Dist. LEXIS 117058, at *8 (N.D. Ill. Nov. 3, 2010) ("[P]leading [based on information and belief] is not categorically improper, especially when information lies uniquely within the control of the defendant.")).

### B. Patent Eligibility Under 35 U.S.C. § 101

"In *Alice [Corp. Pty. Ltd. v. CLS Bank Int'l.*, 573 U.S. 208 (2014)], the [Supreme] Court

9

applied a two-step framework for analyzing whether claims are patent eligible." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1311-12 (Fed. Cir. 2016). The party asserting ineligibility, a form of invalidity, bears the burden of proof by clear and convincing evidence.

### 1. *Alice* Step 1

"First, [the Federal Circuit] determine[s] whether the claim," "considered in [its] entirety," "is 'directed to' a judicial exception, such as an abstract idea." *McRO*, 837 F.3d at 1312. It does so "by ascertaining the 'basic character' of the claimed subject matter" and "must avoid describing the claims at a high level of abstraction, divorced from the claim language itself." *Contour IP Holding v. GoPro, Inc.*, 113 F.4th 1373, 1379 (Fed. Cir. 2024) (citations omitted). It has "reiterated the Supreme Court's caution against 'overgeneralizing claims' …, explaining that characterizing the claims at 'a high level of abstraction' that is 'untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016)); *see Alice*, 573 U.S. at 217 ("At some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." (cleaned up)).

Federal Circuit decisions illustrate the importance of not overgeneralizing in the software context, holding claims eligible at step 1. "'[S]oftware can make patent-eligible improvements to computer technology, and related claims are eligible as long as they are directed to non-abstract improvements to the functionality of a computer or network platform itself.'" *TecSec*, 978 F.3d at 1293; *Enfish*, 822 F.3d at 1339 ("Much of the advancement made in computer technology consists of improvements to software that, by their very nature, may not be defined by particular physical features but rather by logical structures and processes."). In *TecSec*, affirming a denial of a defendant's motion for summary judgment, the court held a software patent eligible, explaining that the defendant "disregard[ed] elements of the claim," thereby "'overgeneraliz[ing] the claim.'"

10

978 F.3d at 1294-95 (citing elements "object-oriented key manager" and "specified uses of a 'label' as well as encryption"). Properly analyzed, the claims "improv[ed] a basic function of a computer data-distribution network, namely, network security." *Id.* at 1296.

In *McRO*, the Federal Circuit reversed judgment on the pleadings for the defendant, holding claims patent eligible under step 1. 837 F.3d at 1316. The claims related to automatically animating lip synchronization and facial expression of animated characters, a task previously performed by an animator manually aided by a computer. *Id.* at 1302-06. The claims employed a computer "to perform a distinct process to automate a task previously performed by humans," thereby "improv[ing] the existing technological process." *Id.* at 1314 (cleaned up). "[T]he automation goes beyond merely 'organizing [existing] information into a new form'" but "uses a combined order of specific rules that renders information into a specific format that is then used and applied to create desired results." *Id.* at 1315.

*SRI Int'l v. Cisco Sys.,* 930 F.3d 1295 (Fed. Cir. 2019),[5] affirmed denial of summary judgment of ineligibility of claims "directed to using a specific technique—using a plurality of network monitors that each analyze specific types of data on the network and integrating reports from the monitors—to solve a technological problem arising in computer networks." 930 F.3d at 1303; *see also Packet Intelligence v. NetScout Sys.*, 965 F.3d 1299, 1309 (Fed. Cir. 2020) ("Like the *SRI* claims, claim 19 purports to meet a challenge unique to computer networks …."; "The ... specifications make clear that the claimed invention presented a technological solution to a technological problem."). The court rejected defendants' argument that the claims were "so general that they encompass steps that people can 'go through in their minds,'" agreeing with patentee "that the human mind is not equipped to detect suspicious activity by using network

---

[5] Mod. on panel reh'g (re § V, attorney fees), 773 F. App'x 620, 1090; reissued at 930 F.3d 1295.

monitors and analyzing network packets as recited in the claims." *SRI*, 930 F.3d at 1304.

In *Contour*, the Federal Circuit reversed summary judgment of ineligibility, instead holding the claims eligible under step 1 as a "technological solution to a technological problem." 113 F.4th at 1380-81. The analyzed claim "recite[d] an improved POV [point-of-view] camera through its combination of claim limitations and requirement that the claimed POV camera processor be configured to record low-and high-quality data streams in parallel, followed by the low-quality data stream's wireless transfer to a remote device." *Id.* at 1379. The Federal Circuit rejected the district court's characterization ("creating and transmitting video (at two different resolutions) and adjusting the video's settings remotely") as "impermissibly high," explaining that "[t]he district court erred in its generalized articulation …, which all but ensured the incorrect conclusion that the claims were drawn to an abstract idea." *Id.* at 1378-80 ("The district court's conclusion … disregards the disclosed technological means for obtaining a technological result.").

Finally, in *Enfish*, the Federal Circuit reversed summary judgment of ineligibility, holding eligible claims directed to "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory." 822 F.3d at 1339. *See also Core Wireless Licensing v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018) (holding eligible claims relating to user interface for small screens); *Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299 (Fed. Cir. 2018) (holding eligible claims relating to virus scanning).

The Federal Circuit has held claims eligible (not merely that a defendant failed to show ineligibility) at the pleadings stage. *McRO*, 837 F.3d at 1302-03; *PowerBlock Holdings, Inc. v. iFit, Inc.*, 146 F.4th 1366, 1373-74 (Fed. Cir. 2025).

## 2. *Alice* Step 2

"If the claims are not directed to an abstract idea [in step 1], the inquiry ends. If the claims are 'directed to' an abstract idea, then the inquiry proceeds to the second step … ." *McRO*, 837

F.3d at 1312. "In step two we consider whether the claims contain an 'inventive concept' sufficient to 'transform the nature of the claim into a patent-eligible application.'" *Id.* (quoting *Alice*, 573 U.S. at 217). "[W]e look to both the claim as a whole and the individual claim elements to determine whether the claims contain 'an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (quoting *Alice*, 573 U.S. at 217-18) (alteration original) (internal quotation marks omitted). "[A]n inventive concept can be found in the ordered combination of claim limitations that transform [an] abstract idea … into a particular, practical application … ." *BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350-52 (Fed. Cir. 2016) (vacating dismissal for claims to "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems").

In *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016), the Federal Circuit reversed a grant of judgment on the pleadings and, assuming arguendo the claims were directed to an abstract idea under step 1, held them eligible under 2. The claim analyzed in the most detail recited a computer program "for processing network accounting information," comprising "receiving" from a first source a first network accounting record, "correlating" that with information from a second source, and "using" the latter information to "enhance" the first record. *Id.* at 1299. The court previously construed "enhance" to require a "distributed architecture." *Id.* at 1300. In holding the claims eligible, the court distinguished *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014), and *Digitech Image Techs. v. Electronics for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014), cited by Hexaware. *Amdocs*, 841 F.3d at 1301. Unlike the claim in *Digitech*, "which was not tied to any

13

particularized structure, broadly preempted related technologies, and merely involved combining data in an ordinary manner without any inventive concept," the *Amdocs* claim "is tied to a specific structure of various components (network devices, … a central database, … and terminals or clients)" and "purposefully arranges the components in a distributed architecture to achieve a technological solution to a technological problem." *Id.* And unlike the claim in *Content Extraction*, "which involved the generic, well-known steps of collecting data, recognizing data, and storing data," the *Amdocs* claim "depends upon a specific enhancing limitation that necessarily incorporates the invention's distributed architecture" providing "'something more' than the performance of 'well-understood, routine, [and] conventional activities.'" *Id.*

While it can be appropriate to hold claims eligible under step 2 at the pleadings stage, *e.g.*, *id.*, if a patentee at least raises plausible allegations that the claims pass step 2, even if not enough for a holding of eligibility, the proper course is to deny the motion to dismiss and allow the case to proceed. *E.g.*, *BASCOM*, 827 F.3d at 1341; *Cellspin*, 927 F.3d at 1316-19.

## IV.   ARGUMENT

### A.   The Claims of the Patents-in-Suit Are Patent Eligible

#### 1.   The Two Claims Analyzed by Hexaware Are Patent Eligible

##### a.   '106 Patent, Claim 1

###### i.   *Alice* Step 1

Claim 1 of the '106 patent is not directed to an "abstract idea." It recites a specific "method for a computing entity to test and provide feedback of an automated process for converting input requirements into application code" ('106 at 44:58-60) permitting automated generation of application code, overcoming deficiencies in prior software-development methods (*id.* at 2:6-14, 2:23-31, 3:29-42), not simply automating such prior methods (H. Br. 14-15). *Supra* § II.A. The claimed method, described in detail in the specification, includes, with detail for each, (i) receiving

14

"application requirements" structured as pre-conditions/actions/post-conditions, (ii) iteratively testing "implementation results" "in a plurality of phases," (iii) generating test cases from the requirements, (iv) converting test cases into a phase-appropriate "level of abstraction" and then into an "appropriate programming language format" (v) stimulating the current implementation result, (vi) comparing observed vs. prescribed behavior, and (vii) generating feedback from that comparison. '106 at claim 1; *supra* § II.A. This claim is eligible under step 1.

The claimed process is not a "quintessential 'do it by computer' abstract idea" (H. Br. 14-16) because it is not the prior process. Humans do not perform the ordered, iterative process described in the claim, where specific modules perform specific actions with specific format requirements, and the specification does not "admit[]" otherwise (*contra* H. Br. 15). *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1370 (Fed. Cir. 2020) (reversing dismissal, holding claims eligible, criticizing district court for "incorrect assumption that the claims are directed to automating known techniques"). To reach the "do it by computer" conclusion, Hexaware contravenes Federal Circuit precedent by overgeneralizing and disregarding elements of the claims. *See, e.g.*, *TecSec*, 978 F.3d at 1294-96; *Contour*, 113 F.4th at 1378-80. Just as the *Contour* claim's object-oriented key manager, label, and encryption dictated eligibility, '106 claim 1's detailed elements described above mandate eligibility. Like with the task automated in *McRO*, 837 F.3d at 1314-15, the claim here employs a computer "to perform a distinct process to automate a task [not process] previously performed by humans," thereby "improv[ing] the existing technological process," "us[ing] a combined order of specific rules that renders information into a specific format that is then used and applied to create desired results." Like with the network-monitoring claims in *SRI*, 930 F.3d at 1304, "the human mind is not equipped to" perform the machine-controlled iterative process claimed here that may take "thousands, millions, or more

steps." '106 at 7:52-8:12. Finally, like the "specific type of data structure" in *Enfish*, 822 F.3d at 1339, '106 claim 1 recites a specific architecture (requirements unit) and specific data formatting/structure (application requirement having a pre-condition, action, and/or post-condition). None of these requirements was part of the "SDLC" discussed by Hexaware, who overgeneralizes the claim, ignoring these requirements. The benefit of the claimed method is not "merely … speed and/or efficiency" (H. Br. 15) but automating a task performed manually that ***could not be automated*** without the new methodology for the task introduced in the claimed method. '106 at 2:6-14, 2:23-31, 3:32-42; *supra* § II.A. In solving the automation problem, the claim is a "technological solution to a technological problem" of computer technology. *See, e.g.*, *Contour*, 113 F.4th at 1380-81; *Packet Intelligence*, 965 F.3d 1309. Thus, like prior cases where claims were found eligible under step 1, so should '106 claim 1.

Hexaware's cases are distinguishable. None relates to generating computer code, a task unique to computing technology. Hexaware's attempted analogy (H. Br. 14) to *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322 (Fed. Cir. 2017), and *Int'l Bus. Machs. Corp. v. Zillow Grp.*, 50 F.4th 1371 (Fed. Cir. 2022) [hereinafter *IBM*], fails. Hexaware states that these cases "already found" "SDLC steps" to be abstract. H. Br. 14. They did not. Putting aside that '106 claim 1 does not recite "SDLC," those cases did not address SDLC. *IBM* involved a method whereby a "user draws a shape on a map to select that area of the map, and the claimed system then filters and displays data limited to that area of the map." 50 F.4th at 1374. *RecogniCorp* involved a "method whereby a user displays images on a first display, assigns image codes to the images through an interface using a mathematical formula, and then reproduces the image based on the codes." *Id.* at 1326. Neither involved "SDLC," let alone any automated application-code generation.

Moreover, each involved mere data manipulation of types performed without computers

that did not improve computing technology and used computers, if at all, as a tool. The *IBM* claims did "not improve any computer function or recite claim limitations specific to a computing environment"; instead, the "patents' purely functional steps … could be done using paper and ink and have long been done by cartographers." 90 F.4th at 1382. The *RecogniCorp* patent "did not claim a software method that improves the functioning of a computer" but instead reflected "standard encoding and decoding, an abstract concept long utilized to transmit information," e.g., "Morse code, ordering food at a fast food restaurant via a numbering system, and Paul Revere's 'one if by land, two if by sea.'" 855 F.3d 3d at 1326-27. In contrast, '106 claim 1 improves computing technology, permitting automated code generation through a novel iterative process involving requirements that shape implementation, tests that are converted and executed, and results that drive feedback that affects further iteration. Claim 1 could not be done, and was not done, without a computer, but instead, in *IBM*'s words, is limited "to a computing environment." Claim 1 is far from mere data manipulation and is distinguishable from *IBM* and *RecogniCorp*.

*Univ. of Fla. Rsch. Found. v. Gen. Elec. Co.* (H. Br. 14-15) involved "integrat[ing] physiologic data from at least one bedside machine." 916 F.3d 1363, 1367 (Fed. Cir. 2019). The patent admitted "data from bedside machines was previously collected, analyzed, manipulated, and displayed manually, and it simply propose[d] doing so with a computer." *Id.* at 1367. As discussed above, no similar admission exists here. *Supra* § II.A. '106 claim 1 is not a "do it on a computer" abstract idea because it recites an inventive technological automated method, where automation of the manual method "highly improbable," '106 at 3:38-42.

*PersonalWeb Techs. v. Google LLC*, 8 4th 1310 (Fed. Cir. 2021), and *People.ai v. Clari Inc.*, No. 22-1364, 2023 U.S. App. LEXIS 8294 (Fed. Cir. Apr. 7, 2023) (H. Br. 14-15), are similarly distinguishable. Both involved technology predating computers and purported solutions

17

not requiring computers. *PersonalWeb*, 8 F.4th at 1318 ("Both the solution … and the problems … have long predated computers."); *People.ai*, 2023 U.S. App. 8294, at *18 ("accomplish[ed] the same ends using the same steps long undertaken by a salesperson or corporate mailroom sorting correspondence"). *People.ai* explains, however, that "[a]utomation of a manual process may not be an abstract idea if the automated process differs from the manual process and provides 'a specific means or method that improves the relevant technology'"—'106 claim 1, which improves computing technology and is meaningless outside such technology, falls here. *See id.* at *23.[6]

### ii.    *Alice* Step 2

Even if claim 1 were directed to an "abstract idea," it contains an "inventive concept" and passes step 2. Like *BASCOM*'s content-filtering, claim 1's "ordered combination of claim limitations" supports eligibility, providing a "technology-based solution" to generate code automatically that "overcomes existing problems with" prior coding methods that precluded automation. *See* 827 F.3d at 1350-52. Claim 1 "is tied to a specific structure of various components … to achieve a technological solution to a technological problem." *See Amdocs*, 841 F.3d at 1301. In allowing the claims, the examiner stated the prior art did not disclose the claimed combination, evidencing it could not be well-understood, routine, or conventional. 12/13/13 Notice of Allowance (Ex. A (attached)) at 3; *see Mayo Collaborative Servs. v. Prometheus Labs.*, 566 U.S. 66, 90 (2012) ("§ 101 patent eligibility … [and] § 102 novelty inquir[ies] might sometimes

---

[6] This focuses on cases Hexaware cites in its argument. In its legal section (H. Br. 12), Hexaware cites *Digitech*, but it is unclear how it supports the cited proposition. Regardless, *Digitech* is distinguishable because it addressed mere organization of information through mathematical correlations. 758 F.3d at 1350-51. Hexaware cites *Elec. Power Grp. v. Alstom S.A*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016), to criticize "[p]rocess steps that are written as verbs." However, *Elec. Power* does not do so, and process steps are necessarily verbs. In any case, '106 claim 1 recites not simply verbs but detailed methodology for each step.

overlap").[7]

Hexaware's argument that the claim elements lack explanation (H. Br. 16-19) is belied by the detailed 66-page specification with 61 figures (and claim elements). *See supra* § II.A. Hexaware's attempt to reduce the elements to their introductory verbs (H. Br. 17-18) ignores the remaining detail in the claim. And Hexaware's characterization of individual elements as "well-understood, routine, and conventional" is attorney speculation, which should not be credited at this stage, where factual disputes must be viewed in Natsoft's favor. Hexaware ignores that "[a]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *See BASCOM*, 827 F.3d at 1350. For example, Hexaware's argument about the "verification tools" (H. Br. 16-17) fails because the tools are used in an inventive way to change the generating of, add, or remove application requirements, such that they "specify a valid subset of the application system state space." '106 at 9:56-10:4, 20:30-53, 21:47-57.

*SnowCast Sols. v. Endurance Speciality Holdings*, No. 15-5305, 2016 U.S. Dist. LEXIS 37559, at *9-15 (N.D. Ill. Mar. 23, 2016) (H. Br. 16), is distinguishable because the claims there were directed to hedging risk, not improvements in computer technology. Moreover, the alleged "iterative" nature of the *SnowCast* claims appears to be a few successive calculations, whereas the iterative method here is an inventive concept involving verification feedback leading to changes to application requirements that may require millions of iterations. Unlike *SnowCast*, this is not merely "employ[ing] a computer 'for its most basic function.'" *See id.* at *14; *SRI*, 930 F.3d at

---

[7] *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008 n.2 (Fed. Cir. 2018) ("On a motion for judgment on the pleadings, however, the court may consider matters of public record. Prosecution histories constitute public records." (cleaned up)); *Corona v. N. Cent. Narcotics Task Force*, No. 24-2306, 2025 U.S. Dist. LEXIS 23313, at *4 (N.D. Ill. Feb. 10, 2025) ("The Seventh Circuit repeatedly has held that courts can take judicial notice of public records which are undisputed, even for motions brought under [Rule 12].").

1304 ("human mind is not equipped to" perform claimed method).

Content Extraction (H. Br. 16) is distinguishable. There, the "claims merely recite the use of … existing scanning and processing technology to recognize and store data [from hardcopy documents] from specific data fields such as amounts, addresses, and dates." 776 F.3d at 1348. Coming from hardcopy documents, the data was not tied to any problem inherent to computing technology, and the claims did not do anything with the information beyond storing it. In contrast, '106 claim 1 lives in the computer world, uses an inventive method to achieve automated code generation, and actually produces a result beyond mere storage of existing data.

Thus, '106 claim 1 is eligible at step 2. At least, Natsoft alleges facts precluding dismissal or should be permitted to amend its complaint to do so. See, e.g., BASCOM, 827 F.3d at 1341; Cellspin, 927 F.3d at 1316-19; Aatrix Software v. Green Shades Software, 882 F.3d 1121, 1125-30 (Fed. Cir. 2018) (reversing denial of leave to amend); Fed. R. Civ. P. 15(a)(2) ("court should freely give leave" to amend).

### b.   '934 Patent, Claim 1

#### i.   *Alice* Step 1

The '934 patent identifies a computer-specific legacy-migration problem, the detrimental existence of emulators and converters in legacy code, that existed only because of how computers work. *Supra* § II.B. The analyzed claim is analogous to claims held eligible in *SRI*. Like the network-monitoring claims in *SRI*, '934 claim 1 "solve[s] a technological problem arising [with] computer[s]" relating to legacy code "by reciting a specific technique for improving" modernization of legacy software, including automatically, identifying, mooting the need for, and eliminating emulators/convertors while generating modernized code. *See* 930 F.3d at 1303-04 (rejecting argument that claims were "simply directed to generic steps required to collect and analyze data"). The *SRI* claims involved deploying a plurality of network monitors, detecting

suspicious network activity, and generating, receiving, and integrating reports thereof. *Id.* at 1303; *see also Finjan*, 879 F.3d at 1303-06 (improvement to computer security, including receiving a downloadable, generating a security profile, and linking the profile to the downloadable before a web server makes the downloadable available). Claim 1 here involves more concrete steps than *SRI* and *Finjan*, e.g., detecting identifiers/potential features, dividing code based on language, determining features correspond to an emulator/convertor, flagging code corresponding to an emulator/convertor so that the emulator/convertor is not reprogrammed, adaptive testing, and integrating feedback, in an iterative fashion, in order to produce reprogrammed operational code automatically. Like in *SRI*, the "human mind is not equipped" to perform the claimed method. *See* 930 F.3d at 1304. Therefore, '934 claim 1 is not directed to an abstract idea and is patent eligible.

While the '934 claim is directed to a different process than '106 claim 1, Hexaware lumped its step-one arguments for the claims, and its arguments again fail. To the extent Hexaware is arguing that '934 claim 1 recites a mere result (*see* H. Br. 15-16), Hexaware is wrong. Like the *Finjan* claims, as explained *supra* § II.B, the claim "recite[s] specific steps … that accomplish the desired result." *See* 879 F.3d at 1305; *see also McRO*, 837 F.3d at 1315. Hexaware's cases are distinguishable from '934 claim 1 for similar reasons as with '106 claim 1. '934 claim 1 is grounded in computing technology and provides an automated technological solution to a problem in computing technology that goes beyond merely automating a preexisting manual process.

### ii. *Alice* Step 2

While '934 claim 1 passes step 1, it also contains an "inventive concept" at step 2 for similar reasons and passes step 2 under *BASCOM* and *Amdocs*. Unlike '934 claim 1, none of Hexaware's cases (H. Br. 20-21) relates to machine-controlled generation of code or other improvements to computer function that are relevant only to computing technology and did not, and could not, have existed beforehand; instead, Hexaware's cases involve computers as a mere

tool. *See, e.g.*, *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1327 (Fed. Cir. 2017) (claimed activity "includes longstanding conduct that existed well before the advent of computers and the Internet"). Hexaware overstates *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016), which addressed the "long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters," not "data" generally, and says nothing about automatically analyzing computer code for emulators/convertors in the process of automatically reprogramming computer code, a problem that did not exist before computers were around long enough for legacy code to exist and its modernization to be a concern.

Unlike Hexaware's cases, the "human mind is not equipped" to perform the method claimed here. *See SRI*, 930 F.3d at 1304. Thus, even putting aside Hexaware's factual mischaracterization about the claimed "meaningfulness" (*supra* § II.B), Hexaware's reliance on *PersonalWeb* is inappropriate because the claim here cannot be performed in the human mind.

Moreover, the examiner's finding the prior art failed to teach at least the full steps beginning "determining" and "testing" belies them being well-understood, routine, or conventional. *See* 2/1/21 Notice of Allowance (Ex. B (attached)) at 7-8; *Mayo*, 566 U.S. at 90.

Hexaware argues that the preamble "execution by a computing device" "is fatal." H. Br. 20. Not so. That the claimed method is executed by a computer does not dictate ineligibility. *TecSec*, 978 F.3d at 1293. Step 2 requires looking at "the claim as a whole and the individual claim elements," not stopping at the preamble. *McRO*, 837 F.3d at 1312. Hexaware makes a similar error when it focuses on the verbs introducing the method steps and, at most, its inaccurate paraphrasing, rather than the steps in full, let the ordered combination of steps. *See* H. Br. 20-21. While Hexaware's factual assertions should be rejected for failing to address the full claim, if considered, at most they raise disputed factual issues of what is a "mental process" or "generic" that cannot be

resolved at this stage; if necessary, Natsoft should be permitted to amend its complaint to allege contrary facts. *See supra* § IV.A.1.a.ii.

## 2. The Remaining Claims Are Patent Eligible

If the Court agrees the claims Hexaware analyzed are eligible or that Hexaware failed to show otherwise, given Hexaware's burden of proof, the same result should apply to the remaining claims. However, even if the Court grants Hexaware's motion as to the analyzed claims, the motion should be denied as to the rest because Hexaware failed to meet its burden to prove representativeness. For example, Hexaware does not even discuss dependent claims. Hexaware is mistaken that the "[c]omplaint itself treats the claims as interchangeable." H. Br. 13. The complaint pleads a separate cause of action for each patent. *Infra* § IV.B. And, by having various features, the accused platforms can infringe distinct claims.

### a. First Family

Hexaware picks portions of the other claims it conclusorily deems ineligible without citing any particular claim, let alone discussing any claim as a whole. H. Br. 22-23. However, even its picked portions support eligibility by contributing to specific claimed technological solutions relating to automated code generation/ modernization:

- The '928 patent claims' "system communication protocol" is not just, as Hexaware deems it (H. Br. 22 n.11), a "result," but includes, per the specification, "a data content protocol," "which may prescribe specific formatting," "and/or communication protocol," each of which is further defined and which may be negotiated by, e.g., the requirements and implantation units ('106 at 6:27-7:7, 9:4-33), addressing the problem of prior methods lacking "standardized implementation … and/or formatting requirements" (*id.* at 3:29-42).

- The '948 patent claims do not just use the "defined term" "ASST" for preexisting conditions and parameters but claim generating the ASSTs from inputted requirements, parameters, and

verification feedback produced through an iterative process, where the ASSTs must be consistent with valid system states and correctness criteria, allowing for automation.

• The '673 patent, which Hexaware does not discuss substantively, claims an iterative tool-selection and code-generation control loop that adjusts tool choice based on testing and feedback.

• The '916 patent claims an objective test threshold to control iteration and drive automatic modification and testing, not what Hexaware calls "human judgment" (H. Br. 22).

• The '046 and '243 patents claim iterative automated multiphase code generation where phases can generate code artifacts based on prior phases and, for the '243 patent, requirements artifacts are automatically generated based on recited factors, including an objective correctness criteria input requirement artifact. That a human may originally input the correctness criteria does not make it any less objective to the automated process using the criteria.

> b.    Second Family

While Hexaware does not discuss dependent claims, those recite additional eligibility-conferring inventive steps, such as "statistical analysis" (*e.g.*, '934 claim 2 (and its dependent claims); '934 at 13:61-14:40, 15:45-57).

## B.    The Complaint Properly Pleads Patent Infringement

Natsoft satisfies the *Iqbal/Twombly* pleading standard. Natsoft set out detailed allegations with respect to the area of technology to which its patents pertain ([6] ("Compl.") ¶¶ 49-53); the accused products, RapidX, Amaze, and Tensai (*id.* ¶¶ 87-152); and the infringed patents (*id.* ¶¶ 40-48, 165-272, Counts I-IX). Fed. R. Civ. P. 8(a)(2) requires the complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Natsoft's infringement allegations are based on publicly available information and Natsoft's knowledge of the software industry and the application modernization services market. Natsoft made factual allegations based on "information and belief" and the publicly available information on Hexaware's website that

24

Hexaware's products, RapidX, Amaze, and Tensai, provide "legacy modernization." *Id.* ¶¶ 94-96. RapidX performs, e.g., "full or semi-automated code refactoring" and "deep code analysis, using reverse engineering to decode undocumented legacy systems." *Id.* ¶¶ 106-21. Amaze "performs two important activities on the desired platform – application assessment and application code transformation." *Id.* ¶¶ 125-40. Tensai is described as an "artificial intelligence-driven unified testing platform." *Id.* ¶¶ 144-47. These allegations, taken as true, fall within the claims of Natsoft's patents and articulate why infringement is plausible. *See Bot M8*, 4 F.4th at 1353.

Plaintiffs are not required at the pleading stage to have full knowledge of how the accused instrumentality works and are allowed to plead infringement allegations on "information and belief." *Rally*, 2024 U.S. Dist. LEXIS 210927, at *30. This Court's Local Patent Rules recognize this and foresee that a patentee will request defendants' confidential information. The Rules provide for Initial Disclosures (LPR 2.1), including an initial document production from the accused infringer (LPR 2.1(b)), and Initial Infringement Contentions only afterward (LPR 2.2). They mandate a party opposing a claim of patent infringement to produce documents showing "the operation and construction of all aspects or elements of each accused … product, device, component, process, method or other instrumentality identified with specificity in the pleadings." LPR 2.1(b)(1). Natsoft identified with specificity RapidX, Amaze, and Tensai. Compl. ¶¶ 87-152. The functionality of the accused products, including schematics, documentation, and source code, is Hexaware's confidential information. *Id.* ¶ 156. The way these products work together is also Hexaware's confidential information. Hexaware refused to provide such information prior to this lawsuit. *Id.* ¶¶ 153-62. Natsoft's level of detail is sufficient. *See Rally*, 2024 U.S. Dist. LEXIS 210927, at *30-31 (stating plaintiff is not required at the pleading stage to have full knowledge of how the "Hide-My-Email" feature works and that pleading on "information and belief" as to

25

plaintiff's understanding of the feature is "sufficient") (citing *DermaFocus* and *BioMérieux*).

Hexaware argues Natsoft did not specify which of the three accused products satisfies the claim elements, analogizing with *Bot M8*'s purported finding that an allegation that one or more "components" infringed "the board limitation" was insufficient. H. Br. 24. But that is *not* why the Federal Circuit held certain pleadings in *Bot M8* insufficient. 4 F.4th at 1353-54. The court found pleadings for the '990 patent insufficient because they did not allege *any* of the components of the accused product satisfied "the mutual authentication requirement." *Id*. at 1354-55. Because Bot M8 failed to allege any component satisfied the claim requirement, the court found Bot M8 had failed to allege that the accused device satisfied all claim requirements and thus the infringement allegations were insufficient. Unlike in *Bot M8*, Natsoft's complaint does allege that the Accused Products satisfy all claim requirements. Natsoft stated that the "Accused Products," identified in its complaint as RapidX, Amaze, and Tensai, are used together and together infringe one or more claims of the asserted patents and provided an exemplary claim for each patent. Compl. ¶¶ 88-90, 165-272. In the public description of RapidX, Amaze, and Tensai, Hexaware itself uses overlapping language for their functionalities causing ambiguity in which product does what, thereby justifying Natsoft's approach to the Accused Products. *Id.* ¶¶ 87-105 (e.g., "Hexaware's Flagship Platforms for Legacy Modernization," *id.* at ¶ 94). Thus, Natsoft alleged infringement of the entirety of the asserted claims, avoiding the Bot M8 problem. Regardless, "[a] plaintiff is not required to plead infringement on an element-by-element basis." *Bot M8*, 4 F.4th at 1352.

### C.   **The Complaint Properly Pleads the Non-Patent Claims**

#### 1.   **Breach of Contract**

None of Hexaware's three arguments for dismissing breach of contract Counts X-XI specifically addresses breach of the NDA, Count X. H. Br. 24-26. For this reason alone, dismissal of Count X should be denied. Regardless, dismissal of Counts X-XI should be denied.

First, Hexaware's argument that the complaint fails to identify Natsoft confidential information used by Hexaware is irrelevant. The complaint alleges Hexaware breached the NDA by "at least reverse engineering, decompiling, and/or disassembling software, hardware, products, or technology disclosed to them by Plaintiffs pursuant to the NDA." Compl. ¶ 277. It alleges Hexaware "breached the [POC] and continues to [do so] at least by using Updraft's tools … for purposes other than those permitted in the agreement, including in the development and use of the Accused Products." *Id.* ¶ 283. These allegations do not depend on confidentiality. Regardless of confidentiality, Hexaware's reverse engineering or unpermitted use breaches the NDA and POC.

Nonetheless, Hexaware's argument that the complaint fails to identify Natsoft's confidential information ignores the many statements to the contrary. The complaint is replete with statements identifying the confidential information, including Natsoft's legacy modernization tools and information, such as training regarding the tools. *E.g.*, *id.* ¶¶ 75-76 ("Plaintiffs provided Defendants with confidential information of Plaintiffs relating to Plaintiffs' tools … The transfer of knowledge included demonstrations of Plaintiffs' proprietary and confidential tools … installation of such tools on servers under Defendants' custody and control … Plaintiffs answering questions about such tools posed by Defendants … The confidential information provided by Plaintiffs to Defendants was and is not generally available to the public."); *see also id.* ¶¶ 82-83. Thus, defeating another Hexaware argument, there can be no conflict between Natsoft's patent infringement and breach of contract allegations. *Contra* H. Br. 2-3, 24.

Hexaware's second argument is also without merit. H. Br. 24-25. Regarding restrictions on use (1) and (2), nothing in the POC suggests that these restrictions do not survive termination. Hexaware's failure to point to support in the POC is telling. *See id.* at 25. Likewise, nothing in the POC states that restrictions (3) and (4) are "directed to the period after termination of the POC."

27

*Id.* The POC does not have a termination date. [6.2] (Ex. 11) ("POC"). And it does not contain any language supporting Hexaware's claim that it expired on September 15, 2022, just because the parties did not enter into the anticipated teaming agreement by that date. *Id.* To the extent Hexaware's assertions evidence ambiguities (which they do not), Hexaware merely raised questions of fact about the intent of the parties, rendering dismissal inappropriate.

Moreover, Hexaware argues Natsoft has not pleaded that Hexaware improperly copied or retained Natsoft's tools. Yet Hexaware states that unpermitted use of the tools "is impossible without concurrent copying or retention of the tools." H. Br. 25. Hexaware is splitting hair. Natsoft alleged impermissible use of Natsoft's tools "on servers under Defendants' custody and control" and "installed in Defendants' Amazon Web Services environment" (not allowed under the POC), not a client's AWS environment. Compl. ¶¶ 75, 82-83, 283, 287. Whether Hexaware installed the tools in its own environment first and kept them there or copied from a client's AWS environment upon completion of a demonstration is immaterial to the allegation that Hexaware impermissibly used Natsoft's tools. And Hexaware's argument that it did not use Natsoft's tools is belied by its public statements. *See, e.g.*, *id.* ¶ 78 ("A March 2024 public report on Hexaware's application modernization services recognized 'Updraft' as a 'partner[]' providing tools relating to Hexaware's application modernization services"); *see also id.* ¶¶ 75-82.

Third, Hexaware argues that the POC distinguishes Natsoft's tools from information about the tools, such as support or instructions, and does not restrict Hexaware's use of Natsoft's information. H. Br. 25-26. Hexaware's distinction is nonsensical—information Natsoft provided is inextricably tied to its tools. Natsoft would not prohibit Hexaware from using its tools while allowing Hexaware to use information about the tools. Regardless, the complaint alleges breach of the POC by Hexaware's unpermitted use of Natsoft's tools themselves, mooting Hexaware's

false distinction. Compl. ¶ 283 (breach "at least by using Updraft's tools … for purposes other than those permitted in the [POC] agreement").

Hexaware provides no support for its argument that Natsoft's permission to install its tools on a third party's network waives the information's confidentiality because it was expected that the information would be shared with the third party. H. Br. 26-28. This argument is contrary to the confidentiality and use provisions of the NDA and POC. In any event, as discussed above, the breach of contract allegations do not depend on whether Natsoft's information is confidential.

### 2. Unjust Enrichment

Hexaware's argument that the complaint fails to allege unjust enrichment ignores the complaint. Hexaware asserts that the unjust act underlying the allegations is its decision not to finalize a joint engagement with Natsoft; Hexaware contends this decision is not unjust. H. Br. 26. Not so. The complaint identifies Hexaware's unjust acts of creating and marketing the Accused Products by impermissibly using Natsoft's proprietary technology and obtaining economic benefits at Natsoft's expense and detriment. Compl. ¶¶ 287-93. Also, it alleges Hexaware has failed to compensate Natsoft for Natsoft's disclosures and labor provided to Hexaware and that Hexaware retains the benefits in violation of fundamental principles of justice, equity, and good conscience. *E.g.*, *id.* ¶¶ 84-85, 287-94. Thus, the complaint sufficiently alleges that the benefits retained by Hexaware are unjust and that the economic benefits Hexaware has received are connected to the detriment Natsoft has suffered. *See Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (noting a sufficiently alleged unjust enrichment claim provides a connection between the benefits (sales revenues) defendant obtained and a detriment to plaintiff). Thus, the complaint sufficiently pleaded unjust enrichment, and Hexaware failed to show otherwise.

### 3. Interference with Prospective Economic Advantage

Hexaware asserts the complaint inadequately pleaded interference with prospective

economic advantage because it (1) does not allege any business expectation with an identified potential customer of Natsoft and (2) alleges that Natsoft had a business expectancy only with "Defendants' customers." H. Br. 26-27. Hexaware provides no legal support for its contention that Natsoft cannot rely on its business expectancy relating to Hexaware's customers, who are third parties. In fact, Hexaware recognizes that a customer to whom the demonstration of Natsoft's tools was made under the POC was a "third-party." *Id.* at 25-26.

*Ali v. Shaw* is inapposite. The parties' relationship in *Ali* put that "case into the category of an employment decision rather than third-party interference." 481 F.3d 942, 946 (7th Cir. 2007). Plaintiff Ali was employed by a board. Defendant Shaw, a member of the board, fired Ali for insubordination. *Id.* at 945. Ali argued Shaw overstepped his privilege to act for the board, thereby interfering with her expected economic advantage from employment. The court disagreed, finding Shaw was not an outsider because he, as a board member, acted within his capacity as Ali's boss in terminating her. *Id.* at 945-46. As such, there were only two parties, not three, in the dispute, employee Ali and employer Shaw. Without a third party, Ali failed to state a claim for third-party interference. *Id.* at 946. In contrast, the complaint alleges Natsoft's reasonable expectation of future business relationships with third parties, Hexaware's customers, and Hexaware's interference with such relationships, along with the other requirements of an action for tortious interference with prospective economic advantage. *E.g.*, Compl. ¶¶ 59-61, 77, 86, 295-30.

## V.   **CONCLUSION**

Hexaware's motion to dismiss should be denied in full. To the extent the Court grants Hexaware's motion in any respect, Natsoft should be permitted to amend its complaint.

Date: January 30, 2026                           Respectfully submitted,

                                                 */s/ Kenneth S. Canfield*
                                                 Max A. Stein

Keith Stolte
**MAXSON MAGO & MACAULAY, LLP**
77 W. Wacker Drive, Suite 4500
Chicago, IL 60601
T: 312-803-0378
mstein@em3law.com
kstolte@em3law.com

Dmitry V. Shelhoff (admitted *pro hac vice*)
Kenneth S. Canfield (admitted *pro hac vice*)
Catharina J. Chin Eng (admitted *pro hac vice*)
**SHELHOFF CANFIELD & CHIN LLC**
30 Chatham Rd. #19
Short Hills, NJ 07078
T: 973-221-4539
dshelhoff@scciplaw.com
kcanfield@scciplaw.com
cchin@scciplaw.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

  I, Kenneth S. Canfield, hereby certify that on January 30, 2026, I caused a true and correct copy of foregoing to be served via e-mail on counsel of record below:

Wilson Elser Moskowitz Edelman & Dicker LLP

Adam Bialek
150 E 42nd Street
New York, NY 10017
adam.bialek@wilsonelser.com

Sarah Fink
90 Merrick Ave, Suite 700
East Meadow, NY 11554
sarah.fink@wilsonelser.com

Brian Myers
1500 K Street, NW, Suite 330
Washington, D.C. 20005
brian.myers@wilsonelser.com

*/s/ Kenneth S. Canfield*
Kenneth S. Canfield
*Attorney for Plaintiffs*
