**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

|  |  |  |
|---|---|---|
| Natsoft Corporation, Updraft, LLC | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cv-11517 |
| | ) | |
| Hexaware Technologies Limited, | ) | Hon. Manish S. Shah |
| Hexaware Technologies, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS HEXAWARE TECHNOLOGIES LIMITED AND HEXAWARE
TECHNOLOGIES, INC.'S REPLY IN FURTHER SUPPORT OF THEIR MOTION TO
DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

Page

I.      Introduction ................................................................................................................... 1

II.     The Claims are Drawn to Non-Patentable Subject Matter.................................................. 2

        A.      The Patents-in-Suit State Problems to be Solved but Do Not State How the
                Problems were Solved with Any Specificity. ......................................................... 2

        B.      The Alleged Invention is "Do it By Computer" and is Therefore Not
                Patentable. ............................................................................................................. 4

        C.      The Specifications' Descriptions of the Alleged Invention Illustrate that it
                is a Mere Automation of a Prior Manual Process, Lacks any Specificity,
                uses Conventional Computing Entities in Their Conventional Manner, and
                is Therefore not Patentable. ................................................................................. 7

                i.      FIRST FAMILY ...................................................................................... 8

                ii.     SECOND FAMILY ................................................................................. 13

III.    The Analyzed Claims are Representative; The Other Claims add Nothing
        Patentable ....................................................................................................................... 16

IV.     The Complaint Fails to Meet the Required Pleading Standard for Patent
        Infringement and for Breach of the NDA. ....................................................................... 17

V.      Plaintiffs Cannot Rewrite the Proof of Concept ("POC") to Suit its Litigation
        Needs and Instead Must Live with the Contract to which it Agreed. ............................... 18

VI.     Conclusion ...................................................................................................................... 20

i

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014) ....................................... 1, 2, 11, 13

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................. 18

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018) ............................................................................... 17

*Bootler, LLC v. Google, LLC*,
    No. 24-cv-3660, 2025 U.S. Dist. LEXIS 172366 (N.D. Ill. Sept. 4, 2025) ............................. 6

*Bot M8 LLC v. Sony Corp. of Am.*,
    4 F.4th 1342 (Fed. Cir. 2021) ................................................................................. 18

*Contra., Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) .............................................................................. 6, 7

*Delta Mining Corp. v. Big Rivers Elec. Corp.*,
    18 F.3d 1398 (7th Cir. 1994) ................................................................................. 18

*Elec. Power Grp., LLC. V. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016) .............................................................................. 14

*Ericsson Inc. v. TCL Comm. Tech. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020) .............................................................................. 16

*Gotv Streaming, LLC v. Netflix, Inc.*,
    No. 2024-1669, 2026 U.S. App. LEXIS 3911 (Fed. Cir. Feb. 9, 2026) .................................. 4

*IBM v. Zillow Grp., Inc.*,
    No. 2022-1861, 2024 U.S. App. LEXIS 546 (Fed. Cir. Jan. 9 2024) ..................................... 8

*IBM. v. Zillow Grp., Inc.*,
    50 F.4th 1371 (Fed. Cir. 2022) ........................................................................... 11, 13

*In re Greenstein*,
    792 F.ed App. 941 (Fed. Cir. 2019) ......................................................................... 12

*In re Rosenberg*,
    813 Fed. Appx. 594 (Fed. Cir. 2020) ....................................................................... 14

*In re TLI Commc'ns LLC Pat. Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) ................................................................................. 2

330936787v.2

*In re Zimmerman*,
  No. 2023-1542, 2024 U.S. App. LEXIS 3034 (Fed. Cir. Feb. 9, 2024) .............................. 5, 6

*Majcrowski v. Norwest Mort*.,
  6 F. Supp 2d. 946 (N.D., Ill 1998) ........................................................................ 18

*Microsoft Corp. v. AT&T Corp*,
  550 U.S. 437 (2007)........................................................................................ 14

*Mobile Acuity Ltd. v. Blippar Ltd*.,
  110 F.4th 1280 (Fed. Cir. 2024) .......................................................................... 16

*People.ai, Inc. v. Clari Inc.*,
  No. 22-1364, 2023 U.S. App. LEXIS 8294, (Fed. Cir. Apr. 7, 2023) ...................................... 3

*PersonalWeb Techs. LLC v. Google LLC*,
  8 F.4th 1310 (Fed. Cir. 2021) ......................................................................... 3, 15

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017)........................................................................... 9

*Ruca Hardware v. Chien*,
  94- 3635, 1995 U.S. Dist. LEXIS 6678 (N.D. Ill. May 16, 1995)......................................... 19

*SAP Am., Inc. v. InvestPic*., LLC,
  898 F.3d 1161 (Fed. Cir. 2018)......................................................................... 15

*SRI Int'l, Inc. v. Cisco Sys*.,
  930 F.3d 1295 (Fed. Cir. 2019).......................................................................... 6, 7

*TecSec, Inc. v. Adobe Inc*.,
  978 F.3d 1278 (Fed. Cir. 2020).......................................................................... 7

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*,
  916 F.3d 1363 (Fed. Cir. 2019).......................................................................... 2, 12

**Statutes**

35 U.S.C. § 101 ........................................................................................... 1, 2, 20

Patent Act § 101 .......................................................................................... 20

Defendants Hexaware Technologies Limited and Hexaware Technologies, Inc. (cumulatively, "Hexaware" or "Defendants") by and through their undersigned counsel provide the following Reply ("Reply") in further support of their brief ("MTD") for their Motion to Dismiss Natsoft Corporation and Updraft LLC's ("Plaintiffs" or "Natsoft") Complaint ("Compl.") and in response to Plaintiff's Opposition Brief ("Opp."). The Complaint asserts infringement of nine U.S. Patents. As explained in the MTD, seven of these patents share a common specification, and are called for purposes of the MTD, the "First Family," or "FF." The remaining two patents share a second common specification, and are called for purposes of the MTD, the "Second Family," or "SF." The Complaint also asserts various business torts. For the reasons set forth in the MTD and herein, Hexaware respectfully asks this Court to dismiss this matter.

## I.     Introduction

The patents-in-suit claim a process for writing software code. The end result of the process is software code. There is nothing more.

The patents-in-suit are directed to unpatentable subject matter under 35 U.S.C. § 101. The patents claim a process for writing software code that is nothing more than the automation of a well-known manual software development lifecycle. Courts have consistently held that automating processes that were previously done manually is not a patentable invention. Under the two-step framework established by *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), the claims fail at step one because they are directed to an abstract idea, namely the computerized implementation of a prior manual process and claim only desired results and functional "black box" language, and they fail at step two because they contain no inventive concept beyond the routine and conventional use of generic computer components. The patent specifications identify "problems" with the prior art—such as manual steps, lack of standardization, and testing errors,

1

but propose only automation as a solution, without any specificity as to how these problems are solved in an inventive manner. Furthermore, the Complaint fails to meet the required pleading standards for patent infringement, breach of contract, and the other asserted claims, as Plaintiffs have pled contrary facts that fail to put Defendants on notice of the specific accusations against them. For these reasons, this Court should grant the MTD.

## II.     The Claims are Drawn to Non-Patentable Subject Matter.

### A.     *The Patents-in-Suit State Problems to be Solved but Do Not State How the Problems were Solved with Any Specificity.*

The Supreme Court instructs that abstract ideas are not patentable under 35 U.S.C. § 101. *Alice* (*passim*). If the claims are "directed to" an abstract idea, then the claims are not eligible for patent. *Id*. The Court described the two-step inquiry regarding eligibility that governs this dispute.

The question of what a patent is "directed to" should be the focus of *Alice* Step One. *See, e.g., In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 611-612 (Fed. Cir. 2016). The "directed to" inquiry may involve looking to the specification to understand "the problem facing the inventor" and, ultimately, what the patent describes as the invention. *See*, *id.* at 612. Here, the FF specification and the Opp. present a list of "problems" with the prior art method of writing software. FF Spec., 1:54-3:42; Opp. at pp. 3-4. The SF specification does the same. Neither the patents nor the Opp., however, adequately describe or claim any patentable solution in this case.

The first problem identified in FF with the prior process is that "the requirements step… is still primarily a manual step…due to the extremely large state space of the system and the lack of automated testing," FF Spec., 2:6-11. The fix for a problem of a manual step is to automate that step. But, automation of a manual process is not patentable. *See, e.g., Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019) (holding ineligible a "quintessential 'do it on a computer' patent" that merely automated prior pen-and-paper methods).

2

To the extent that the alleged invention permits one to automate the requirements step (which Hexaware does not concede), that is not patentable subject matter.

In the same vein, another problem according to the FF specification was that the entire prior process was manual. According to the patents (FF Spec., 3:29- 32.) and the Opp. (p. 3), the prior process was "far from an optimal process and…far from fully automated or near-fully automated." Therefore, "automation of the software development process using the current techniques [was] highly improbable." FF Spec., 3:39-40. Plaintiffs' Opp. claims that Plaintiff achieved the "highly improbable" result. This automation of the entire manual prior process (to the extent that that the prior art process was entirely manual, which is contradicted in the FF specification[1]), is similarly not patentable. *See, e.g., PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1317 (Fed. Cir. 2021) (finding claims that "are clearly focused on the combination of [] abstract-idea processes" and that "string together" the claimed steps by "[a]dding one abstract idea . . . to another," does not render a claim patentable under Section 101).

Yet another problem with the prior process according to the patent was that for the "architecture step," the automation that existed was "prone to manual errors and incompleteness of testing." The fix for this was to create a complete process with no errors. This fix, too, is not a patentable invention. *People.ai, Inc. v. Clari Inc.,* No. 22-1364, 2023 U.S. App. LEXIS 8294, at *19 (Fed. Cir. Apr. 7, 2023) (improved speed, accuracy, and completeness inherent in automating manual workflows does not provide an inventive concept). Further, the specification states that in the purportedly automated process, "errors" are identified by testing, and then addressed via feedback loops and regeneration of code. FF Spec., 23:22-28. The prior manual process also

---

[1] "Current software development techniques include a combination of manual steps and automated steps." FF. Spec. 1:56-57.

included testing for the same purpose of "verifying" that the code works and fixing errors. Id., at 3:22-24.[2] The automation of this process, the purported "fix," is not a patentable invention.

The third problem identified in the FF specification is that the different steps in the software writing process were "autonomous," (*id*. at 3:37) and "lack[ed] a standardized language." *Id*, at 2:29-33.. And, there was "the inconsistency of language[]…used to represent the requirements." *Id*., 2:12-14. The "invention" allegedly solved this problem by stating that the automatic process should include a "system communication protocol." FF. Spec., 6:27-7:8. Creating a standardized communication protocol does appear to be an appropriate fix to the problem of not having standardized communications. However, the FF specification does not provide any specificity about how to create this protocol or what this protocol actually is. The patent states only: "the data content protocol defines data communication formatting for communication between the units… and may further define the communication within the units." *Id*., 6:28-31. The patent further allows the units to "negotiate" the common protocol. *Id*., 6;60-65. Presumably, the patents "intended" that the common protocol would address the purported communication issue. However, the specification gives only amorphous descriptions of how to make and use such a protocol. Without something specific, the "protocol" does not confer patentability. *See, e.g., Gotv Streaming, LLC v. Netflix, Inc*., No. 2024-1669, 2026 U.S. App. LEXIS 3911, at *28. (Fed. Cir. Feb. 9, 2026).

### B. The Alleged Invention is "Do it By Computer" and is Therefore Not Patentable.

Plaintiffs' primary argument is that, because the process is to be done automatically, via computer "units," and because, before these patents, it was (allegedly) "highly improbable" to

---

[2] Hexaware acknowledges that the statement that the purpose of testing is to "fix" errors is phrased in a conclusory manner and that the specification states only "verifying". However, Hexaware's position is that the "fixing" is absolutely necessary for there to have been working computer software prior to any automation of the process and that there is no reason to "verify" if there is not another step to "fix." If the Court believes this is a matter of fact and not of logic, Hexaware requests that the Court take judicial notices of the existence of working software well in advance of the patents' earliest filing dates.

automate the manual process, the patents are not simply "do it by computer" patents that are ineligible. However, crediting this argument would require that <u>all</u> "do it by computer" patents are patent-eligible because, before the patent, the process was only done manually. This is not the law.

Courts differentiate "do it by computer" patents drawn to patentable subject matter from those that are drawn to non-patentable subject matter using a few rules of thumb. The Federal Circuit gave the following guidance shortly before this Reply was filed: "**On one side of the line (requiring a determination favoring the patent challenger at step one)** are claims that simply call for the use of computers and networks as tools to carry out an abstract idea, using their ordinary functions without specific hardware or process advances in those functions—e.g., receiving inputs, storing and retrieving, processing, outputting (including displaying), and transmitting. **On the other side of the line (ending the Alice inquiry, without proceeding to step two)** are claims that call for a <u>concrete asserted improvement</u> in <u>how those functions are carried out</u>, which requires <u>more than result-focused functional language</u> and <u>more than just using those functions in the context of specifically identified content</u>." *Id.*, at *24-25 (emphasis added).

The purported invention here easily falls on the first "side of the line," requiring a determination of invalidity under Section 101. The claims fail on each underlined element on the patentable "side of the line." There is no concrete asserted improvement in how functions are carried out (indeed, there is nothing concrete other than to use computers to do the work). There is only result-focused functional language and use only in the context of writing code, again pointing to the unpatentable side of the line. This is explained in detail in the next Section.

A 2024 Federal Circuit case is instructive on the difference between improving computer technology and using existing computer technology as a tool. *In re Zimmerman*, No. 2023-1542, 2024 U.S. App. LEXIS 3034 (Fed. Cir. Feb. 9, 2024). There, the court said, "While Mr.

5

Zimmerman repeatedly calls his patent a "technological" improvement, the purported improvement he describes deals only with the efficiency of the trade's matching process, which makes the *trader* faster and more efficient, not the computer." *Id*. at \*7 (emphasis in original). Here too. The automation of writing software code may make the *coder* more efficient, but it does not make the computer more efficient. *Contra., Enfish, LLC v. Microsoft Corp*., 822 F.3d 1327, 1337 (Fed. Cir. 2016) ("the plain focus of the claims is on an improvement to computer functionality itself, not on … tasks for which a computer is used in its ordinary way.")

Here, in contrast to *Enfish* and similar to *Zimmerman*, by the very terms of the patent, the patented process uses computers as a tool and does not improve or affect the functioning of computers. The first sentence of the specification reads, "The invention relates generally to computing systems and *more particularly to computing systems implementing software applications*." (emphasis added). This is quintessentially using computers for their conventional purpose of computing, and the "invention" is not patentable. *Bootler, LLC v. Google, LLC,* No. 24-cv-3660, 2025 U.S. Dist. LEXIS 172366, at \*15 (N.D. Ill. Sept. 4, 2025). Additionally, claim 1 of the '106 patent expressly states that the "inventive" process is to use a computer. It begins, "A method for a computing entity to test and provide feedback of an automated process for converting input requirements into application code." This is a non-patentable method of using a computer to compute with a feedback loop.

Another scenario in which "do it by computer" patents are found to be drawn to patentable subject matter is if a claim element is drawn to using a computer in a non-conventional way, as was the case in *SRI Int'l, Inc. v. Cisco Sys*., 930 F.3d 1295 (Fed. Cir. 2019). In that case, the problem that the claims attempted to solve was that the "very interoperability and sophisticated integration of technology that make networks such valuable assets also make them vulnerable to

6

attack." *Id.* at 1303. In *SRI*, "the claims actually prevent the normal, expected operation of a conventional computer network." *Id*. at 1304. The patent solved a computing technology problem by changing the way that a computer worked. In this case, in contrast, the "solution" simply uses a computer and a computer network to do what computers normally do.

Yet another scenario in which "do it by computer" patents are found to be drawn to patentable subject matter is when the claims are drawn to a "specific implementation" of a solution to a computing problem. This was the case in *Enfish,* wherein the patentee had invented a "specific type of data structure designed to improve the way a computer stores and retrieves data in memory." *Enfish*, 822 F.3d at 1339. And, in *TecSec, Inc. v. Adobe Inc*., 978 F.3d 1278, 1295 (Fed. Cir. 2020), the patent used the specific implementation of an "object-oriented key manager," that had been specifically discussed during prosecution of the application and identified as the focus of the invention. There is no such feature claimed or mentioned here.

Because the "invention" here is "do it by computer," it is not patentable.

C. *The Specifications' Descriptions of the Alleged Invention Illustrate that it is a Mere Automation of a Prior Manual Process, Lacks any Specificity, uses Conventional Computing Entities in Their Conventional Manner, and is Therefore not Patentable.*

Plaintiffs accuse Hexaware of oversimplification of the alleged invention, and state that the claimed process is not simply an automatic implementation of the manual software development life cycle ("SDLC") process, as Hexaware asserts: "This machine-controlled, closed-loop iterative process is not mere manual SDLC iteration." Opp., pp. 5-6. An investigation into this "machine-controlled, closed-loop iterative process" is needed to answer the questions: Have Plaintiffs created something new? (NO) Have Plaintiffs simply claimed the idea of automating something manual? (YES) What do the patent specifications tell us about any new process, if anything? (NOTHING)

7

It is appropriate to look to the Opp. as a guide to what Plaintiff believes to be the portions of and quotes from the claims and the specifications that best demonstrate the alleged differences between the manual SDLC and the claimed automated process. These quotes demonstrate that the invention is merely the computer implementation of a well-known manual process, lacking any specificity, and using only conventional computing devices in their routine manner.

  i. FIRST FAMILY

Plaintiff quotes portions of the FF specification that discuss the allegedly differentiating features of the "invention" beginning on page 4 of the Opp., with the paragraph starting, "the 20-page "Detailed Description" describes the patents' technological solutions that provide automation that was "highly improbable" with the prior process." Quotations from the Opp. are repeated here – verbatim – along with Hexaware's explanation of where each asserted feature is present in the prior art manual process (as stated in the FF specification), or otherwise not patentable.

1. The specification "describes a software-development automation system with a "requirements unit," implementation unit," and "testing unit."" Opp., at p. 4.

    a. ***These are functional black boxes***: "software-development automation system" is an unpatentable desired result. *See, e.g., IBM v. Zillow Grp., Inc.*, No. 2022-1861, 2024 U.S. App. LEXIS 546, *12 (Fed. Cir. Jan. 9 2024) (finding claims invalid when "the claim language is entirely result-oriented, specifying what data enters and leaves the proverbial 'black box," but revealing nothing about the inner workings of the box itself.")

2. The system includes a "system communication protocol" including "a data content protocol and/or a communication protocol. The data content protocol defines data communication formatting for communication between the units and may further define the communication

8

within the units." "This addresses the "lack of "standardized implementation…and/or formatting" in the prior process." Opp. at p. 4.

    a. ***This is a desired result***: The provided circular description of the protocol gives no new information or specificity on how to develop the protocol. Without an explanation of how to develop the protocol, this is a mere desired result. Claims that are directed to an abstract end-result as opposed to "a specific means or method" are abstract. *See, e.g., RecogniCorp, LLC v. Nintendo Co.,* 855 F.3d 1322, 1326 (Fed. Cir. 2017).

3. "The requirements unit receives inputted requirements and parameters," each of which are described in detail in the specification and from which the requirements unit generate application requirements." Opp., at p. 5.

    a. ***This was done manually***: The prior art disclosure in the patent states that an "objective" of the requirements step of the manual system is "to develop a list of requirements that identify the needs and/or conditions for the software development project to meet." FF Spec., 1:63-65. Inputting requirements was, thus, part of the manual process. The specification then implicitly states that another function of the requirements step is to generate requirements in computer language: "another issue with automating the generation of requirements is the inconsistency of language, descriptor, diagrams, etc. that are used to represent the requirements." Thus, the generation of the "application requirements" was also part of the manual step.

4. "The application requirements of a specific form, including "one or more application system state transition[s]," or "ASST[s], each including "one or more pre-<u>conditions,</u> one or more <u>actions,</u> and one or more post-<u>conditions.</u>" Opp. at p. 5 (emphasis added)

    a. ***This was done manually***: The prior art manual method generated a list of requirements that "identify the needs and/or <u>conditions</u> for the software development project to meet" and may include "functional requirements" (e.g., what <u>actions</u>, tasks, and/or activities, the system must do)." FF Spec., 1:63-65. Actions and conditions were, thus, always needed to write software code that was to have a defined function.

5. "The requirements unit outputs the application requirements…to the implementation unit and/or to the testing unit…[T]he implementation unit generates application code based on the application requirements and the parameters, and feedback from the testing unit. The implementation unit outputs the application code…[and] may also receive the parameters…[and] tests the application code and provides feedback…to the requirements unit and/or the implementation unit." Opp., at p. 5.

    a. ***This was done manually***: The patent states: "The code generation step of software development includes writing source code." FF. Spec., 2:63-64And, "the code generation step of software development also includes requirements analysis and testing the source code." *Id*, at 3:20-21. The purpose of the testing is "to verify that source code achieves the desired behavior." *Id*., at 3:23-24. The patent is silent as to what happens in the manual software-writing process if the test fails. However, logic dictates that testing is done because there are sometimes things in the code that do not work, and they need to be identified. Logic further dictates that, once errors are identified, the failure information is "fed back" to the entity that does the

10

code generation for testing. If there had been no feedback loop in the manual method, there would have been no working software and no purpose for testing.[3]

6. "This process is iterative and may include "several phases," such as "an architectural level design phase, a high level design (HLD) phase, a low level design (LLD) phase and an application code level phase." Opp., at p. 5.

   a. ***This was done manually. These are conventional computing concepts***. The patent states that the prior art process included a number of "steps;" each corresponds to a "phase." FF 1:58-61. The patents state that architecture was a feature of the manual process. *Id*. at 1:59; 2:15-33. The patents name some architecture types with respect to the manual process. None of the architecture types, either from the manual method or from the alleged "inventive" method are defined – these must be routine and conventional and do not contribute to patentability under *Alice* step 2. *See, e.g., IBM. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022).

7. "To test the developing application code, the testing unit generates test cases (e,g., input stimuli and expected results corresponding to the current level of development of the application code at a level of abstraction corresponding to the level of development of the application code"). Opp., at p. 5.

   a. ***Testing was done manually***. The patent states that "each primary step includes a form of testing" (*i.e.*, testing was at each "level" of development). FF Spec. 1: 61-62. The words "test case" are replaced with the words "Use Case" in the description of the prior art, but these terms are the same: the purpose of Use Case analysis is "to verify that source code achieves the desired behavior." *Id*., at 3:23-24.

---

[3] Please see footnote 3, above.

8. The testing unit "generates feedback indicating that the developing application is…[or] is not functioning in accordance with the application requirements." Opp., at p. 5

    a. ***This was done manually***. See points 5 and 7.

9. The implementation unit receives the feedback and reacts in an "iterative process [that] may require thousands, millions, or more steps to reach a favorable outcome." Opp., at p. 5.

    a. ***This was done manually***. See point 5. Doing something faster and more with computers doesn't make a process patent eligible. *See, e.g., In re Greenstein*, 792 F.ed App. 941, 944-45 (Fed. Cir. 2019) (finding claims in a "do it by computer" patent application patent ineligible even though the "millions of calculations" that were done by an automatic process "cannot feasibly be performed without use of a computer".)

Later in the Opp., beginning on page 14, Plaintiffs provide their explanation of how the law supports their conclusion that the claims are purportedly patentable. The recitation begins with repeating the steps listed above. The Opp. then continues, arguing that the "invention" is not a "quintessential 'do it by computer' abstract idea because it is not the prior process." Opp., at 15. Plaintiff is incorrect – as explained immediately above, none of the individual steps are patentable. The combination of these unpatentable steps is also not patentable. *Univ. of Fla.,* 916 F.3d at 1367.

The Opp. also describes the claimed process as "ordered" and "iterative," and asserts that human do not "perform" the same type of process. Opp. at p. 15. This may be true – humans think like humans, and computers follow their own logic. This same difference, however, between how humans think and how computers compute is present in every patent in which a manual process is automated and therefore cannot be the basis for patentability. Further, there is no "order" element

in the claims and the figures clearly illustrate a process that can proceed along arrows going in many different directions. (*See, e.g.*, FF Spec., Figures 1-8, wherein the output from the "requirements unit" can either go to the "testing unit" or the "implementation unit.") To the extent that there is any order, the patents and claims do not describe it and so it is not possible to differentiate the patented process from the human thought process.

With respect to *Alice* step 2, the Opp. does not provide any item that was allegedly not routine and conventional. *See, e.g., IBM*, 50 F.4th at 1379 (explaining that a patent fails at *Alice* Step 2 if it consists of the use of "well-known, routine and conventional" computer and network components operating according to their ordinary functions). Further, the claims do not provide any specific implementation, but permit any type of computer component for any portion of the process: "Each of the requirements unit, the implementation unit, and the testing unit may be constructed from separate centralized computing entities, from separate distributed computing entities, from a shared computing entity, from a shared distributed computing entity, and/or a combination thereof. As used herein, a computing entity includes one or more processing modules, memory, local and/or wide area network connection capabilities, and other components as may be needed to perform the operations of the requirements unit, the implementation unit, and/or the testing unit." FF Spec., 5:11-21. With no particular implementation and simple recitation of various conventional computer components, these patents fail at *Alice* Step 2 and are not patentable.

### ii.  SECOND FAMILY

According to the Opp., the problem to which the second patent family is addressed is that computer "programs that are still used today have evolved over years or even decades," such that they contain "obsolete" programming languages and were updated by different programmers

13

leading to "inconsistencies in…optimization," e.g., "the outdated programming language portion…will remain intact, but will include[] a software compiler and/or software interpreter to process that portion." Opp. at page 6, *citing* SF Spec., 1:56-2:3. The Opp. continues, "prior to the present invention, running such software required "converters" to run old code, "emulators to mimic older computer platforms," "translation" that could be inaccurate (among other issues), and/or "recoding by hand.""" Opp. at p. 6-7, *citing* SF Spec., 5:54-6:6. This last statement "recoding by hand," is all that is needed to find the alleged invention unpatentable – prior to the "invention," the process of recoding was already done by hand.

Plaintiff states that the claimed "legacy software processing system" "eliminate[s] disfavored programming languages,…emulators,…[and] convertors," and "generate[s] new operational code" per current languages and conventions. Opp. at p. 7, *citing* SF Spec., 6:7-22. The Opp. then lists elements that "compris[e], in part," the process. Each of these steps involve the manipulation of information and is therefore not patent eligible. "Information as such is an intangible," and, therefore, the manipulation of information by, for example, "identifying languages," "grouping identifiers," etc., are intangible and abstract." *Elec. Power Grp., LLC. V. Alstom S.A.,* 830 F.3d 1350, 1353-54 (Fed. Cir. 2016); *see also, In re Rosenberg*, 813 Fed. Appx. 594, 597 (Fed. Cir. 2020) ("claims focused on collecting and analyzing certain information and then reporting the results of that analysis are directed to an abstract idea").

To draw its conclusion that information is not patentable and its manipulation is not patentable, the Federal Circuit in *Elec. Power* cites the Supreme Court in *Microsoft Corp. v. AT&T Corp.*, for the unambiguous statement that software is not patentable. 550 U.S. 437, 451, n.12 (2007). Software is simply information, akin to a blueprint, and its manipulation is not patentable. *Id*. Software alone, the Court said, is "more like notes of music in the head of a composer than "a

roller that causes a player piano to produce sound" to arrive at its conclusion that information is not patentable. *Id*. Similarly, software is not computing technology; it uses computing technology to turn an input into an output.

Additionally, that the manipulation of data in the patents-in-suit is limited to the field of software development does not help the patents. *See SAP Am., Inc. v. InvestPic*., LLC, 898 F.3d 1161, 1168 (Fed. Cir. 2018) ("As many cases make clear, even if a process of collecting and analyzing information is "limited to particular content" or a particular "source," that limitation does not make the collection and analysis other than abstract.")

The process claimed from the SF, as described in the brief is, in essence, the same as organizing books under the Dewey Decimal System.[4] Consider the Dewey Decimal System for a book about tigers. In the first level of categorization, the book is identified as belonging to the "broad class" of "natural sciences and mathematics" (category 500), which is akin to identifying a computer language here. Then the books are separated into "divisions," and the tiger book would go into the "animals" division, (sub-category 590). This is akin to "relational grouping of identifiers" here. The tiger book is then further categorized into the mammal "section" (sub-sub-category 599). This is comparable to determining the common features of identifier groups here. The tiger book is then identified as part of the tiger "sub-section" (sub-sub-sub-category 599.756). (Note that there is no analog for this level of specificity in the patents.) The confirmation and flagging element of the claim here would be similar to removing, for example, magazines from the books with the Dewey Decimal System number 599.756 (except, in the patents, there is no explanation of how emulator/convertor code is different from other code). In the Dewey Decimal System, the desired result is organized books about tigers without magazines. In the patent, the

---

[4] *See, PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (citing with approval the patent challenger's comparison to a librarian assigning "identifiers" to books).

desired result is "reprogramming" without emulators or convertors (the patent does not claim the reprogramed code (unpatentable information), just the step of reprogramming).

The brief also discusses the "meaningfulness" element in the SF by stating that it is determined by applying a "threshold to decide whether to add the potential feature to a feature set or adjust relational aspects or testing parameters and repeat." Opp. at p. 9. This provides no information about the "level" that is "meaningful," other than that it is greater than an undefined "threshold." Further, to determine whether the threshold has been met, a "decision" is made. Neither the brief, nor, more importantly, the specification, explains how the decision is made and based on what information. Of course, humans have been making "decisions" since their beginning, and computers routinely make decisions regarding data, and have since they were invented. *See, e.g., Ericsson Inc. v. TCL Comm. Tech. Holdings Ltd*., 955 F.3d 1317, 1326 (Fed. Cir. 2020) (explaining that a claim to a "decision entity" is not patentable because "it can be performed in the human mind, or by a human using a pen and paper," and is comparable to building guards "allowing certain employees entrance to only certain floors.") Meaningfulness" does not help Plaintiffs here.

The claims in this case are not patentable. Plaintiffs have not identified any element that (1) is not the same as the prior art manual process as described in the patents, done automatically; (2) is specific; or (3) uses computers other than for their routine and conventional purpose.

### III. **The Analyzed Claims are Representative; The Other Claims add Nothing Patentable**.

"Limiting the analysis of a § 101 challenge to representative claims is proper when the claims at issue are substantially similar and linked to the same ineligible concept." *Mobile Acuity Ltd. v. Blippar Ltd*., 110 F.4th 1280, 1290 (Fed. Cir. 2024). This is true at any stage of a patent litigation, including at the motion to dismiss stage. *Id*. at 1290. Once a patent challenger has shown

16

that the claims are substantially similar and linked to the same ineligible concept, the burden shifts the patentee to "present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018).

Here, Hexaware summarized the claims in each of the patents-in-suit and discussed what was purportedly new and different in those patents from the ones that Hexaware chose to be representative. Specifically, Hexaware wrote, "The other members of the First Family "fine-tune" the claimed system, but do not change the fundamental purpose of the system itself." MTD at 21, *citing SnowCast Solutions LLC v. Endurance Specialty Holdings, Ltd.*, No. 15-5305, 2016 U.S. Dist. LEXIS 37559 at *8 (N.D. Ill. Mar. 23, 2016). Hexaware then explained, for each patent, how any additional element did not change the focus of the claims in a way to make them drawn to a different concept from the representative claims. Hexaware then did the same for the SF. Hexaware, thus has made a *prima facie* case that representative treatment is appropriate and that claim 1 of the '106 patent and claim 1 of the '934 patent are representative.

Plaintiffs, in the Opp., did nothing more than repeat Hexaware's argument, and claim that the additional elements are new. Plaintiffs added no meaningful and/or non-performative argument. Plaintiffs have not met the burden of showing that the representative claims are not truly representative, and the Court should so find.

### IV. The Complaint Fails to Meet the Required Pleading Standard for Patent Infringement and for Breach of the NDA.

Due to the shortcomings of the Complaint, as explained in the MTD, Hexaware does not know what product (or "aspect" thereof) is accused of infringing which patent, and what product (or "aspect" thereof) is accused of improperly using allegedly confidential information owned by Plaintiffs. Plaintiffs here pled inconsistent facts: either the Accused Products embody the patents-

in-suit (*i.e.*, they use information that Plaintiffs have purposely made public) or they embody Plaintiffs' confidential information (*i.e.*, they use information that Plaintiffs have purposely held back from the public). Since Plaintiffs have not identified any purported confidential information (Plaintiffs admit as much: "Hexaware's argument that the complaint fails to identify Natsoft confidential information used by Hexaware is irrelevant." Opp. at p. 27), Hexaware (and this Court) can only use their imagination to divine to which product which cause of action applies. This does not meet the required pleading standard, in which the plaintiff must plead a case sufficient to put the defendant on notice of the specific accusations. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 566 and n. 3 (2007). Plaintiffs here have not done that. Plaintiffs, by alleging contradictory facts (not by alleging contradictory theories of law), have "pled themselves out of court." *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1354 (Fed. Cir. 2021).[5]

## V. Plaintiffs Cannot Rewrite the Proof of Concept ("POC") to Suit its Litigation Needs and Instead Must Live with the Contract to which it Agreed.

Plaintiffs oppose Hexaware's MTD arguments regarding the breach of the POC, unfair competition, and interference with prospective economic advantage claims by urging the Court not to "split hair" [sic] but instead rewrite the POC. Opp. at p. 28. However, Plaintiffs must "live with the agreement they signed." *Majcrowski v. Norwest Mort.*, 6 F. Supp 2d.946, 966 (N.D., Ill 1998); *see also, Delta Mining Corp. v. Big Rivers Elec. Corp.*, 18 F.3d 1398, 1401 (7th Cir. 1994) (rejecting a contract interpretation that would "fly in the face of logic.") Plaintiffs make a few arguments that would require a "contravention of the rule of construction directing us to give "effect to all parts and every word in the contract." *Delta Mining*, 18 F.3d at 1403. Specifically, Plaintiffs argue the following:

---

[5] The Opp. states that Hexaware failed to argue the insufficiency of the Complaint with respect to the breach of NDA cause of action. While Hexaware did not use the term NDA in the proper MTD section, the only fair reading of section VI(c)(i)(1) on page 24 of the MTD is that this section concerns the NDA.

a) "Nothing in the POC suggests that restrictions termed "(1) and (2)" do not survive termination." Yet, the POC itself states that it will remain in effect "<u>until</u>" such time both agreed to a "formal teaming agreement." POC. Plaintiffs' proposed understanding of this term would require that restrictions (1) and (2) remain in effect in perpetuity. This is not what the POC says and cannot be the intended meaning. Further, contracts in perpetuity (even assuming arguendo that there is no stated end date in the POC) are routinely found to be indefinite and therefore terminable at will. *See, e.g., Ruca Hardware v. Chien*, 94- 3635, 1995 U.S. Dist. LEXIS 6678, at *21 (N.D. Ill. May 16, 1995). Further, restrictions (3) (to delete tools upon completion of the demonstration); and (4) (not to retain tools after the demonstration project is complete), only apply <u>after</u> the POC expired when the parties finished the demonstration project and failed to enter into a "formal teaming agreement." They are fundamentally different than restrictions (1) and (2).

b) "Whether Hexaware installed the tools in its own environment…is immaterial to the allegation that Hexaware impermissibly used Natsoft's tools." Opp. at 28. However, far from being "immaterial," since there is no allegation that Hexaware installed the tools in its own environment, this fact is conclusive: Hexaware did not have possession of the tools, and therefore cannot have used them other than in the third-party client's environment, which is permitted by (and is the point of) the POC.

c) The "tools" and the "information" mentioned in the POC are one and the same. But, the POC unambiguously identifies the "tools" separately from the "information." Plaintiffs have not, and cannot, defend a reading different from the plain meaning of the POC.

d) With respect to the claim for unjust enrichment, Plaintiff argues that Hexaware understood that Plaintiffs expected further consideration for the services that it provided under the POC.

19

Plaintiff cannot, though, explain why. To the extent that the POC is a binding contract, as Plaintiffs claim (Comp., § 281, it was supported by adequate consideration and nothing further was required from Hexaware. It is not unjust to fail to close an agreement when there is no requirement to close an agreement. The point of a "proof of concept" agreement is to decide whether to further engage in longer agreements, not to bind parties as if they had engaged in longer agreements. Plaintiffs' arguments to the contrary cannot be credited.

e) With respect to interference with prospective economic benefit, Plaintiffs misstate Hexaware's argument from the MTD. The POC agreement did concern a third-party, yet that third-party was Hexaware's client with whom Plaintiff was not permitted, by the terms of the NDA, to work with directly. There was therefore no prospective advantage.

## VI.  Conclusion

Hexaware has shown that the patents-in-suit are not patentable under Section 101 of the Patent Act. Hexaware has also shown that all the claims are inadequately pled and therefore asks the Court to: (a) grant the Motion to Dismiss in its entirety, with prejudice, by holding that (1) the patents-in-suit are invalid under 35 U.S.C. § 101 as directed to unpatentable abstract ideas; (2) Defendants cannot infringe the patents-in-suit because these patents are invalid; (3) the Complaint fails to meet the pleading standard for patent infringement; (4) the Complaint fails to put Defendants on notice of the breach of contract claims lodged against them; (5) Hexaware cannot have been unjustly enriched if the facts in the Complaint are taken as true; and (6) Plaintiff cannot have been deprived of any realistic business expectancy by Hexaware's actions if the facts in the Complaint are taken as true; and (b) grant such other and further relief as the Court deems just and proper.

Dated:  February 27, 2026

Respectfully submitted,

WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP

s/ Sarah Fink
Sarah Fink, Esq. *admitted pro hac vice*

90 Merrick Avenue, Suite 700
East Meadow, NY 11554
T: (516) 620-4637
F: (516) 228-0200
Sarah.Fink@wilsonelser.com

Brian H. Myers, Esq. (ARDC# 6305867)
1500 K Street NW, Suite 330
Washington, DC 20005
T: (202) 626-7695
F: (202) 628-3606
Brian.Myers@wilsonelser.com

*Attorneys for Defendants*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2026, I electronically filed the foregoing pleading with the Clerk of the Court using the ECF system which will send notification of such filing by electronic mail to all ECF participants.

By:  <u>/s/ Brian H. Myers</u>

22