**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATSOFT CORPORATION and UPDRAFT, LLC, | |
| Plaintiffs, | No. 25 CV 11517 |
| v. | Judge Manish S. Shah |
| HEXAWARE TECHNOLOGIES LIMITED and HEXAWARE TECHNOLOGIES, INC., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Natsoft Corporation and Updraft, LLC brought claims against defendants Hexaware Technologies Limited and Hexaware Technologies, Inc. for patent infringement, breach of contract, unjust enrichment, and intentional interference with prospective economic advantage. Defendants move to dismiss all claims, challenging the patent infringement claims on the grounds that the purported invention is ineligible for patent protection. For the reasons discussed below, the motion is granted.

## I.      Legal Standards

To survive a Rule 12(b)(6) motion, the complaint "'generally requires only a plausible short and plain statement of the plaintiff's claim,' showing that the plaintiff is entitled to relief." *AlexSam, Inc. v. Aetna, Inc.*, 119 F.4th 27, 39 (Fed. Cir. 2024) (quoting *Skinner v. Switzer*, 562 U.S. 521, 530 (2011)) (citing Fed. R. Civ. P. 8(a)(2)). In evaluating a complaint's sufficiency, "the court must take the allegations in the

complaint as true and construe them in the light most favorable to [the plaintiff]." *Lesko v. United States*, 166 F.4th 967, 975 (Fed. Cir. 2026).

Patent eligibility is a legal question that may be resolved by reference to the complaint and the patent, without factual development, when the claims amount to no more than an abstract idea without a transformative inventive concept. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166–67 (Fed. Cir. 2018); *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) ("Although the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter, claim construction is not an inviolable prerequisite to a validity determination under § 101."). There can be no infringement without patent eligibility. *See Content Extraction*, 776 F.3d at 1351 (affirming Rule 12(b)(6) dismissal of patent infringement claims on the ground that the asserted patents are invalid as patent-ineligible under § 101).

## II.    Background

Application modernization is the practice of updating older software for newer computing approaches. [6] ¶ 49.[1] This process is sometimes called legacy modernization and includes rewriting old code for modern programming languages. [6] ¶ 49. As developers retire and maintenance becomes costlier, there is increased demand for tools that can extract and document the software's logic and convert the

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the unredacted complaint, [6], as well as the specifications contained in the representative patents, [1-1] and [1-8].

software into a more maintainable code in a more modern language. [6] ¶ 50. Automating this process as much as possible saves time. [6] ¶ 50. Testing is a crucial part of the application development cycle and testing efforts can be costly and tedious. [6] ¶ 52. The North American modernization services market was worth $8.33 billion in 2024. [6] ¶ 53.

Plaintiffs Natsoft and Updraft are affiliates; they work together to sell services, including services relating to automated extraction of software logic (also called business rules) from computer code, automated testing of computer code, and automated modernization of computer code. [6] ¶¶ 6–7. Updraft took about five to six years to develop tools for these services, which are now comarketed by plaintiffs, and spent over $100 million in development costs. [6] ¶ 54.

### A.    The Patents

Between January 2014 and July 2024, the U.S. Patent and Trademark Office issued Updraft nine patents relevant to the instant lawsuit. [6] ¶¶ 40–48. The first seven patents—the '106, '928, '948, '673, '916, '046, and '243 patents—"relate[] generally to computing systems and more particularly to computing systems implementing software applications." *See, e.g.*, [1-1] at 1:26–28.[2] The patents share nearly identical specifications and the parties refer to these seven patents as the First Family. The final two patents—the '934 and '941 patents—"relate[] generally to computer system operations and more particularly to a method and system for updating legacy software." *See, e.g.*, [1-8] at 1:30–32. The two patents also share

---

[2] Citations to the patents use the convention [column]:[row].

nearly identical specifications and the parties refer to these two patents as the Second Family.[3]

As explained in the First Family specification, typical software development is far from optimal and far from fully automated. [1-1] at 3:29–32. "Current software development techniques include a combination of manual steps and automated steps." [1-1] at 1:56–57. The steps generally are: (1) identify the requirements of the project; (2) define the architecture, or structure, of the system—identifying software components and their relationships; (3) design the system (using the architecture to implement the required solution); and (4) generate the source code in one or more programming languages that will produce the functioning software. *See* [1-1] at 1:58–3:28. The requirements step "is still primarily a manual step," [1-1] at 2:7–8, and the architecture step is "still prone to manual errors and incompleteness of testing." [1-1] at 2:28–29.

The patents claim "[a] method for a computing entity to test and provide feedback of an automated process for converting input requirements into application code." [1-1] at 44:58–60. The method receives application requirements and implementation results; tests the results; generates a test case (which includes converting test cases into a level of abstraction and then converting them into an

---

[3] Defendants argue, and I agree, that the '106 patent is representative of the First Family and the '934 patent is representative of the Second Family. [30] at 18. The patents within each family have a shared specification. *See Content Extraction*, F.3d at 1348 (finding representative claim treatment appropriate where all claims are "substantially similar and linked to the same abstract idea"). Though plaintiffs note the differences between the individual patents, [42] at 28–29, no additional elements found in the non-representative patents change the claims such that they relate to a different concept than the representative claims. *See Content Extraction*, 776 F.3d at 1349.

appropriate programming language format); stimulates the implementation result based on the test case; compares observed behavior of the current application system response with that of the test case; and generates feedback based on that comparison. [1-1] at 44:61–45:33.

The Second Family specification explains that as programming languages become obsolete, maintaining documentation becomes challenging. [1-8] at 1:59–66. Updating legacy code "was limited to virtualization, rehosting, translation, and/or recoding by hand." [1-8] at 5:55–56. The patents describe a translation process; the "method for execution by a computer device" analyzes code, ascertains identifiers, determines that certain features correspond to an emulator or converter, tests those features, groups like identifiers, and ultimately reprograms the operation code into the desired programming language. [1-8] at 19:45–20:35.

### B. The Contracts

Defendants Hexaware Technologies Limited and Hexaware Technologies, Inc. (Hexaware) also provide application modernization services. [6] ¶¶ 87–88. Hexaware promotes its products (Amaze, RapidX, and Tensai) as using generative artificial intelligence to enrich automation and reduce time to market. [6] ¶ 89.

Plaintiffs allege that they entered a confidential relationship with defendants whereby defendants would provide modernization services to their clients using plaintiffs' tools. [6] ¶ 59. Plaintiffs performed several proof-of-concepts for defendants and expected an economic benefit from the parties' relationship. [6] ¶¶ 60–61. The parties entered into a non-disclosure agreement, which prohibited the recipient of

confidential information from reverse engineering any software. [6] ¶¶ 62–71. The parties also entered into a proof-of-concept agreement, which prohibited defendants from copying plaintiffs' tools without consent. [6] ¶¶ 72–77. Plaintiffs allege, on information and belief, that defendants used their confidential information and have gained a competitive advantage as a result. [6] ¶¶ 82–86.

Plaintiffs now bring patent-infringement claims for all nine patents, as well as state-law claims for breach of contract, unjust enrichment, and intentional interference with prospective economic advantage. [6] ¶¶ 165–301. Plaintiffs bring these state-law claims under the court's supplemental jurisdiction. [6] ¶ 35.[4]

## III.   Analysis

### A.     Patent Eligibility

The Patent Act defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. But "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). To assess patent eligibility, courts apply a two-step framework. *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1314 (Fed. Cir. 2021). First, courts "determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Id.* (quoting *Alice*, 573 U.S. at 218). Second, courts

---

[4] Plaintiff Natsoft is a Delaware corporation with its principal place of business in New Jersey. [6] ¶ 4. Defendant Hexaware Technologies, Inc. is a New Jersey corporation with its principal place of business in New Jersey. [6] ¶ 11. The citizenship of plaintiff Updraft LLC and defendant Hexaware Technologies Limited is not apparent from the complaint but is ultimately irrelevant because the shared domicile of New Jersey precludes the exercise of diversity jurisdiction.

undertake "a search for an inventive concept"—an element or combination of elements that is sufficient to transform the nature of the claim into a patent-eligible application. *Id.* at 1318 (quoting *Alice*, 573 U.S. at 217). Throughout the inquiry, courts must be careful not to overgeneralize claims in the § 101 analysis. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020).

In cases involving software innovations, the *Alice* inquiry "often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies an abstract idea for which computers are invoked merely as a tool." *TecSec*, 978 F.3d at 1293 (citation omitted). A claim that "automates 'pen and paper methodologies' to conserve human resources and minimize errors is a quintessential 'do it on a computer' patent directed to an abstract idea." *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1382 (Fed. Cir. 2022) (quoting *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019)) (cleaned up); *see also Alice*, 573 U.S. at 223 ("[I]f a patent's recitation of a computer amounts to a mere instruction to 'implement' an abstract idea 'on a computer,' that addition cannot impart patent eligibility.") (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 84 (2012)) (internal citation omitted) (cleaned up); *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) ("[A]fter *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible.").

### 1.  The First Family

Hexaware maintains that the asserted patents are directed to the abstract idea of using a computer to carry out the software development process. [30] at 19–20. Plaintiffs respond that the claimed process is not the "quintessential 'do it by computer' abstract idea" because it is not the prior process. [42] at 20. But whether humans already perform the exact ordered, iterative process described in the claim is not the test. Claims that automate "steps people go through in their minds" are "essentially mental processes within the abstract-idea category." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016). Further, "presenting the results of abstract processes of collecting and analyzing information," without more, is abstract. *Id.*[5] Here, the patents' technological solutions do not do anything more than piece together desired results and automate steps that were previously done manually.

As outlined in the specification, "software development includes four primary steps: requirements, architecture, design, and code generation, each of which includes a combination of manual functions and automated functions." [1-1] at 1:58–61. Because each primary step included multiple manual operations, the prior art was prone to manual errors and incompleteness. The patented claims sought to fix this process through automation. While "claims that call for a concrete asserted improvement in *how* those [ordinary computer] functions are carried out" are not

---

[5] Though the First Family's specification refers to "implementation tools" and "validation tools" on several occasions, these tools are not described in enough detail to conclude that they operate in an unconventional or non-abstract way. *See* [1-1].

directed to an abstract idea, plaintiffs do not (and seemingly cannot) articulate what distinguishes their technique from what the ordinary computer is equipped to achieve. *See GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1064 (Fed. Cir. 1053) (emphasis in original).[6] Despite "the detailed 66-page specification with 61 figures," [42] at 24, plaintiffs' claims boil down to a faster way to implement software development. The method described in the First Family specification lacks the level of detail necessary to transform an abstract idea into a transformative inventive concept.

Plaintiffs cite *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358 (Fed. Cir. 2020), for the proposition that claims directed to automating unknown techniques are not abstract. [42] at 20. Similarly, in *McRO, Inc. v. Bandai Namco Games America, Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), the court found that a claimed process using specific rules to render information into a specific format was not abstract. But without an explanation of how their technique improves upon or is different than the abstract idea of assessment, analysis, and coding as a means of software development, plaintiffs are left merely with a desired result rather than a novel approach sufficient to establish patent eligibility.

The fact that the "automation of the software development process using the current techniques [was] highly improbable," [1-1] at 3:38–42, is further evidence that

---

[6] Indeed, though plaintiffs argue that their patents are not directed to an abstract idea, they fail to articulate exactly what their claims *are* directed to other than the well-trod idea of developing a project by learning its requirements, figuring out what tools are available, using the tools to build the project, and then writing the instructions for a computer to turn the recipe into an application. This is different from both *SRI International v. Cisco Systems*, 930 F.3d 1295 (Fed. Cir. 2019), and *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016), where the claims were directed to articulable techniques.

plaintiffs sought to use computers as a tool to automate steps that could ultimately be done manually. It is not, as plaintiffs argue, resolving "a technological problem in computer technology." [42] at 9. Efficiency gains do not "render an abstract idea less abstract." *PersonalWeb*, 8 F.4th at 1318. The focus of plaintiffs' First Family claims is on independently abstract ideas that use computers as tools. That fails step one of the *Alice* test.

Plaintiffs argue that even if their claim is directed to an abstract idea, it nevertheless contains an inventive concept. [42] at 23–25. Specifically, plaintiffs contend that the claims' "ordered combination of claim limitations" supports eligibility by providing a "technology-based solution" to generate code automatically. [42] at 23.

"[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Plaintiffs argue that their verification tools are used in an inventive way to change the analysis of application requirements. [42] at 24. But unlike *Bascom*, where the plaintiff articulated the specific improvement achieved by their filtering tool, plaintiffs here have not explained *how* their tools achieve results different than those achieved through more conventional "pen and paper" methods, other than performing a faster analysis.

Moreover, that they "specify a valid subset of the application system state space" is a result-oriented conclusory statement. [42] at 24. Where "the claim language is entirely result-oriented, specifying what data enters and leaves the

10

proverbial 'black box,' but revealing nothing about the inner workings of the box itself," the claim is abstract. *Int'l Bus. Machs. Corp. v. Zillow Grp., Inc.*, 2024 WL 89642, at \*5 (Fed. Cir. Jan. 9, 2024).

Here, plaintiffs have not established that their "verification tools" (or verification feedback) is an inventive concept. While other modules adjust in response to the verification feedback, this is no different from how "pen and paper" feedback works outside the software context. The claims do not recite any specific implementation of the fundamental practice of selecting the most complete method based on iterative feedback. *See, e.g.*, *Twilio, Inc. v. Telesign Corp.*, 249 F.Supp.3d 1123, 1145 (N.D. Cal. 2017) (finding that selecting the best approach based on feedback is a "fundamental human activity"). And "alleging inventiveness without tying those allegations to the patent is insufficient to survive a Rule 12 motion." *Int'l Bus. Machs. Corp.*, 2024 WL 89642, at \*5.

### 2. *The Second Family*

The Second Family patents run into similar problems. Like the First Family, these claims also seek to address the inefficiencies and inaccuracies of recoding done by hand. [42] at 12–13 (citing [1-8] at 5:54–6:6). The shared specification for the Second Family describes a method for translating legacy code. While plaintiffs detail the claim's "machine-controlled, iterative method to update legacy software written in multiple language languages to a desired result," [42] at 12, the specification itself claims "[a] method for execution by a computing device," [1-8] at 19:45. This is a

quintessential "do it on a computer" patent that renders an idea abstract. *Univ. of Fla. Rsch. Found.*, 916 F.3d at 1367.

Plaintiffs cite *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299 (Fed. Cir. 2018), in support of their argument that the '934 claim recites more than a mere result. [42] at 26. But in *Finjan*, the claims did more than manipulate information—the specific steps recited in the claims were an innovative arrangement that generated a security profile that identified suspicious code and linked it to an executable application program. 879 F.3d at 1305. Here, the "analyzing, by the computing device," "grouping, by the computing device," "testing, by the computing device," and "reprogramming," [1-8] at 19:47–20:34, described in the claimed method are more akin to the lengthy—but insufficient—steps recited in *Electric Power Group*. *See* 830 F.3d at 1351–52. Like in that case, the claims here are drawn using computers as tools to solve a problem; the claims deploy computers to update outdated programming language. Plaintiffs do not (and seemingly cannot) suggest that their claims contain sufficient specificity to go beyond result-focused functional language. *See GoTV*, 166 F.4th at 1068.

With respect to *Alice* step two, plaintiffs argue that the '934 claim contains an inventive concept because it relates to an improvement in computer technology. [42] at 26–27. But as alluded to above, the claims do not call for any new hardware, and the alleged improvement operates entirely within the device's constraints. *See GoTV*, 166 F.4th at 1065–66.

12

Plaintiffs also argue that the claim's ability to produce feedback regarding meaningfulness is inventive in the sense that such a step cannot be performed by the human mind. [42] at 12–13. But the idea of providing feedback to a software processing system is an abstract idea, and plaintiffs have failed to establish that their patent accomplishes this abstract idea through any more than a conventional technique. Meaningfulness is not defined in the specification and the claim does not define the threshold that must be met for the program to adjust. *See, e.g.*, [1-8] at 20:17–31. Attributing meaning and adjusting behaviors, like controlling access to resources, "is exactly the sort of process that 'can be performed in the human mind.'" *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (quoting *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011)). There is no evidence that this method cannot be performed by pen and paper. *See id.*

None of plaintiffs' alleged "improvements to computer functions" constitute "an inventive concept in the non-abstract application realm." *PersonalWeb*, 8 F.4th at 1319 (citation omitted). No matter how much of an advance in the legacy coding field these claims recite, the advance lies entirely in the realm of abstract ideas, with no plausibly alleged innovation in the non-abstract application realm. An advance of this nature is ineligible for patent protection.

## B. State-Law Claims

Having found that plaintiffs' asserted claims are not patent-eligible, I need not address the question of whether plaintiffs have adequately alleged patent

13

infringement. Further, with all federal claims dismissed from the case, there is a rebuttable presumption that the court decline jurisdiction over the supplemental state-law claims. *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012). Therefore, I decline to exercise supplemental jurisdiction over the remaining claims and they are dismissed without prejudice.

## IV. Conclusion

Defendants' motion to dismiss, [29], is granted. Because patent ineligibility cannot be cured through amendment, the dismissal of plaintiffs' patent infringement claims is with prejudice. Plaintiffs' state-law claims are dismissed without prejudice. Plaintiffs' motion for leave to file a first amended complaint, [57], is denied, because the proposed amended complaint includes futile patent claims. Plaintiffs seek to add a new federal-law claim under the Defend Trade Secrets Act. If plaintiffs want to file an amended complaint limited to a federal trade-secrets claim and supplemental state-law claims they may do so by June 24, 2026; if plaintiffs prefer to have a final appealable judgment now, then if no amended complaint is filed by June 24, 2026, the clerk will enter a final judgment.

ENTER:

_____
Manish S. Shah

Date: June 9, 2026               United States District Judge

14